**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF MISSOURI**

| | | |
|---|---|---|
| STEPHANIE GASGA, MILDRED CURREN, TIMOTHY GALLAGHER, KENNETH HEMPHILL, JESSE NEELY and AMBER WYSE,<br><br>on behalf of themselves and all similarly situated individuals,<br><br>Plaintiffs,<br><br>v.<br><br>ANNE PRECYTHE, in her official capacity as Director of the Missouri Department of Corrections; KENNETH JONES, in his official capacity as Chairman of the Missouri Division of Probation and Parole; JENNIFER ZAMKUS, in her official capacity as Vice Chair of the Missouri Board of Probation and Parole; and JIM WELLS, MARTIN RUCKER, ELLIS MCSWAIN, JR., DON RUZICKA, and GARY DUSENBERG, in their official capacities as Members of the Missouri Board of Probation and Parole.<br><br>Defendants. | ) | Case No. ___________________ |

**<u>CLASS ACTION COMPLAINT</u>**

Plaintiffs STEPHANIE GASCA, MILDRED CURREN, TIMOTHY GALLAGHER, KENNENTH HEMPHILL, JESSE NEELY and AMBER WYSE, individually and on behalf of all similarly situated individuals, file this complaint against ANNE PRECYTHE, Director of the Missouri Department of Corrections, KENNETH JONES, Chairman of the Missouri Division of Probation and Parole, and Missouri Parole Board Members JENNIFER ZAMKUS, JIM WELLS, MARTIN RUCKER, ELLIS MCSWAIN, JR., DON RUZICKA, and GARY DUSENBERG, and allege as follows:

## INTRODUCTION

1. This is a civil rights class action complaint filed on behalf of men and women in custody, or under supervision, of the Missouri Department of Corrections ("MDOC"), and who are at risk of imprisonment without adequate due process as a result of unconstitutional practices, procedures, and customs of both the MDOC and its Division of Probation and Parole ("Parole Board") with respect to parole revocation proceedings.

2. The Defendants have developed fundamentally unfair and procedurally flawed parole revocation processes that violate Plaintiffs' rights under the Fourteenth Amendment to the United States Constitution as set forth in *Gagnon v. Scarpelli*, 411 U.S. 778 (1973), *Morrissey v. Brewer*, 408 U.S. 471 (1972), and related cases. This Court should declare such procedures unlawful and enjoin them from being used now and in the future.

3. In blatant disregard of the United States and Missouri Constitutions, the Parole Board consistently detains individuals accused of parole violations and renders findings against them by way of faux-proceedings that have few of the trappings of due process required before an individual can be imprisoned or otherwise deprived of their liberty.

4. Pursuant to policies, practices, and customs of the Parole Board and MDOC, parole officers issue and execute their own parole violation warrants, taking parolees into custody without sufficient cause or independent review, and then re-incarcerate them within the prison system.

5. Thereafter, meaningful probable cause preliminary hearings or final hearings are almost never held. Instead, parolees are denied adequate notice and information about the specific allegations against them and their rights during such proceedings, including the right to counsel.

6. In the end, Parole Board members merely rubber stamp parole violation allegations made by such parole officers, who themselves almost never appear to testify. Proceedings are also

frequently bifurcated as between violation adjudications and dispositions without adequate notice to parolees about this unique process or their rights during such prolonged proceedings.

7. Finally, the Defendants uniformly refuse to provide attorneys to parolees at any point in the parole revocation process. This is true even if a parolee is both indigent and (1) has a colorable claim that he did not commit an alleged violation, (2) has mitigating evidence explaining why revocation is inappropriate and/or (3) would have difficulty advocating for themselves given the complexity of the process or their own mental health, medical, educational, or other challenges.

8. Given these shockingly deficient processes that have been in place for years, parole revocation hearings in Missouri have been and continue to be a sham.

9. The Defendants conduct thousands of these proceedings each year and, in effect, have created a procedural vortex from which people on parole cannot escape and are at continual risk of being rearrested and reentered into the prison system in violation of their rights. As a result of Defendants' policies, procedures, and customs, the Plaintiffs are constantly rotated in and out of the prison system—often as a result of non-criminal technical parole violations, and often based upon unsubstantiated accusations that the parolee committed a new criminal offense.

10. The vast majority of parolees in the State of Missouri need and are entitled to appointed counsel to help them navigate these arcane proceedings. Yet, as a matter of practice, procedure, and custom, the Defendants systematically deny indigent parolees their right to counsel. Indeed, they absolutely fail to consider whether indigent parolees qualify for the appointment of counsel, at cost to the State, and they fail to appoint counsel to those parolees who do qualify, in violation of the Due Process Clause of the Fourteenth Amendment to the United States Constitution.

11. As a result of Defendants' failure to appoint counsel, parolees find themselves without anyone to help ensure adherence with other procedural protections—including the right to

speak on their own behalf, present evidence, and cross-examine adverse witnesses during parole revocation proceedings—to which they are also constitutionally entitled.

## JURISDICTION AND VENUE

12. This action is brought pursuant to 42 U.S.C. § 1983 to redress the deprivation under color of law of the Plaintiffs rights as secured by the Fourteenth Amendment to the United States Constitution.

13. This Court has jurisdiction pursuant to 28 U.S.C. §§ 1331. Venue is proper in this district under 28 U.S.C. § 1391(b) because a substantial part of the events giving rise to the claims asserted in this complaint occurred in this judicial district.

## PARTIES

14. Plaintiff STEPHANIE GASCA is a parolee currently in the custody of MDOC. She was taken into custody by parole officials in June 2017 for allegedly violating the terms of her parole. Her parole revocation proceedings are not yet final. She has a colorable claim that she did not willfully commit the alleged violations, mitigating evidence to justify why he should not be further imprisoned, and needs assistance to meaningfully present evidence. Defendants failed and will continue to fail to ensure that Ms. Gasca is afforded appropriate process and is represented by counsel during parole revocation proceedings. In addition, when ultimately re-released on parole in the days ahead Ms. Gasca will continue to be at risk for arbitrary and capricious processes relating to alleged parole violations.

15. Plaintiff MILDRED CURREN is a parolee currently in the custody of MDOC. She was taken into custody by parole officials in April 2017 for allegedly violating the terms of her parole. Her parole revocation proceedings are not yet final. She has a colorable claim that she did not willfully commit the alleged violations, mitigating evidence to justify why he should not be

further imprisoned, and needs assistance to meaningfully present evidence. Defendants failed and will continue to fail to ensure that Ms. Curren is afforded appropriate process and is represented by counsel during parole revocation proceedings. In addition, when ultimately re-released on parole in the days ahead Ms. Curren will continue to be at risk for arbitrary and capricious processes relating to alleged parole violations.

16. Plaintiff TIMOTHY GALLAGHER is a parolee currently in the custody of the MDOC. He was taken into custody by parole officials in November 2015 for allegedly violating the terms of his parole. He continues to have a colorable claim that he did not willfully commit at least some of the alleged violations, mitigating evidence to justify why he should not be further imprisoned, and needs assistance to meaningfully present evidence. He further fears his parole proceedings may have been tainted by misconduct and has been seeking further review. Defendants failed and will continue to fail to ensure that Mr. Gallagher is afforded appropriate process and is represented by counsel during parole revocation proceedings. In addition, when ultimately re-released on parole in the days ahead Mr. Gallagher will continue to be at risk for arbitrary and capricious processes relating to alleged parole violations.

17. Plaintiff KENNENTH HEMPHILL is a parolee who is currently in the custody of the MDOC. He was taken into custody by parole officials in May 2017 for allegedly violating the terms of his parole. His parole revocation proceedings are not yet final. He has a colorable claim that he did not willfully commit the alleged violations, mitigating evidence to justify why he should not be imprisoned, and needs assistance to meaningfully present evidence. Defendants failed to ensure that Mr. Hemphill was represented by counsel during his parole revocation proceedings. In addition, when ultimately re-released on parole in the days ahead Mr. Hemphill will continue to be at risk for arbitrary and capricious processes relating to alleged parole violations.

18. Plaintiff JESSE NEELY is a parolee who is currently in the custody of the MDOC. He was taken into custody by parole officials in January 2017 for allegedly violating the terms of his parole. His parole revocation proceedings are not yet final. Mr. Neely has colorable claims relating to the willful violation of parole, mitigating evidence to justify why he should not be imprisoned, and needs assistance to meaningfully present evidence. Defendants have failed to ensure that Mr. Neely is represented by counsel during his parole revocation proceedings. In addition, when ultimately re-released on parole in the days ahead Mr. Neely will continue to be at risk for arbitrary and capricious processes relating to alleged parole violations.

19. Plaintiff AMBER WYSE is a parolee who is currently in the custody of MDOC. She was taken into custody by parole officials in April 2017 for allegedly violating the terms of her parole. Her parole revocation proceedings are not yet final. Ms. Wyse has colorable claims relating to willfully committing the alleged violations, mitigating evidence to justify why he should not be imprisoned, and needs assistance to meaningfully present evidence. Defendants have failed to ensure that Ms. Wyse is represented by counsel during his parole revocation proceedings. In addition, when ultimately re-released on parole in the days ahead Ms. Wyse will continue to be at risk for arbitrary and capricious processes relating to alleged parole violations.

20. Defendant ANNE PRECYTHE is the Director of the Missouri Department of Corrections ("MDOC"). She is responsible for the operations of MDOC, including adopting, approving and implementing and/or modifying the policies, practices and customs applicable to prisons that MDOC operates throughout the State of Missouri, the Division of Probation and Parole, and the Missouri Board of Probation and Parole (the "Board" or "Parole Board"). The Parole Board is responsible for determining whether a person confined in the Department of Corrections shall be paroled or conditionally released, and for supervising all persons on probation and parole. As part

of that supervision, the Board's staff issue parole violation reports and warrants based on such reports. Individuals facing alleged parole violations are frequently re-imprisoned by MDOC pending resolution of the alleged parole violations. Upon information and belief, Director Precythe is the final policymaker for MDOC, including the Board. She is sued in her official capacity.

21. Defendant KENNETH JONES is the chairman of the Parole Board. In this capacity, he supervises and directs all of the Division's staff and operations as reflected in the organizational chart attached hereto as Exhibit 1.[1] This includes serving overseeing the Parole Board's staff and members in the course of parole revocation proceedings. Chairman Jones is further responsible for developing and implementing the rules, regulations, procedures, standards and customs governing the Parole Board, parole supervision, and revocation processes in the State of Missouri. Upon information and belief, Defendant Jones also personally participates in, leads, or directs parole hearings, and contributes to or makes decisions regarding parole determinations, including for individuals facing possible revocation. He is sued in his official capacity

22. Defendant JIM WELLS is a member of the Parole Board. In that capacity, Defendant Wells personally participates in, leads, or directs parole hearings, and contributes to or makes decisions regarding parole determinations, including for individuals facing parole revocation proceedings. He is sued in his official capacity.

23. Defendant MARTIN RUCKER is a member of the Parole Board. In that capacity, Defendant Rucker personally participates in, leads, or directs parole hearings, and contributes to or makes decisions regarding parole determinations, including for individuals facing parole revocation proceedings. He is sued in his official capacity.

---

[1] This exhibit, and all others attached to this Complaint, is incorporated herein by reference and should be read as facts pled in this case.

24. Defendant ELLIS MCSWAIN, JR., is a member of the Parole Board and the former Chairman of the Board. As Chairman, McSwain was responsible for, among other things, the operations of the Board, including the policies, practices and customs governing the parole hearings for individuals facing parole revocation proceedings. In his current capacity, Defendant McSwain personally participates in, leads, or directs parole hearings, and contributes to or makes decisions regarding parole determinations, including for individuals facing parole revocation proceedings. He is sued in his official capacity.

25. Defendant DON RUZICKA was a member of the Parole Board until his resignation on or about June 12, 2017. In that capacity, Defendant Ruzicka personally participated in, led, or directed parole hearings, and contributed to or made decisions regarding parole determinations, including for individuals facing parole revocation proceedings. As further described below, he was the subject of MDOC internal investigation, has a confirmed history of abusing his position on the Board, and yet—until recently, after Plaintiffs' counsel brought his misconduct to light—he remained on the Board participated in countless proceedings each week. He is sued in his official capacity, with the understanding and expectation that if and when his position on the Board is filled, the new member of the Board will automatically be substituted in as a party pursuant to FED. R. CIV. P. 25(d).

26. Defendant JENNIFER ZAMKUS is the Vice Chair and a member of the Parole Board. Upon information and belief, in her capacity as Vice Chair, Defendant Zamkus is responsible for, among other things, the operations of the Board, including the policies, practices, and customs governing parole hearings for individuals facing parole revocation proceedings, and the Board's funds and expenditures. In her capacity as a member of the Board, Defendant Zamkus personally participates in, leads, or directs parole hearings, and contributes to or makes decisions

regarding parole determinations, including for individuals facing parole revocation proceedings. She is sued in her official capacity.

27. Defendant GARY DUSENBERG is a member of the Parole Board. In that capacity, Defendant Dusenberg personally participates in, leads, or directs parole hearings, and contributes to or makes decisions regarding parole determinations, including for individuals facing parole revocation proceedings. He is sued in his official capacity.

28. At all times relevant to this Complaint, Defendants Precythe, Jones, Wells, Rucker, McSwain, Ruzicka, Zamkus, and Dusenberg (collectively, "Defendants") all acted under color of law.

## CLASS ALLEGATIONS

29. Plaintiffs bring this suit on their own behalf and on behalf of all men and women in the custody, or under supervision, of MDOC, and who are at risk of imprisonment without adequate due process as a result of unconstitutional practices, procedures, and customs of MDOC and its Division of Probation and Parole, including parolees in the custody of the Missouri Department of Corrections who currently or will in the future face parole revocation proceedings.

30. The class is so numerous that joinder of all members is impractical. Clear and accurate statistics about parole violations in Missouri are hard to come by given the arbitrary practices of MDOC and its lack of transparency.

31. However, in 2015 it appears that more than 15,000 persons were under MDOC parole supervision. *See* Exhibit 2 at 8. According to records provided in response to a Sunshine Law request from undersigned counsel, between March 2014 and March 2017, fewer than 250 parole revocation *hearings* were held by MDOC and the Parole Board. *See* Exhibit 3.

32. But in supplementing these materials, MDOC also conceded that many more parole revocation *proceedings* take place than reflected in parole revocation *hearing* statistics. *See* Exhibit 4. This is because the vast majority of individuals facing parole violations are never given any kind of formal hearing, but instead supposedly waive such rights without being provided with access to counsel or knowingly and intelligently assessing the risks involved with such waivers.

33. Indeed, between March 20, 2017 and June 2, 2017 alone, approximately 600 parole revocation *proceedings* occurred in Missouri. *See* Exhibit 4. Using these figures as a base-line, it appears that approximately 3,000 individuals face violation of parole violations each year. *See id.*

34. However, statistics from the United States Department of Justice suggest that in 2015, nearly 7,000 persons on parole in Missouri found themselves re-incarcerated based upon alleged parole violations, new sentences, or other reasons unknown. *See* Exhibit 5 at 24.

35. The class also includes many future members whose names are not known, since new people are released from prison and placed on parole each day and Defendants initiate the parole revocation proceedings many times each week.

36. There are questions of law and fact common to all class members. This includes, but is not limited to, the question of whether the Defendants' policy and practice of systematically denying appointed counsel to parolees under the supervision of the MDOC and failing to inform parolees of such a right violates the United States and Missouri Constitutions.

37. The questions of law and fact common to all class members further includes, but is not limited to, the question of whether the Defendants' parole revocation procedures, under which parolees are denied basic information about the allegations against them, are pressured into waiving hearing and other rights without understanding what these things mean, and are violated without meaningful preliminary or final hearings, all fail to provide parolees with adequate due process.

38. Because the practices and procedures challenged in this Complaint apply with equal force to the named Plaintiffs and the other members of the class, the claims of the named Plaintiffs are typical of the class in general.

39. The named Plaintiffs will fairly and adequately represent the interests of the class. They each possess a strong personal interest in the subject matter of the lawsuit and are represented by experienced local counsel with the MacArthur Justice Center at St. Louis, who are part of an even larger team of civil rights attorneys at MacArthur Justice Center offices across the country. Counsel have the legal knowledge and resources to fairly and adequately represent the interests of all class members in this action.

40. The Defendants have acted or refused to act on grounds generally applicable to the class: their policies, procedures, practices, acts, and omissions have affected all class members. Accordingly, final injunctive and declaratory relief is appropriate to the class as a whole.

## ALLEGATIONS OF FACT

### A. PAROLE REVOCATION IN MISSOURI: THOUSANDS OF PERSONS ARE DEPRIVED OF LIBERTY EACH YEAR WITHOUT DUE PROCESS OR LEGAL REPRESENTATION IN A SYSTEM THAT HAS BEEN CALLED ARBITRARY, "DISTURBING," AND "DISGUSTING"

#### 1. *National Spectacle Marred by Massive Re-Incarceration Rates*

41. According to a Council of State Government's Justice Center Report presented to Governor Eric Greitens' Justice Reinvestment Task Force on July 11, 2017, Missouri's current incarceration rate is the eighth highest in the nation. *See* Exhibit 6 at 3. Although prison incarceration rates have dropped across the country, Missouri is one of only a small handful of states where the incarceration rate has risen. *Id.* Indeed, Missouri has the "fastest-growing female prison population in the United States." *Id.*

42. In addition, in recent years, Missouri's Parole Board has come under intense scrutiny. From the Washington Post to the St. Louis Post Dispatch, investigative journalists have reported that Missouri's parole processes are arbitrary and lack of transparency. *See* Exhibit 7.

43. Most recently Missouri's parole system became a national spectacle when one of its Board Members was forced to resign for literally turning parole proceedings into games for his own enjoyment. That Board Member, Don Ruzicka, and staff working with him, visited irrelevant, ridiculous words and phrases into hearings – such as "platapus" and "armadillo" – to see if inmates might repeat them. *See* Exhibit 8. Ruzicka and the staff kept score to see who could make the most persons – desperate for their liberty – repeat these idiotic phrases. *Id.*

44. Concerns about the competency, professionalism, and reliability of Missouri's parole system based on these and other problems have resulted in legislators and even Governor Eric Greitens calling out Missouri Parole Board abuses as "disgusting" and "disturbing." See Exhibits 9.

45. More conservative assessments, such as from the Council of State Governments, call our parole system "lackluster" at best. *See* Exhibit 6 at 3. Yet a large proportion of prison growth in Missouri stems from readmission based upon alleged parole violations being processed within this system. Indeed, recent estimates suggest that nearly half of Missouri's current prison admissions are attributable to probation or parole violation proceedings. *Id.*

46. Regarding parole specifically, approximately 15,000 people were under supervision in Missouri in 2015. *See* Exhibit 2 at 8. As noted above, conservative estimates provided by MDOC in response to a recent Sunshine Law request by undersigned counsel, suggest that about 3,000 such persons faced parole revocation that year. *See* Exhibit 5. However, statistics from the United States Department of Justice claim that in 2015, nearly 7,000 persons on parole in Missouri found

themselves re-incarcerated based upon alleged parole violations, new sentences, or other reasons unknown. *See* Exhibit 5 at 24. As a result, Missouri was sixth in the nation for parolee returns to prison. *See* Exhibit 5 at 34.

**2. *Failure to Provide Constitutionally-Required Protections***

47. Such alarming re-incarceration rates are in no small part due to Defendants' failure to provide parolees with procedural rights under controlling Supreme Court precedent, as set forth in *Morrissey v. Brewer* 408 U.S. 471, to protect against questionable parole violation claims. Such constitutional protections include but are not limited to:

- The right and opportunity to receive adequate written notice of allegations and accurate information about rights during revocation proceedings;
- The right to a formal preliminary and final hearing on the alleged violations;
- The right and opportunity to present written evidence and witnesses at both the preliminary and final hearing;
- The right and opportunity to confront and cross-examine adverse witnesses at both the preliminary and final hearing; and
- The right to be protected from involuntary waivers that are not knowingly and intelligently entered.

48. Instead, from beginning to end Missouri's parole revocation process is inscrutable and byzantine. First, in many instances parolees are not at all certain of the terms of their parole. As a matter of policy, practice, and custom, inmates are released under a Parole Order that sets forth the general terms of their parole. *See* Exhibit __ (sample Order of Release on Parole provided to undersigned counsel in response to a Missouri Sunshine Law request).

49. But that Order is sometimes in conflict with the Release Decision Form completed by the Parole Board, which may list various special conditions. *See, e.g.*, Exhibit 20 (reflecting competing release conditions for Mr. Gallagher).

50. What is more, local parole officers are empowered to add any additional directives they wish. As a result, parole officers often unilaterally modify these terms with directives that also may be in conflict with original terms or confusing to parolees. *See* Exhibit 10 (noting "I will abide by any directions given me by my Probation and Parole Officer"); *see also* Exhibit 11 (reflecting unilateral directive by Mr. Gallagher's parole officer that he no longer live with his mother, thus rendering him homeless).

51. From there, parolees may find themselves involved in parole revocation proceedings that lack regularity and fail to comply with state and constitutional law. For instance, in some instances, parole revocation proceedings are initiated when an MDOC employees serves a parolee with a copy of a Field Violation Report. *See* Exhibit 11. In other cases, parole officers unilaterally issue a warrant for the parolee's arrest without any prior notice of the allegations or review of warrant request. *See* Exhibit 12 (sample Parole Warrant document provided to undersigned counsel in response to a Missouri Sunshine Law request).

52. One way or another, parolees facing violation proceedings are uniformly taken into custody rather than being permitted to post bail or seek release pending resolution of the allegations. Some parolees, when facing new criminal charges, may be confined at local jails for weeks prior to being removed to the prison system to have their revocation matter resolved. Others are moved near immediately from local jails back to prison, sometimes without ever seeing a parole officer or having a preliminary hearing relating to their alleged violations.

53. Some parolees are informed that a preliminary hearing can be held prior to a final revocation determination. But many do not understand what such a process entails or what their rights are during such a process. The MDOC Parole Revocation Handbook entitled "Rights of Offender to Preliminary and Revocation Hearing," purports to inform parolees of their rights relating to parole revocation proceedings. *See generally* Exhibit 18.

54. However, frequently parolees are not provided with this Handbook, otherwise known as the "Red Book," until after proceedings have taken place. Some parolees my receive the wrong Handbook or none at all. *See, e.g.,* Exhibit 11 (one of Mr. Gallagher's forms notes that no booklet was given, the other claims that he was given a booklet entitled "Right of Alleged Violator" – not "Rights of Offender to Preliminary and Revocation Hearing"). Moreover, as further described below, the information in MDOC's Handbook is confusing and fails to correctly set forth constitutional standards. *See generally* Exhibit 18.

55. The forms provided to parolees to give notice of alleged violations are in many instances dense and incomprehensible. The complex language and confusing design of these forms, as reflected in a sampling of Field Violation Reports in Mr. Gallagher's case that are provided here as representative for the class, far exceed the comprehension of the average parolee. *See, e.g.,* Exhibit 11.

56. Other forms fail to provide parolees with important information about their rights or what to expect at final revocation hearings. For instance, the "Board Decision" memorandum in Plaintiff Timothy Gallagher's case informed him that "revocation proceedings" will be held, but provided no details about what to expect or the right to counsel. *See* Exhibit 16.

57. The Parole Board Inter-Office Communication Memoranda provided in cases of parolees like Plaintiffs Mildred Curren and Amber Wyse are not only confusing, but actually dissuade the women from even asking any questions of parole staff. *See* Exhibit 14.

58. And Notice of Revocation Hearing Forms, like those provided to Plaintiffs Amber Wyse and Timothy Gallgher, contain almost no explanations or detail. Indeed, they include no facts at all to support the findings of the Board. *See* Exhibit 16. For instance, while in both of their cases the Board supposedly determined that they had committed law violations – there is no indication what law was supposedly violated and based upon what conduct. They also provide no information about the next stage of the process where disposition or the length of parole "hit" is determined, or how an appeal might be taken regarding the revocation decision. *See generally id.*

59. Most frequently, sometimes after being provided with incorrect information or being pressured by parole staff who repeatedly return to urge informal resolution, parolees sign waiver forms giving up their rights to preliminary hearings and/or final parole revocation hearings.

60. This waiver process generally happens in just a matter of minutes, while the parolee is in a secure facility, in a small visit space, before a parole officer, without any prior access to a law library, and without access to counsel. It is also accomplished by way of waiver forms, samples of which are attached hereto, that are confusing and lack sufficient information about their implications. *See* Exhibits 13 and 15.

61. All of the above is borne out from data collected from a random sampling of twenty-five Missouri parole revocation cases handled by the Parole Board from December 1, 2016 through February 28, 2017, provided to undersigned counsel in response to a Sunshine Law request. In all twenty-five matters, no preliminary hearing was held, even though formal waivers appear to have been executed in only ten cases. Not a single revocation hearing was held, although final hearing

waivers appear to have been executed in only eight cases. And in each case no witnesses were called and no evidence was presented to substantiate the allegations. *See* Exhibit 3.

62. MDOC records over an extended period of time shed further shocking light on the extensive waiver process employed by Missouri parole officials. In approximately 600 parole revocation proceedings conducted by the Parole Board between March 20, 2017 through June 2, 2017, it appears violation hearings were provided in only six cases. *See* Exhibit 4.

63. Even when preliminary hearings occur, parolees generally are not provided with a meaningful opportunity to present evidence or live witnesses on their behalf. For instance, some hearings are held in jails and security issues prevent witnesses from attending such hearings.

64. Some preliminary hearings are conducted by supervisory parole officers – others are apparently conducted by the very parole officer assigned to the case and who may be the only witness to the underlying technical allegation.

65. Sometimes police or parole reports are admitted as evidence. Sometimes they are not. Parole staff may also consider information that was not presented at the hearing, such as information contained in the parolee's computerized parole file and to which the parolee has no access.

66. When preliminary hearings are conducted they are very brief—sometimes less than five minutes—and they are generally routine affairs during which probable cause is almost always found.

67. Thereafter, parolees proceed to final revocation. How this occurs also appears to fluctuate. Sometimes parolees may be seen by a member of the Parole Board along with other parole staff. Other times they may not. The final revocation hearing is often held only after the

parolee has been imprisoned for weeks or months following a preliminary hearing or preliminary hearing waiver.

68. Final hearing dates frequently change with little notice to the parolee, regardless of whether travel arrangements need to be made for witnesses or evidence. When final revocations hearings do occur, generally they are a retread of what occurs at the preliminary hearing—cursory proceedings during which no witnesses are called and no evidence is presented beyond the written parole violation report. Decisions relating to violation findings are not made at the hearing. Instead, a written decision or Order of Revocation is issued at a later date the Board.

69. In some instances, the written decision – generally a one-page document with few details or reasons for the determination – may note a future release date. *See* Exhibit 17 (Order of Revocation documents for Timothy Gallagher and Amber Wyse). And sometimes, adjudication and disposition of the violation are bifurcated and a parolee may be brought back before one or more Parole Board members for re-release consideration. *Id.*

70. Regardless, the Parole Board almost always ratifies the decision of the hearing officer and keeps parolees imprisoned for a length of time that can vary from a few additional months to years.

71. Counsel are never appointed to represent the parolee at the preliminary or final revocation hearing, regardless of individual circumstances.

72. Many of the above assertions about Missouri parole hearings are also borne out by data provided by MDOC in response to a Sunshine Law request by undersigned counsel. For the approximately 250 parole hearings conducted by the Parole Board between March 2014 and March 2017, revocation resulted in 237 cases. Attorneys were present for only 3 of the 250 cases. *See Exhibit* 3.

**3.** ***Failure to Appoint Counsel to Indigent Parolees***

73. The absolute lack of appointed counsel at parole revocation hearings reflects the Defendants' failure to implement any system whatsoever, by which adult indigent parolees may request and obtain counsel at cost to the State. Rather, as is clear from the MDOC Parole Revocation Handbook supplied to some inmates, the constitutional right to counsel is not even a consideration in revocation proceedings before the Missouri Parole Board. *See* Exhibit 18.

74. Indeed, the Red Book informs parolees that only individuals involved in "Court parole revocation hearings" might have a right to counsel if they are indigent and "the rules of the Court" so provide. *See* Exhibit 18 at 3. The Red Book continues that "if the offender appears to be incapable of representing himself/herself, legal counsel may be provided" in that circumstance too. *Id.* However, as written, the Redbook is misleading and suggests that such a right to counsel only applies to specialized court-based parole proceedings.[2]

75. With regard to proceedings before the Parole Board, the Red Book explains that a parolee may have only one representative of their choice present – "a family member, a friend, an employer or legal counsel." *Id.* Thus, as in all other Missouri parole matters, if somehow the parolee was to find an attorney who would come to the final hearing with them, the attorney would be relegated to the role of a mere witness and not allowed to engage in true legal representation.

76. And, of course, almost no parolees are accompanied by counsel to hearings before the Parole Board because the State categorically denies any request for appointed counsel. There is no system or funds are in place to secure such an appointment. As a result, parolees in the State

[2] Although the Red Book is not at all clear about what kinds of parole revocation cases would involve the courts rather the Parole Board, it may be referring to "long-term treatment program" matters handled under Section 217.362 of the Missouri Revised Statues.

of Missouri are and continue to be subjected to MDOC parole revocation proceedings without the assistance of counsel to which many are constitutionally entitled.

77. The Defendants' policies and practices in this regard directly violate the requirements of due process established in *Gagnon v. Scarpelli*, which held that counsel should be provided in parole revocation cases where, after being informed of his right to request counsel, the parolee makes such a request, "based on a timely and colorable claim (i) that he has not committed the alleged violation of the conditions upon which he is at liberty; or (ii) that, even if the violation is a matter of public record or is uncontested, there are substantial reasons which justified or mitigated the violation and make revocation inappropriate, and that the reasons are complex or otherwise difficult to develop or present." 411 U.S. 778, 790 (1973). The Court further held that, in "passing on a request for the appointment of counsel, the responsible agency also should consider, especially in doubtful cases, whether the probationer [or parolee] appears to be capable of speaking effectively for himself." *Id*. at 790–91.

78. Thus, *Gagnon* affirmed that the right to counsel was "presumptive" in these three categories of cases—where there is a colorable claim the parolee did not commit the violation; where there is substantial evidence in mitigation of the violation, making revocation inappropriate; and where the parolee is incapable of speaking effectively for himself.

79. A significant percentage of indigent parolees in Missouri fall within one or more of the *Gagnon* categories.

80. *First*, many parolees have, at the very least, a colorable claim that they did not commit the alleged parole violation. Parolees frequently are accused of violating parole merely because they have been arrested on suspicion of committing a new criminal offense. Sometimes the arrests themselves are unlawful. More often, these criminal charges are dismissed in a court of

law as unfounded. The Defendants' policies and procedures allow parolees to be violated and re-imprisoned based solely on the fact that the parolee was subject to arrest—regardless of the merits of the case against him.

81. Similarly, a high percentage of parolees are accused of violating parole on the basis of their parole agent's allegations that they committed a non-criminal technical violation, such as failing to check in with their parole officer. However, the evidence supporting these technical violations is often unreliable and open to interpretation. Further, MDOC's parole files and inmate records are frequently filled with errors. *See, e.g.*, Exhibit 20 (showing how parole officials erroneously attributed a pending assault matter to Timothy Gallagher that, in fact, involved an entirely different defendant).

82. Yet, parolees have no access to any of this information, and no way to challenge its reliability. The Parole Board routinely re-imprisons parolees based solely on parole agents' statements that parolees have not complied with the terms of parole.

83. *Second*, even in cases where the alleged violation is uncontested, many parolees have substantial reasons mitigating the violation, which, because of the complexity of developing such evidence, they are incapable of presenting on their own. Parolees are unable to present witnesses who can testify to facts that either justify or mitigate against revocation, or present documentary evidence in their favor.

84. Moreover, parolees have difficulty developing such evidence at the time of their supposed preliminary hearings while they are subject to the strict and inhumane conditions of local jails, such as the St. Louis "Workhouse." And once delivered to MDOC reception centers – sometimes many hours away from where the parolee lived and where alleged violations occurred – organizing and presenting mitigating evidence becomes even more difficult.

85. Technical violations in particular can often be remediated by an adjustment of the parolee's conditions of parole, without full-scale revocation proceedings. Yet, without counsel to aid in the presentation of such mitigation evidence, the hearing officer and Parole Board systematically fail to take it into consideration.

86. *Third*, many parolees are unable to speak on their own behalf or understand the various layers to the parole revocation process. Parolees who are under the supervision of the MDOC have significantly higher levels of cognitive impairment, educational disabilities, illiteracy, and other impairments than are found in the general public, and which make it difficult for such parolees to speak on their own behalf.

87. Indeed, national data suggests that 36% percent of people held behind bars live with mental illness. And MDOC's own data indicates that two-thirds of people on parole in Missouri suffer from drug or alcohol addiction. *See* Exhibit 19 at 106. Unfortunately, both mentally impaired and chemically addicted inmates report that they receive inadequate medical and other supports once they are returned to prison in Missouri to face alleged violations. For these reasons, too, the class members in this case are largely unable to prepare for or effectively defend themselves at their parole hearings without the assistance of counsel.

88. Yet, parolees must defend themselves within this shadowy and complex revocation system without the assistance of counsel, regardless of their limitations or ongoing medical or other challenges and despite the fact that many parolees meet the requirements set forth in *Gagnon*, which entitle them to such assistance.

89. Because the Defendants do not provide parolees with appointed counsel, Plaintiffs are denied a meaningful opportunity to: (1) consider the charges leveled against them; (2) prepare a defense; (2) present evidence, including witnesses, on their own behalf; (3) confront their

accusers; (4) make informed decisions regarding hearing waivers, or (5) appeal or seek reconsideration of revocation decisions.

90. The systematic and on-going violations described in the preceding paragraphs result in the arbitrary imprisonment of thousands of people in Missouri prisons. People are consistently subjected to months of unreviewable incarceration without process or remedy. As a result of the Defendants' practices and procedures, the members of the Plaintiff class have suffered and continue to suffer well-established violations of their right to due process under the Fourteenth Amendment of the U.S. Constitution.

## B. PAROLE REVOCATION PROCEEDINGS FOR INDIVIDUAL NAMED PLAINTIFFS: TYPICAL EXAMPLES OF ARBITRARY AND DISTURBING PRACTICES IN MISSOURI

### 1. *Stephanie Gasca*

91. STEPHANIE GASCA is a 30-year old white woman who suffers from a history of homelessness, substance abuse, and mental health challenges. She was taken into custody by parole officials in June 2017 and held at the Greene County Jail. She was eight months pregnant at the time.

92. Upon information and belief,[3] although she had no new law violations, a parole warrant apparently was issued immediately upon Ms. Gasca's departure from a residential drug

[3] Unfortunately, undersigned counsel was prohibited by prison officials from accessing any of Ms. Gasca's parole documents during our legal visit on August 12, 2017. Although counsel drove two hours anticipating that she could review Ms. Gasca's parole documents in person, such information sharing and document review is prohibited as a matter of policy at WERDCC. Indeed, quite shockingly, a sign in the attorney visit room reads: "Per policy offenders are not allowed to bring anything or take anything from a legal visit. All written correspondence must be done by mail." Thus, Ms. Gasca was prohibited from even bringing her parole materials to our legal meeting, let alone providing them to undersigned counsel for purposes of attaching them as an exhibit to this Complaint.

Undersigned counsel face other challenges in quickly accessing documents relating to the claims alleged in this Complaint. These include the Missouri Parole Board's insistence that its files

treatment program. However, completion of an in-patient drug program was not a specific condition of Ms. Gasca's parole. In addition, she had voluntarily entered the program on her own.

93. Ms. Gasca's parole officer came to visit her at the Greene County Jail after Ms. Gasca had been there for several days without appropriate pre-natal or mental health care. The parole officer indicated she was there to interview Ms. Gasca and had not yet completed her Field Violation Report, which she said would likely include a single #8 technical violation for failing to report to her parole officer.

94. During this conversation, although the parole officer did place a red pamphlet on the table, she never directed Ms. Gasca to read it before answering any questions or signing any documents. Rather, the parole officer, who never mentioned anything about a right to counsel, led Ms. Gasca to believe that it was in her best interest to answer all questions and waive all formal proceedings.

95. As a result of this conversation and her misunderstanding that she might be released on house arrest if she signed a preliminary hearing waiver form, Ms. Gasca did so. Thus, she was surprised to learn thereafter that she was being moved to the Women's Eastern Reception and Diagnostic Correctional Center ("WERDCC").

96. After several weeks at WERDCC, again without access to mental health care and now nearly nine-months pregnant, Ms. Gasca was called from her cell to meet with Institutional Parole Officer (IPO) Richards. During that meeting, which occurred on or about June 29, 2017,

---

are confidential, inmates being unable to securely maintain documents when moved, and problems with and costs of inmate mail. However, all factual assertions on behalf of the named plaintiffs are made in good faith and upon information and belief. In addition, the MDOC and Parole Board documents attached as exhibits hereto, and incorporated by references into the Complaint, serve as representative samples for the class.

Ms. Gasca was presented with her Field Violation Reports for the first time. It described her alleged violation as a #11.5 special conditions allegation – different from what her parole officer had represented during their meeting at the Green County Jail.

97. In addition, Ms. Richards had a Final Hearing Form with her that was already filled out for Ms. Gasca to sign to indicate that she would waive her final hearing.

98. Again, she was not told anything about her right to counsel prior to waiving her final revocation hearing. Rather she was operating on hearsay information in the facility, that led her to believe that if she gave up her right to a preliminary hearing, she would be released home quickly – perhaps in time to have her baby.

99. Unfortunately, that did not occur. Rather, Ms. Gasca gave birth on July 11, 2017 – while still in MDOC custody. Her child is now living with her mother. And Ms. Gasca still awaits a determination from the Parole Board about her alleged violation and her future. She also is in pain, suffers from complications due to her delivery by cesarean section, and lacks sufficient mental health services and care.

100. Ms. Gasca's parole matter is still pending and she continues to have colorable claims that she did not willfully violate conditions of her parole, mitigating evidence to justify why he should not be imprisoned, and needs assistance to meaningfully present evidence. Defendants failed to ensure that Ms. Gasca was represented by counsel during his parole revocation proceedings.

101. In addition, when ultimately re-released on parole in the days ahead Ms. Gasca will continue to be at risk for arbitrary and capricious processes relating to alleged parole violations. This is especially true given his lack of stable housing, difficulty obtaining work, and history of substance use and abuse.

### *2. Mildred Curren*

102. MILDRED CURREN is a 54-year-old African-American woman who was taken into custody by parole officials in April 2017. She believes a parole warrant was issued based upon her alleged failure to report to her parole officer and possible mistaken information about past minor law violations.

103. But Ms. Curren, who has a 10th grade education and suffers from various medical conditions, was struggling with obtaining stable housing and only learned of her parole warrant during the course of a traffic stop.

104. Once in parole custody at the Boone County jail, she was never provided with a preliminary hearing by parole officials. Instead, she was transported to WERDCC to await a final revocation determination.

105. At the prison she was provided with a confusing form that both suggested that she had an upcoming hearing and that a parole decision had already been made in her case. *See* Exhibit 14. Either way, she was told she should not ask any questions of parole officials as they would not be answered. Instead, someone by the name of Mr. Houser would come to see her at some point. *See* Exhibit 14.

106. Apparently, Mr. Houser never came to see Ms. Curren. Instead in June 2017 she found herself in a meeting with IPO Richards. During this time, Ms. Curren was in extreme medical distress and pain due to an apparent blood clot in her leg that required medical attention.

107. But she believes sometime after the meeting with IPO Richards she received a letter from the Board notifying her that she was going to be revoked. Thus, without being provided with a meaningful revocation hearing including legal protections and the right to counsel, Ms. Curren

was apparently found guilty of some alleged violations and awaits a final determination of the outcome of her case.

108. Given the lack of information and assistance provided, as well as ongoing health issues that have impaired her thinking and abilities, Ms. Curren remains confused about her status and rights in these proceedings.

109. She has a colorable claim that she did not commit the alleged violations, mitigating evidence to justify why he should not be further imprisoned, and needs assistance to meaningfully present evidence. Defendants failed and will continue to fail to ensure that Ms. Curren is afforded appropriate process and is represented by counsel during parole revocation proceedings.

110. In addition, when ultimately re-released on parole in the days ahead Ms. Curren will continue to be at risk for arbitrary and capricious processes relating to alleged parole violations. This is particularly true given her vulnerable status as a homeless person and struggles with substance use and abuse.

**3. *Timothy Gallagher***

111. TIMOTHY GALLAGHER is a disabled 54-year-old white man who suffers from Bi-polar Disorder and is currently in the custody of the MDOC. In July 2015, he was arrested on allegations that he stole an item from a store. Thereafter he was released on bond. While out on bond and continuing to report to his parole officer, he was taken into custody in November 2015 for allegedly violating his parole.

112. Initially his parole officer suggested her main concern was some kind of financial disagreement with his mother and discord in the family home more generally – not the July 2015 store theft charge. *See* Exhibit 11. But no charges were ever filed by Mr. Gallagher's mother nor was any kind of court case brought on her behalf. Rather, she actually wrote to inform parole

authorities that the allegations were untrue and that she wanted her son to be released. *See* Exhibit 20.

113. Nevertheless, parole officials apparently proceeded with revocation proceedings against Mr. Gallagher – not for the incident involving his mother, but for the alleged store theft charges and *three* past technical violations.

114. But Mr. Gallagher was acquitted of the store theft charges. In addition, he was never provided with a preliminary hearing on the revocation matter by parole officials, even though such a hearing had been scheduled for November 17, 2015.[4]

115. Rather, Mr. Gallagher was removed from the St. Louis County Justice Center to an MDOC facility pending a final parole revocation determination. Once in the prison system, parole officials pressured Mr. Gallagher until he waived his right to a formal final parole revocation hearing. *See* Exhibit 15.

116. Indeed, after Mr. Gallagher signed a form requesting such a hearing on December 22, 2015, he was urged to abandon his request. The very next day a different parole official pulled Mr. Gallagher from his cell to press him to reconsider his decision, resulting in Mr. Gallagher becoming confused and having his will overborne. He thus signed a second form on December 23, 2015 that waived his right to a final parole revocation hearing. *See* Exhibit 15.

117. Throughout this entire process no one informed Mr. Gallagher that he could be provided with an attorney. Indeed, the Waiver of Revocation Hearing Form that he signed makes no reference at all to the right of representation during such a proceeding. *See* Exhibit 15.

---

[4] Mr. Gallagher's records reflect that he was presented with a Request for or Waiver of Preliminary Hearing form that informed him of a Preliminary Hearing date of November, 17, 2015. His parole officer tried to get Mr. Gallagher to waive that hearing, but he refused to do so. *See* Exhibit 13. Yet, it was never held.

118. Subsequent parole records suggest Mr. Gallagher was both violated based upon the already dismissed theft charge and *seven* supposed technical violations (that is four more violations than those for which he was given notice) – and that the decision of the Board was based upon incorrect information relating to another inmate. In addition, it appeas he has been held more than eighteen months based on what amounts alleged technical violations and may be held for many more months yet. *See* Exhibits 17 and 20.

119. Moreover, after learning that Parole Board Member Don Ruzicka resigned from the Board due to his inappropriate handling of parole hearings, Mr. Gallagher has sought further review of his parole determination. On August 2, 2017, Mr. Gallagher wrote to parole officials seeking to learn if Ruzicka was involved in his revocation as he wishes to appeal if this is the case. However, parole officials refuse to disclose such information or provide further review. *See* Exhibit 20.

120. Mr. Gallagher thus has colorable claims that undermine the alleged violations in his case, mitigating evidence to justify why he should not be further imprisoned, and needs assistance to meaningfully present evidence. He further fears the proceedings against him were tainted by the improprieties of Don Ruzicka and continues to seek review of the matter. Yet, defendants failed and will continue to fail to ensure that Mr. Gallagher is afforded appropriate process and is represented by counsel during parole revocation proceedings.

121. In addition, when ultimately re-released on parole in the days ahead Mr. Gallagher will continue to be at risk for arbitrary and capricious processes relating to alleged parole violations. This is particularly true given Mr. Gallagher's mental health diagnosis and history of substance use and abuse.

### 4. *Kenneth Hemphill*

122. KENNENTH HEMPHILL is a 26-year-old white male parolee who is currently in the custody of the MDOC. He was taken into custody in May 2017 on a parole warrant issued by his parole officer for the technical violations of failing to maintain employment, report to his parole officer, and maintain stable housing.

123. After being taken into MDOC custody in late May 2017, undersigned counsel arranged to visit with him. However, shortly before our scheduled visit, Mr. Hemphill was visited by a parole official at Eastern Reception and Diagnostic Correctional Center ("ERDCC") who interrogated Mr. Hemphill about his alleged technical violations. The official then recommended that Mr. Hemphill waive any further formal processes since Mr. Hemphill supposedly already admitted his wrongdoing to him – which was not quite the case as Mr. Hemphill did not admit that he had engaged in a willful violation. He further suggested it was in Mr. Hemphill's interest to forgo any formal proceedings.

124. During this time, Mr. Hemphill was being forced to sleep at night on a "boat" mat placed in a common hallway at ERDCC due to facility overcrowding and was deprived hot water for showing and hygiene. Thus, during this hurried conversation with the parole official, which occurred without any assistance of counsel or offer to access counsel, and while he lacked sufficient rest, Mr. Hemphill signed whatever document the parole official presented.

125. Mr. Hemphill's April 12, 2017 Field Violation Report indicates that his parole officer planned to work with him informally over the next 90 days to address his alleged technical violations. Yet, the same day he sought a parole warrant. *See* Exhibit 11.

126. The Field Violation Report also confirms that Mr. Hemphill was never given MDOC's Handbook to explain his parole revocation rights. And while Mr. Hemphill does recall

seeing some kind of pamphlet when parole officials came to see him once he was incarcerated on the parole warrant, he believes that was provided to him after he had already signed the forms presented by the parole official.

127. Thus, Mr. Hemphill did not know about the protections to which he was entitled or understand of his rights at the time he signed a hearing waiver, including his right to counsel. He was also led to believe there was no use in having a hearing and he would likely be released more quickly by waiving his rights. Without full appreciation of where he is in the parole revocation process, Mr. Hemphill still awaits a determination relating to allegations that he failed to report to his parole officer as scheduled.

128. He has a colorable claim that he did not commit the alleged violations, mitigating evidence to justify why he should not be imprisoned, and needs assistance to meaningfully present evidence. Defendants failed to ensure that Mr. Hemphill was represented by counsel during his parole revocation proceedings.

129. In addition, when ultimately re-released on parole in the days ahead Mr. Hemphill will continue to be at risk for arbitrary and capricious processes relating to alleged parole violations. This is especially true given his lack of stable housing, difficulty obtaining work, and history of substance use and abuse.

**5. *Jesse Neely***

130. JESSE NEELY is a 33-year-old Black male parolee who is currently in the custody of the MDOC. He was taken into custody based on allegations relating to new criminal charges stemming from his allegedly being found in a vacant building.

131. While he was awaiting trial on his new criminal charges, he was visited at the St. Louis "Justice Center" by his parole officer who provided him with her Field Violation Report and

indicated that she would be recommending revocation – even though the charges against him had not been resolved.

132. He does not recall any preliminary hearing being conducted by the parole officer or being informed of any rights relating to the parole revocation process. Instead she simply drilled him about the facts of his alleged crime in a small visit cell without concern for his representation on the underlying pending case or offering appointed counsel for the parole revocation matter. Thereafter she provided him with a red pamphlet.

133. Days later, when he tried to inquire into posting bail on his new charges he was told he could not because his parole warrant had been fully executed and revocation proceedings had already begun.

134. Several of the original charges against Mr. Neely were dismissed. He was thereafter delivered to ERDCC on or about May 24, 2017. He was subjected to deplorable conditions, including being made to sleep in "boats" in the hallway due to prison overcrowding, lack of blankets or clean clothes, and no hot water for showers.

135. While enduring these conditions, Mr. Neely was visited by a parole official who provided confusing information. Mr. Neely was informed that any parolee readmitted based on a new crime was required to see the Parole Board, but that it was also in his best interest to waive a formal hearing before the Parole Board. As a result, we would be given a general "open date" with the Board in November. Mr. Neely thus signed whatever documents he was asked to sign by the parole official.

136. Mr. Neely remains utterly befuddled about the procedural posture of his parole revocation matter, does not know if he waived his right to a formal hearing, and does not have a

clear sense of what to expect at the November hearing. He further fears he is not being properly credited for the time he is serving,

137. Mr. Neely has colorable claims relating to the alleged violations, mitigating evidence to justify why he should not be imprisoned, and needs assistance to meaningfully present evidence. Defendants have failed to ensure that Mr. Neely is represented by counsel during his parole revocation proceedings.

138. In addition, when ultimately re-released on parole in the days ahead Mr. Neely will continue to be at risk for arbitrary and capricious processes relating to alleged parole violations.

**6. *Amber Wyse***

139. AMBER WYSE is a 31-year-old white woman who is currently in the custody of MDOC. She was arrested in April 2017 following a traffic stop where all car occupants were taken into custody based upon drugs and a weapon found in the vehicle. This incident forms the basis of the parole revocation proceedings against her.

140. While she was incarcerated, parole staff presented her with paperwork she did not fully understand. *See* Exhibit 14. And she signed documents without the assistance or advice of counsel. *See*, Exhibit 15. All charges stemming from her April 2017 arrest have been dropped. Yet Ms. Wyse still awaits a final determination of her parole violation case.

141. Although she does not fully appreciate what it means or what rights she possesses, she has been informed she has an "open date" in November where she will be presented to the Parole Board. *See* Exhibit 17. But she also has a reconsideration appeal pending given that she believes she should not remain in prison because all of the matters against her have been dismissed.

142. Ms. Wyse has colorable claims relating to the alleged violations, mitigating evidence to justify why he should not be imprisoned, and needs assistance to meaningfully present evidence.

Defendants have failed to ensure that Ms. Wyse is represented by counsel during his parole revocation proceedings.

143. In addition, when ultimately re-released on parole in the days ahead Ms. Wyse will continue to be at risk for arbitrary and capricious processes relating to alleged parole violations. She is particularly at risk of future revocation given her history of narcotics involvement.

## LEGAL CLAIMS

### COUNT I

### 42 U.S.C. § 1983 Right to Due Process

144. The Plaintiffs repeat and re-allege the preceding paragraphs as if fully set forth in this Count.

145. Plaintiffs seek injunctive and declaratory relief against all Defendants to prevent the continued violation of the rights of Plaintiffs and the class they represent.

146. As a matter of policy, practice, and custom, the Defendants systematically fail to screen parolees to determine whether they are eligible for counsel, at cost to the State, as required under *Gagnon v. Scarpelli*. They fail to appoint counsel to those parolees who do qualify.

147. The Defendants also fail to ensure that parolees receive adequate notice of the rights to which they are entitled in the parole revocation process. As a result of the Defendants' policies, practices, and customs, parolees are unable to speak on their own behalf, present evidence, and cross-examine adverse witnesses.

148. Consequently, the Defendants are in continuous violation of Plaintiffs' rights and the rights of the members of the class under the Fourteenth Amendment to the United States Constitution.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs and the class they represent respectfully pray that this Court enter judgment in their favor and against the Defendants in the following manner:

1. Enter an Order certifying a class of all adult parolees in the State of Missouri who currently or will in the future face parole revocation proceedings.

2. Adjudge and declare that the policies, practices, and conduct described in this Complaint are in violation of the rights of Plaintiffs and the class they represent under the Fourteenth Amendment of the United States Constitution.

3. Preliminarily and permanently enjoin the Defendants, their agents, employees, and all persons under their control from subjecting Plaintiffs and the class they represent from the unlawful policies, practices, and conduct described in this Complaint.

4. Retain jurisdiction of this case until such time as the Defendants have fully complied with all orders of the Court, and there is reasonable assurance that the Defendants will continue to comply in the future with these orders.

5. Award Plaintiffs reasonable attorneys' fees, costs, and expenses pursuant to 42 U.S.C. § 1988.

6. Award Plaintiffs and the class they represent such other and further relief as the Court deems just and proper.

Respectfully submitted,

**/s/ *Mae C. Quinn***
Mae C. Quinn, MO61584

**/s/ *Amy E. Breihan***
Amy E. Breihan, MO65499

RODERICK AND SOLANGE MACARTHUR
JUSTICE CENTER AT ST. LOUIS
3115 South Grand Blvd., Suite 300
St. Louis, MO 63118
Telephone: (314) 254-8540
Facsimile: (314) 254-8547
mae.quinn@macarthurjustice.org
amy.breihan@macarthurjustice.org