1           UNITED STATES DISTRICT COURT
            WESTERN DISTRICT OF MISSOURI
2

3  STEPHANIE GASCA, et al.,

4                    Plaintiffs,      No. 2:17-cv-04149-SRB

5   v.

6  ANNE L. PRECYTHE, et al.,          Jefferson City, Missouri
                                      December 16, 2019
7                    Defendants.

8

9                   .......................
                 TRANSCRIPT OF ORAL ARGUMENT
10         BEFORE THE HONORABLE STEPHEN R. BOUGH
              UNITED STATES DISTRICT COURT JUDGE
11

       Proceedings recorded by electronic stenography
12            Transcript produced by computer

13  APPEARANCES:

14   For the Plaintiffs:        MS. AMY E. BREIHAN
      (via telephone)           MS. MEGAN G. CRANE
15                              MacArthur Justice Center
                                3115 South Grand Boulevard
16                              Suite 300
                                St. Louis, Missouri 63118
17

18   For the Defendants:        MR. MICHAEL PRITCHETT
                                MR. MATTHEW G.  KIMMINAU
19                              Missouri Attorney General's
                                Office
20                              P.O. Box 899
                                Jefferson City, Missouri 65102
21

22  _____
                 Judy K. Moore, CRR, RPR
23              United States Court Reporter
                400 East Ninth Street, #8420
24              Kansas City, Missouri 64106
                     816.512.5622
25

1          (Proceedings commenced at 2:38 p.m.)

2          THE COURT:  Good afternoon.

3          MS. BREIHAN:  Good afternoon, your Honor.  This is

4   Amy Breihan.

5          THE COURT:  We are here on the case of Gasca versus

6   Anne...

7          MR. PRITCHETT:  Precythe.

8          THE COURT:  ...Precythe, Case Number 17-4149.  May I

9   have appearances by the parties, please?

10          MS. BREIHAN:  Your Honor, this is Amy Breihan from

11  the McArthur Justice Center for the plaintiff.  My colleague

12  Megan Crane will be here momentarily.  She ran to the restroom.

13          MR. PRITCHETT:  Mike Pritchett for the defendants,

14  Judge, here with Matt Kimminau from the Attorney General's

15  Office.

16          THE COURT:  Very good.  Mr. Pritchett, I appreciate

17  you always being so respectful.  I'm going to ask you not to be

18  respectful today and just stay and talk into the microphone

19  because that will most likely get everybody on the phone.

20          Did somebody just join us on the phone?

21          LAW CLERK:  This is your law clerk Grace Colato.

22          THE COURT:  Thank you, Grace.

23          Well, we are here on defendants' motion to dismiss

24  as moot and for failure to join an indispensable party.  And so

25  we'll let defense go first and wrap it up by the plaintiff.  I

have read all the pleadings that have been filed in this case,
read several of the exhibits that have been provided.  I'm not
going to lie to you and tell you that I've read every case that
has been cited, but I've got several of the cases that I've
read and looked over and tried to make hide nor hair of
Missouri Statute 600.042 and the changes that were made in that
piece of legislation.  So that's where I'm at.  I'll have some
questions.

We obviously are letting the plaintiffs appear by
phone due to the inclement weather in St. Louis.  As soon as
this hearing is done, we're going to drive down to Springfield,
so I told you I'd give you an hour for the hearing and I'm
still giving you an hour for the hearing, but anything after
that is going to affect my drive time, so...

MR. PRITCHETT:  I'll do my best, Judge.

THE COURT:  All right.  You all, pull that
microphone closer to you.  That one, or you're welcome to come
stand up at the podium if that's easier for you.

MR. PRITCHETT:  I'm not sure which is easier, Judge.
I'll start out standing.

THE COURT:  Okay.

MR. PRITCHETT:  May it please the Court?

THE COURT:  Please proceed.

MR. PRITCHETT:  The defendants would move to dismiss
on the grounds of mootness and failure to join an indispensable

1  party.  I'll begin with mootness.

2         There has been a general timeliness challenge to the

3  motion to dismiss.  It doesn't appear to me that the plaintiffs

4  argue that the portion regarding mootness is untimely, but even

5  if they did, they cannot.  Cases have been dismissed as moot

6  even on appeal.

7         Turning to the merits, then, defendants, the Parole

8  Board and the Director of the Missouri Department of

9  Corrections, their voluntary adoption and implementation of

10 policies compliant with due process has rendered plaintiffs'

11 claims moot, in that they are now no longer subject to the

12 policies that this Court found to be inconsistent with due

13 process in its summary judgment order.  As you've noted, the

14 new policies have been provided as exhibits to the motion to

15 dismiss and the reply.

16        Plaintiffs assert that the case is not moot because

17 the policy changes here are insufficient to show that the

18 allegedly wrongful behavior cannot be reasonably expected to

19 recur in the future.  In order for behavior to be reasonably

20 expected to recur, there must be some recognizable danger of

21 recurrent violation, something more than the mere possibility,

22 which serves to keep the case alive.

23        Plaintiffs have cited a couple of cases as part of

24 their argument that this case isn't moot because the issues are

25 likely to recur.  One of those is *Lankford versus Sherman*, but

1    in that case the action asserted as mooting the case was the

2    mere submission of a new process for approval.  Here, the

3    Department of Corrections has actually implemented and is using

4    the new parole policies.

5           Plaintiffs also cite *Strutton versus Meade*.  In that

6    case, the Court looked to see whether or not the changes that

7    were made by the defendant could be maintained if previous

8    budgetary and staffing restrictions might occur -- recur.  But

9    defendants here haven't merely submitted something for approval

10   and they haven't submitted something that's going to require

11   additional resources to implement; they've actually implemented

12   the process and they have implemented it with the resources

13   that they have at hand.  So it is not likely that the

14   complaints are likely to recur.  These policies are in place.

15          Plaintiffs also assert that the policies themselves

16   don't correct the due process violations that have been found.

17   They allege certain specific process, parole system violations,

18   one of which is they allege parole violators are not provided

19   adequate notice of the alleged violations.  But under the new

20   policies, the alleged parole violators are to be advised of the

21   specific parole violations they are charged with at their

22   violation interviews.  That's in Exhibit B.  They're also

23   provided with a copy of the violation report that sets out

24   their alleged violations.  They get these at their violation

25   interviews.  That's Exhibit H.

1        This violation report that they receive describes
2    the particulars of the charged violations, and those
3    particulars include the date, the time, the place, and the
4    basis of any new arrest and identification of outside sources
5    of information.  The circumstances of each violation are to be
6    included in separate paragraphs under this new policy.  So
7    these policies establish that the alleged parole violators
8    received notice of the parole violations they are alleged to
9    have committed; and, also, by giving the details, the
10   particulars of the violation, they receive the evidence
11   supporting the violation and they receive these before the
12   preliminary hearing.

13        There's also an assertion in the complaint that the
14   alleged parole violators are not advised of their rights during
15   the revocation proceedings.  There is now a specific notice of
16   rights form that's included in the packet.  That's Exhibit C.
17   All alleged parole violators are provided a copy of the notice
18   of rights at their violation interview.

19        In a few places the plaintiff has asserted the
20   notice of rights form doesn't comply with all due process
21   requirements.  One of the things they assert is the notice of
22   rights form does not inform class members of their right to
23   appeal.  While that is true that's not in the notice of rights
24   form, the notice of right to appeal is information that's
25   provided at the time of the decision regarding whether parole

1  will be revoked or not.

2          Plaintiffs also say the notice of rights form does

3  not indicate that the class members will receive a written

4  statement from the fact finders as to the evidence relied on

5  and the reasons for the decision made by the Parole Board, but

6  the notice of rights form specifically provides that -- tells

7  violators that they will get a written statement of the

8  decision, including the evidence relied on and the reasons for

9  revoking parole.  That's in the notice of rights form, Exhibit

10 C, Section 3.

11          The complaint also alleges parole violators are not

12 appropriately screened to determine if they qualify for a

13 public defender appointment.  Whether due process requires the

14 appointment of counsel or not is to be decided on a

15 case-by-case basis, though.  The appointment, according to the

16 *Gagnon* case, will probably be both undesirable and

17 Constitutionally unnecessary in most revocation hearings.  But

18 *Gagnon* does provide that counsel should be appointed in a

19 couple of circumstances.  That's when the plaintiff requests

20 counsel based on a claim that he or she has not committed the

21 alleged violation of parole, or where there may be substantial

22 reasons which justified or mitigated the violation that make

23 revocation inappropriate and that these reasons are complex or

24 otherwise difficult to develop or present.

25          But under Missouri's new policies, when counsel is

1  requested, the parole officer will use a counsel eligibility

2  screening instrument to determine whether they are eligible for

3  appointment of counsel.  That's Exhibit D.  This screening

4  instrument asks a number of questions that the parole officer

5  goes over with the parolee.  It asks the alleged parole

6  violators about their education and about other potential

7  reasons that could affect their ability to speak for

8  themselves.  The screening form also asks whether they are --

9  the alleged parole violator is contesting the alleged parole

10  violation, and it allows the parole violators to discuss any

11  mitigating circumstances or other grounds making revocation

12  inappropriate.

13          Based on the information the parole officer gathers

14  from this form, the parole officer then makes a decision about

15  whether the issues to be adjudicated at the revocation process

16  are complex or whether the mitigating -- there are mitigating

17  circumstances that are substantial and whether the alleged

18  parole violator is incompetent to proceed on his or her own.

19  Fielding those questions are just -- the parole officer has the

20  alleged parole violator complete a public defender application.

21  The parole officer assists the alleged parole violator in

22  filling that out, and then the parole officer faxes the

23  application for appointment of counsel to the Public Defender's

24  Office.

25          We'll get to the actual appointment of counsel in a

moment, but these provisions I've just talked about provide
alleged parole violators with appropriate screening under
*Gagnon* to determine whether they qualify for appointment of a
public defender.

        THE COURT:  And are those all just based on *Gagnon*?
I mean, because you do have some individual decision making by
a parole officer about whether someone gets a counsel.  Is it
your view that those -- that decision making by the parole
officer is based on *Gagnon*?

        MR. PRITCHETT:  Yes, Judge.  The form -- the
screening instrument, as they call it, was developed based on a
reading of *Gagnon*.

        THE COURT:  Okay.

        MR. PRITCHETT:  Plaintiffs have also asserted due
process violations, in that waivers of preliminary and
revocation hearings by alleged parole violators are not knowing
and voluntary, but under the new policies -- excuse me -- in
determining whether a waiver is knowing and voluntary, no
particular requirements have to be met.  It's the totality of
circumstances that are looked at with particular attention paid
to the defendants', or in this case the alleged parole
violators', understanding of the right to be waived and how it
might be waived.

        So during the parole violation interview under the
new policies, the parole officer is required to explain the

notice of rights and gives the notice of rights form to the

alleged parole violator.  This notice of rights explains the

parole revocation process and it sets out the rights of alleged

parole violators during that process.  The parole officer is

also to read to the alleged parole violators from the request

for waiver of preliminary hearing form and also the request for

-- excuse me -- request or waiver of the final revocation form.

Those two forms where the alleged parole violator can either

state he or she wants the hearing or waives the hearing reminds

the parole violators of their right to the hearings, both of

them, and to their right to counsel at both the preliminary and

final stages, including their right to appointment of counsel

if they're eligible for counsel.

       So in the totality of these circumstances where the

rights are explained from the form, there's actually a

discussion with the parole officer and the notice that the

hearing is available and that counsel can be provided -- and,

actually, in all cases the alleged parole violator can bring

counsel at his own choice.  Where those things are explained,

parole violators who choose to waive either or both the

preliminary and the final hearing have done so knowingly and

voluntarily.  They have the information they need to make those

decisions.

       Another allegation from the complaint is that

alleged parole violators are not provided the opportunity to

1   present written evidence and witnesses and to confront adverse

2   witnesses.   New policies, though, ensure that alleged parole

3   violators may present documents and other evidence at both the

4   preliminary and the final revocation hearings, and they're also

5   guaranteed under these rules the opportunity to confront and

6   cross-examine adverse witnesses at both stages of that

7   revocation process, except in extreme cases in which the

8   hearing officer determines the adverse witness would be

9   susceptible to risk or harm or potential problems where future

10  prosecutions would result.   That exception is an item that

11  *Gagnon* recognizes is a part of the analysis on whether

12  confrontation is to occur.

13          The new policies also provide that alleged parole

14  violators may present their own testimony at both the

15  preliminary and the final revocation hearings, and they're

16  again given a notice of all these rights, Exhibit C.   These

17  policies do ensure the right to present evidence, to present

18  themselves, and to cross-examination of adverse witnesses.

19          In the reply -- excuse me -- in the response, the

20  suggestions in opposition to the motion to dismiss, plaintiffs

21  also assert issues with the length of time between taking a

22  parolee into custody and the revocation hearing.   A policy

23  attached to the reply of the defendants shows that revocation

24  hearings are to be held within 30 days from the parolee's

25  return to the Department of Corrections at one of its reception

1   and diagnostic centers.  This 30-day -- it's 30 business days.

2   This 30 business-day time period or even potentially somewhat

3   longer is not an unreasonable time to wait for the final

4   hearing.

5           Even if these policies do correct the due process

6   issues found by this Court in its summary judgment order, the

7   plaintiffs allege that there have been failures to follow these

8   regulations.  I think the comment is they've had -- I don't

9   know if the word countless was used but -- many complaints that

10  these alleged parole violators are not getting the protections

11  these regulations -- policies, rather, provide.

12          The plaintiffs' challenge here is to the Missouri's

13  parole system.  It's not a challenge to any alleged deviations

14  from that system in individual cases.  That this is a facial

15  challenge to the system itself, to Missouri's policies on

16  parole, is evidenced from this Court's order granting class

17  certification.  That order states defendants' parole revocation

18  policies and procedures apply generally to the class so that

19  final injunctive relief or corresponding declaratory relief is

20  appropriate respecting the class as a whole.  So even if there

21  are any deviations from the newly established process in

22  individual cases, that would still require individual relief

23  and not class relief, as this case is set up to do.  And I

24  should mention, when I talk about the new procedures, it's not

25  a wholly new procedure anyway.  It was built on a previous one

1   which even though this Court found some violations to due

2   process was in part still correct.

3         Anyway, because this is a facial challenge,

4   plaintiffs' allegations that some class members continue to

5   complain of failures to follow the new policies, those

6   complaints aren't relevant.  To the extent they have individual

7   issues regarding compliance with the new policies, these claims

8   should be resolved separately in another action because it

9   would be based on individual transactions and not the policy or

10  the system as a whole.

11        I'll turn now to the other issue, failure to join an

12  indispensable party.

13        THE COURT:  Let me ask you a question since we're

14  getting there, because it seems like that's, at least in my

15  mind, where a lot more of the meat of this is.  So you've been

16  quoting *Gagnon*, and I think you started out part of it with

17  this quote, whether there's a due process violation determines

18  on a case-by-case basis at the exercise of the sound discretion

19  of the State authority charged with the responsibility for

20  administering the parole system, and that's *Gagnon* at 790?

21        MR. PRITCHETT:  Yes.

22        THE COURT:  I think you started out with that quote.

23  So the -- clearly, the organization charged with administering

24  the parole system are defendants in this case.

25        MR. PRITCHETT:  Yes.

1          THE COURT:  And so then, as I understand the

2     plaintiffs' argument, then, because you're in charge of

3     administering the parole system and because of the change in

4     the statute, that means your clients then have to hire lawyers

5     to defend them.  What's wrong with that argument?

6          MR. PRITCHETT:  Primarily, the defendants don't have

7     the authority to hire lawyers, your Honor.  That responsibility

8     is the Public Defender's responsibility.  The Department of

9     Corrections doesn't have the resources to hire counsel for

10    alleged parole violators.  And even if somehow it did, that

11    would bring up conflict issues, too, in the sense that now you

12    would have someone representing the alleged parole violators

13    against the administrative body that's determining whether or

14    not they violated the parole.

15         THE COURT:  Because the -- I understand your

16    argument under the statute is that it creates and empowers the

17    Public Defender.  One of the subsections says, anywhere the

18    Courts say that there's a Constitutional violation, Missouri

19    Public Defenders, that's who you represent?

20         MR. PRITCHETT:  Right.  And that's why the argument

21    that the change in the statute ended, terminated, the

22    Commission's responsibility for parole violators is incorrect.

23    That statute did change.  It did reduce the obligation of the

24    Public Defender's Office, but it reduced it in the parole

25    situation to certain circumstances rather than all

circumstances, and those certain circumstances aren't relevant here. And it did delete the reference to Commission will represent those detained or charged with parole violations. That is, as I suggest and you mentioned, included in the provision that was in the original statute before 2013 and still after 2013. It says the Public Defender Commission is to provide counsel for those who are required to have it by the U.S. or the Missouri Constitution. That's exactly what the plaintiffs are arguing here, that they're entitled to counsel by the United States Constitution. That provision is still in Section 600.042.45, I think.

THE COURT: You nailed it.

MR. PRITCHETT: Is still there and still puts the obligation on the Public Defender Commission.

THE COURT: Do you know why parole was taken out of the statute?

MR. PRITCHETT: I don't know why. I looked at the bill. It looks like the intent of the bill truly was to reduce the burden on the Public Defender's Office. And, again, previously, it essentially said Public Defender's Office will represent all parole and public -- parole and probation, those who allegedly violated their parole or probation.

THE COURT: And I don't mean to, like, make up facts and thrust them in here, but from my understanding of the plaintiffs' brief, it is that when the screening form was

1  completed by parole and it's sent over to the Public Defenders,

2  they get nice little emails back saying, we don't have to

3  represent these folks; or they get more lengthy letters like

4  the April 2, 2019, letter by Michael Barrett saying, no thanks,

5  and the emails like the one from April 5th, 2019, from Gina,

6  G-I-N-A, Savoie, S-A-V-O-I-E, to Tracy Declue, D-E-C-L-U-E,

7  saying, we're not going to be representing these individuals.

8         MR. PRITCHETT:  And those exhibits were provided

9  with the motion to dismiss that we filed, and that's exactly

10  why the Commission needs to be a party in this case, the Public

11  Defender Commission, because if they were fulfilling the

12  responsibility of appointing lawyers when the *Gagnon* factors

13  applied, the order could be to the defendants in this case, the

14  Parole Board, make sure lawyers are provided and they could do

15  the screening, which they're doing, fax the request over to the

16  Public Defender's Office, and then the Public Defender could

17  fulfill its responsibility.  But that's not what's happening.

18  They need to be in this case so that -- I guess I won't say if

19  this is a requirement because *Gagnon* says it is -- so that the

20  party that is obligated under State law to provide those

21  counsel in those cases is part of this case and injunctive

22  relief can actually provide the relief that the plaintiffs are

23  asking for.

24         THE COURT:  Because you say one of the reasons that

25  the Department of Corrections and the Parole Board can't be

ordered to hire lawyers is because they don't have the
resources. We all know for sure -- I think it would be fair to
say we all could agree that the Public Defender is going to
say, we don't have the resources. So to some extent we'll just
be in the same spot even if they were a party.

MR. PRITCHETT: Well, in addition to the
resources -- and I understand the Public Defender Commission
has taken a point of view that it is overburdened and can't
take on this responsibility, but the defendants in this case,
again, don't have the authority to appoint counsel, so the
order would basically be impossible to comply with. And in, I
think it was *Randolph versus Rodgers*, an injunction shouldn't
be issued when it would be impossible to fulfill.

And, theoretically, the Department of Corrections,
if ordered, could try to go out and provide counsel. If that
were the case, other plaintiffs out there could say, that's
beyond your responsibility, Department of Corrections. You're
using my taxpayer money for something you shouldn't be doing,
so stop it. That gets into assuming it was not feasible to
join the Commission, and again, we assert that it is feasible
to join. It would actually be the Commissioners and maybe
individual officials of the Public Defender Commission because
you can't sue the Commission as a body, of course, but just as
the Director of the Department of Corrections and the Parole
Board members were sued, so could the Commission members, so

1  could -- I think the chief administrative officer is called the

2  Executive Director.

3          THE COURT:  The *Gagnon* case is obviously 1973.  A

4  lot of cases interpreting it since then.  And I come back to

5  that language that says the decision for the need of counsel

6  must be made on a case-by-case basis at the exercise of the

7  sound discretion of the State authority charged with the

8  responsibility for administering the probation and the parole

9  system.  And so what I hear you saying is, Judge, we're doing

10  that, we're filling out our screening form the best we can

11  under the -- how we interpret it, and then we send it to the

12  Public Defenders and they say, we're not going to defend them,

13  so, Judge, our hands are tied here.

14          Are you aware of any case in the prodigy of *Gagnon*

15  that has said, well, since the Parole Office has the discretion

16  to determine if they need counsel, then the Parole Office has

17  to hire the lawyer?

18          MR. PRITCHETT:  I'm not aware of any such case,

19  Judge.

20          THE COURT:  I would imagine plaintiff would be the

21  one telling us if they were aware of that case.

22          MR. PRITCHETT:  And I can't suggest what they may

23  cite today.  I haven't seen it cited in pleadings or motions up

24  to this time.

25          Just to briefly take a step back to address the

timeliness challenge which is made to the Rule 19 part of this motion, case law cited in our brief, *Mescalero Apache Tribe* and *United Government of Wyandotte* -- excuse me -- *Wyandotte Nation*, both say that the indispensable party issue may be raised at anytime. In fact, the diagnostic unit case says the issue of whether a party is indispensable is not waivable and a Court has the duty to raise the issue sua sponte. Cases cited by the plaintiffs in their suggestions in opposition, *Provident* and *Judwin*, both deal with cases where it was raised on appeal, in fact, one case even after oral argument was made. And then the *Oklahoma versus Tyson Food* cases --

THE COURT: I can tell you the timeliness thing is just not an issue for me at least. And you're welcome to talk about it, so is plaintiff, but I mean, this case is not what I would call your traditional path. This is not a traditional case. It's not -- traditionally, the defendants don't agree to summary judgment or agree to class action. All this is -- you know, I didn't do the Supreme Court case. The summary judgment I entered, but it's because nobody opposed it. Class action I entered because nobody opposed it. So this -- the timeliness just doesn't strike me as the best argument here.

MR. PRITCHETT: I will pass on, then, and leave it to what's said in the briefs, because as you can probably tell, I don't know that I'm getting in anything beyond the briefs anyway. I'm happy to answer any questions.

1     THE COURT:  Well, let's see what plaintiffs says,

2  and then I'll give you an opportunity, if you'd like, to rebut.

3     MR. PRITCHETT:  I will do that, Judge.  Thank you.

4     THE COURT:  Thank you.  Plaintiff?

5     MS. BREIHAN:  Your Honor, this is Amy Breihan.  I

6  first want to thank you for allowing us to appear by phone so

7  we didn't have to make that treacherous drive.  I appreciate

8  the flexibility.

9     THE COURT:  Safety first.

10    MS. BREIHAN:  I want to -- of course, I'll address

11 the defendants' arguments with respect to both mootness and the

12 necessary and indispensable party, but I want to first take a

13 step back and ask the Court to consider what it would mean to

14 dismiss the case at this point, because that's what the

15 defendants are asking for, the dismissal of a class action

16 that's already been certified, or a summary judgment that's

17 already been granted in favor of the plaintiffs' class and

18 where the Court has already found that the defendants, without

19 dispute, were systematically violating class members' due

20 process rights in six big ways:  By failing to provide adequate

21 notice of alleged parole violations and the basis of revocation

22 decisions; by routinely failing to advise class members of

23 their rights during revocation proceedings; by securing waivers

24 of preliminary hearings and final revocation hearings that are

25 not knowing, voluntary and intelligent; by not screening for or

providing State-funded counsel in compliance with *Gagnon*; by
refusing to disclose to a parolee evidence against them and
denying them the opportunity to present witnesses or confront
adverse witnesses at the preliminary or revocation hearings;
and by failing to conduct revocation hearings within a
reasonable time after the parolee is taken into custody, all in
violation of the 14th Amendment.

Now, the defendants make some distinction between a
facial attack versus these individual claims or the facial
attacks to the actual written policies.  This case has always
been about, not just the written policies and procedures of the
Department of Corrections and its Parole Board, but also the
customs of the DOC and its Parole Board.  That's clear from
Paragraph 1 of the class action complaint, which says that this
is a civil rights class action complaint filed on behalf of men
and women in custody or under supervision of the Missouri
Department of Corrections and who are at risk of imprisonment
without adequate due process as the result of unconstitutional
practices, procedures and customs of both MDOC and its Division
of Probation and Parole.

THE COURT:  So from my perspective, if there's -- I
mean, maybe they're doing some of them right, maybe they're
doing some of them wrong.  Tell me the ones that they're doing
wrong, because if there's one that they're doing wrong still,
well, then it's not moot.  And I'm assuming the one you're

1   going to tell me they're doing wrong is appointment of counsel.

2         MS. BREIHAN:  Yeah, your Honor, I'm happy to answer

3   that question and identify specifically what they're doing

4   wrong, where they have not mooted our claims.  I want to just

5   remind the Court that -- and I'm sure you're already aware of

6   this -- it's a very stringent test for proving mootness, and

7   that burden is on the defendants who have moved for dismissal

8   on mootness.  It has to be absolutely clear that the allegedly

9   wrongful behavior, and here proven wrongful behavior, could not

10   reasonably be expected to recur.  And the Court should not

11   dismiss the case for mootness unless it's impossible -- unless

12   it's impossible for the Court to grant any effectual relief

13   whatsoever.  In other words, they have to meet the heavy burden

14   of showing mootness as to every violation that was established

15   by the summary judgment that was granted earlier this year.

16         Their purported proof of mootness is just these new

17   written policies which are attached to their motion and reply.

18   Their new policies are not enough to moot plaintiffs' claims.

19   For one, they don't address all of the Constitutional

20   deficiencies in the revocation process.  So, for example, the

21   Supreme Court is actually very clear that parolees are entitled

22   to disclosure of the evidence against them.  That's in

23   *Morrissey versus Brewer*, which pre-dates *Gagnon* by just a year.

24   And that while the new policies require that parolees be

25   advised of the violations they are charged with, they don't

1  require that parolees be apprised of the evidentiary basis for

2  any alleged parole violation.

3  Now, the defendants' response is, well, parolees

4  will get a violation report. Well, that's not always the case.

5  And they're not always given that violation report at the time

6  they are making critical decisions, such as whether to waive a

7  preliminary hearing or whether to ask to be screened for

8  counsel. And the undisputed facts that were presented on

9  summary judgment are the field violation reports don't always

10 contain relevant facts or an explanation of the alleged

11 violation. That's in Paragraph 70 of our summary judgment

12 motion. They often contain little more than admission from the

13 parolee. And in some instances, parolees are arrested before

14 they ever give a field violation report. That comes in

15 Paragraph 68 of the summary judgment order.

16 So this representation by the defendants that, hey,

17 we have this written policy that says they get a field

18 violation report, well, that was there before and they weren't

19 complying with that, so why should we trust the defendants are

20 going to comply with this new policy when they weren't

21 complying with the one before?

22 The notice of rights form is also an issue. This

23 basically replaced what was previously referred to as the red

24 book which our expert identified a number of issues with,

25 including that it wasn't written in plain language or in a

1    manner acceptable to the expected reading comprehension level

2    of the average parolee.  And you can see our expert report

3    talks about that on Page 4.  It doesn't indicate whether or

4    when class members will receive a written statement by the

5    fact-finders as to the evidence relied on and the reasons for

6    revoking parole, but due process requires that.

7                Now, the defendants argue that this -- in their

8    response that this is not raised in the complaint, the

9    allegation that parolees are not given an explanation as to

10   evidence relied on, the reasons for revoking, but that's not

11   true.  It's clearly -- the foundations are clearly a part of

12   the case.  In fact, an entire section of the summary judgment

13   motion is titled "Defendants violate the proposed class's due

14   process by failing to provide adequate notice of alleged parole

15   violations and the basis for revocation decision."

16               So I've talked about notice of the violations and

17   the evidence for it, notice of rights form.  A third example --

18   and these are non-exhaustive, but a third example with the

19   written policies is that the screening tool and the policy that

20   relates to the screening tool focused almost exclusively on

21   competency and are not compliant with *Gagnon*.

22               THE COURT:  What was that last thing you said?  You

23   said the screening tools focused on competency and not what?

24               MS. BREIHAN:  Yeah.  It focuses almost exclusively

25   on competency and not -- you know, *Gagnon* has a couple of

different factors to consider as to whether somebody would be eligible for State-funded counsel when they're facing revocation. It's not just competency. But the screening tool and the written policies by the defendant seem to focus on that, and that's borne out by some of the individuals we've spoken to who have gone through the process. And I'll get to that in a moment.

But those -- I don't want to just focus on the written policies because they don't address all the unconstitutional practices that were found to be occurring here, right, and so in order to show mootness, you've gotta show there are no live claims. Well, even if they were complying with these policies, even if they brought them into compliance with *Gagnon* and *Morrissey*, which they don't, they don't provide any evidence that they are compliant with the policies or what due process other than otherwise required.

So the waiver issue is the big one, right? On summary judgment, this Court found that class members were being routinely pressured to waive their rights during the revocation process. The defendants provide this written policy that they say, you know, requires that they're going to be provided notice of their rights, which we have issues with, and that would ensure that there's no involuntary waiver anymore. They don't provide any evidence to back up that conclusionary representation. And as I'll discuss in a moment, there is

1    evidence that will show this is not happening, that folks are

2    still being pressured to waive their hearings and their rights

3    during the revocation process.

4         Another issue is the issue with timeliness.

5    Although the defendants say that the new policy requires that

6    revocation hearings be conducted within 30 business days of

7    returning to a reception and diagnostic center, their answer to

8    a recent set of interrogatories says that since February of

9    this year, February 27th of 2019, hundreds of parolees have

10   spent more than 60 days incarcerated prior to having their

11   revocation hearing, hundreds.

12        The defendants insist that these written changes,

13   these written policy changes, are such that deficiencies are

14   not likely to occur.  Well, setting aside for a brief moment

15   the fact that due process violations do continue to occur, this

16   argument does not win the day.  In fact, as a matter of law,

17   policy changes not reflected in statutory changes or even in

18   changes in ordinances or regulations do not necessarily render

19   a case moot.  That's from the *Rosebrock* case, *Rosebrock versus*

20   *Mathis,* out of the 9th Circuit.

21        And the 8th Circuit in 2008, in a case involving

22   student civil rights claims against a school district and

23   superintendent and others about school policies, during that

24   case the defendants actually changed their policy, and there

25   even the 8th circuit said, this doesn't render the case moot

1   because it's a voluntary change of policy.  It's not something

2   discriminate, for example, as a change in statute.  And here

3   the defendants have amended their policies multiple times,

4   including as recently as September of this year.  They can just

5   as easily change them again.  Indeed it's for this reason, as I

6   said, this lack of permanence, the Court noted that a policy

7   change does not necessarily render a case moot.  That's in the

8   *Rosebrock* case.  It's supported by *Lowry, ex rel., Crow versus*

9   *Watson Chapel School District* out of the 8th Circuit.  It's

10  supported by *Akers versus McGinnis* out of the 6th Circuit which

11  said that a revision of the Michigan UMC rules did not moot

12  Constitutional challenges to its previous rules.

13          THE COURT:  Let's say I agree with you and that

14  there's a whole bunch of factual scenarios that I'm going to be

15  hearing about in Kansas City early next year and that because

16  of those factual differences -- and not all before this Court

17  at this time, I need to -- I deny the mootness motion.  Tell me

18  more about joining the Public Defender in this case, why that's

19  not necessary.

20          MS. BREIHAN:  I'd be happy to, your Honor.  So the

21  argument that the Public Defender is a necessary party here is,

22  quite frankly, a distraction, I think.  First of all, we don't

23  deny that the right to and the obligation to screen for and

24  provide counsel is an important part of this case, but I want

25  to be clear, that's not the only part of this case.  At the

beginning of my argument, I laid out six categories, broad
categories, of due process violations which, your Honor, exist
across the parole revocation system in the state of Missouri.
One of those six categories is not screening for or providing
State-funded counsel in compliance with *Gagnon*.  Now, under
*Gagnon versus Scarpelli*, the responsibility for screening for
and for providing those attorneys falls on the agency that is
responsible for administering the parole system, which as you
pointed out earlier, is the responsibility of the named
defendant.

THE COURT:  What's the best case that says exactly
that?

MS. BREIHAN:  It's *Gagnon*.  It's *Gagnon* itself that
says exactly that.

THE COURT:  *Gagnon* says, we think, rather, that the
decision as to the need for counsel must be made on a
case-by-case basis at the exercise of the sound discretion of
the State authority charged with the responsibility for
administering the probation or parole system.  What I heard the
State say was, well, we're determining the need for counsel on
a case-by-case basis, but that doesn't mean we have to provide
it.  Is that wrong?

MS. BREIHAN:  That -- that is wrong.  Our argument
is that is wrong.  It's a mistaken reading of *Gagnon*, that
*Gagnon* places the responsibility for ensuring that parolees who

1 are eligible to have attorneys, that responsibility lies with

2 the agency that's administering the parole system. Here, that

3 is the defendants. And --

4      THE COURT: Do you know of any state -- is there any

5 state that you know of that the Department of Corrections

6 provides the attorneys to represent people on parole

7 violations?

8      MS. BREIHAN: So in the state of Illinois, the DOC

9 does provide, through private contract, attorneys for parolees

10 who are eligible under *Gagnon*. Now, I want to make sure that

11 it's clear, you know, the defendants do have authority here to

12 provide attorneys to eligible parolees. That's the big

13 argument the defendants make is, okay, we can screen and

14 determine whether they're eligible, but then we can't do

15 anything beyond that. Well, that's -- first of all, it's

16 unjust, right, to say that we know someone's eligible but we're

17 going to keep them incarcerated and have their hearing anyway

18 or continue their hearings indefinitely because we can't give

19 them attorneys. That's just an unjust outcome, but also it's

20 not true. They have the authority to enter into contracts in

21 order to meet their obligation.

22      THE COURT: And that's your Section 217.035 that

23 gives them the authority?

24      MS. BREIHAN: Yeah. 217.035 gives the Director of

25 the Department of Corrections, who's named as a defendant here,

1  the authority to secure contractual services for the Department
2  in each of its divisions.

3      And also, Under Section 217.020, the -- it says that
4  the DOC shall advise, consult and cooperate with private
5  entities in developing and implementing programs to fulfill the
6  Department's responsibilities.  Well, one of the Department's
7  responsibilities is administering a Constitutionally adequate
8  parole revocation system, which includes properly screening for
9  counsel and providing counsel where somebody is eligible.

10     An analogy to what's going on here is a provision of
11 medical care within the Department of Corrections, right?  The
12 Department of Corrections has a Constitutional obligation to
13 provide medical care to inmates in their custody and control.
14 Now, they could do that themselves, and historically in
15 Missouri they have done that, or they could do what they do
16 now, which is contract out with a third party to provide
17 medical services in order for them to be able to meet their
18 Constitutional obligations.  And that's why Corizon, L.L.C., is
19 the healthcare provider who's contracted with the Missouri DOC,
20 pursuant to 217.035.

21     Similarly here, the DOC and its Board of Probation
22 and Parole have a Constitutional obligation to screen for and
23 provide counsel to parolees who are eligible under *Gagnon*.  In
24 order to meet that contractual obligation, they can enter into
25 a -- excuse me -- in order to meet that Constitutional

1  obligation, they can contract for services with private

2  attorneys under 217.035.

3       The defendants keep saying they don't have authority

4  or they don't have the power to provide attorneys, but they

5  haven't ever explained why.  They haven't, for instance, cited

6  any law that says they do not have that power or authority.

7  They make this argument in response that we seem to suggest

8  that any State agency with the statutory authority to enter

9  into contracts can be sued to enforce any Constitutional rights

10 when their remedial actions required are obtainable by

11 contract.  But that's not the truth -- that's not the case

12 here.  We're not asking the -- the plaintiffs are not asking

13 the defendants to enter into a contract to remedy a

14 Constitutional harm for which they are not responsible.

15      There is no dispute that the defendants caused

16 plaintiffs' due process violations and continue to take actions

17 and inactions which result in due process violations for class

18 members across the state.  They're directly responsible for

19 these violations, and it is their responsibility to remedy it.

20 Fortunately, they have the authority to do that by entering

21 into the contract under 217.035.

22      THE COURT:  Well, one thing you're saying is, don't

23 dismiss the case on the mootness argument, we want to stick

24 around and see if they really do abide by the new policies even

25 if you don't agree all the policies are there, but you're also

1  saying, well, we don't want to join the Public Defenders at

2  this time.  I mean, if the case is going to be around a little

3  while, why not get the Public Defenders in here so we have an

4  opportunity to fight about who actually is in charge of

5  defending these folks under the *Gagnon* decision?

6         MS. BREIHAN:  Well, the reason not to do that is

7  that you don't have to, right?  And so in order to join them

8  in, the defendants have to prove that they are a necessary

9  party, which means they have to show that this Court can't give

10 complete relief to the parties that are already in this suit.

11 So this analysis is independent of the question whether relief

12 might be available to the absent party, that under 19(a) we've

13 got to determine whether they're a necessary, in which case

14 they must be joined if feasible.  But the central question in

15 deciding defendants' motion under Rule 19 is, can the Court

16 grant parties complete relief without even bringing the Public

17 Defender into the case?  The answer is yes.  So the analysis

18 really stops there.  There is no need to grant their motion or

19 bring the Public Defender in.

20         THE COURT:  Well, and I can't make you sue them,

21 right?

22         MS. BREIHAN:  In fact, they're already -- you know,

23 are being sued, and to bring them in, it would create a case

24 within a case that's just unnecessary.

25         THE COURT:  When you say they're already being sued,

1  is that some case pending in front of Judge Laughrey or...

2  MS. BREIHAN:  Yes, the *Church* now *Dalton* case.  But

3  I want to make clear that, of course, if your Honor finds that

4  they're necessary, they could be brought in for purposes of

5  remedy only, but they're not necessary.  The relief that the

6  plaintiffs have asked for relates only to the defendants'

7  policies, practices and customs.  We asked for a declaratory

8  and injunctive order declaring that the policies, practices and

9  customs are unconstitutional and enjoining them would subject

10  the class to unlawful policies, practices and customs.  So

11  without a doubt, the Court can grant that relief in the absence

12  of the Public Defender.

13  That's especially true given that the defendants

14  have statutory authority to provide attorneys.  And that seems

15  to really be the only bone of contention.  The defendants

16  aren't arguing that they don't have -- that they don't have

17  authority to provide adequate notice or advise class members of

18  their rights or make sure waivers are really voluntary and

19  intelligent, for example.  They believe then, at least it seems

20  to me, that they have the power to change that.  They're not --

21  the only point at which they're, you know, sort of throwing up

22  their hands and saying that they can't do anything is with

23  respect to providing the attorneys, a pretty narrow issue, and

24  they actually do have the authority to do that.

25  THE COURT:  You said they could be enjoined for the

1    remedy portion only; is that right?

2          MS. BREIHAN:  Yes, your Honor.  So we -- as an

3    alternative argument, we said -- in the first instance, they're

4    not necessary.  If the Court finds that they are necessary,

5    they could be joined solely for remedy, and, you know, that

6    could be done -- I guess even without joinder, they could be

7    heard by the Court in an amicus brief or something of the like,

8    but we certainly don't need to dismiss the case because they're

9    not indispensable.

10          And I think even the defendants -- and Mike can

11   correct me if I'm wrong -- but I think in their reply brief at

12   Page 9 the defendants concede that joining MSPD is feasible,

13   and so the Court needs to determine whether they're

14   indispensable.  The question is really whether they are

15   necessary or not.

16          THE COURT:  Anything else from plaintiff?

17          MS. BREIHAN:  I do want to highlight a couple more

18   things, your Honor.  One is that, as you pointed out, I think

19   you've already considered and perhaps decided this issue when

20   you considered the defendants' first motion to dismiss filed

21   earlier on in the case where you actually noted that you could

22   craft complete relief for the plaintiff even if the defendants

23   don't have authority to provide counsel.  And you certainly

24   weren't conceding that they didn't have the authority, but you

25   acknowledged that with these parties as named, you could afford

1  complete relief, which leads to the conclusion that the Public
2  Defender itself is not a necessary party here.

3        I was going to highlight a couple of specific issues
4  that persist to sort of highlight the evidence that we will be
5  presenting in February.  I'm happy to still do that if you'd
6  like to hear it.  I want to make sure it's clear we're not
7  waiving our timeliness argument, but we'll stand on our brief
8  as to timeliness because I understand that you indicated that
9  it wasn't really an issue for you, and so I don't want to waste
10 the Court's time on that.

11       THE COURT:  Yeah.  I don't think the timeliness is
12 that -- I don't think you need to give me a preview for
13 February.  I predict it's going to be cold between now and
14 February.  That's my preview.

15       MS. BREIHAN:  The only thing I'll say as to
16 timeliness is that timeliness is definitely relevant.  Even if
17 it's not dispositive, it's relevant here in terms of, you know,
18 how recently the defendants made some of these policy changes.
19 And that goes to the issue of mootness.  So in an 11th Circuit
20 case, *Bruce Rich versus Secretary of Florida DOC*, the Court
21 said that -- the Court considered the timeliness of the change
22 in policy in determining mootness, and they noted that this was
23 made not before litigation was threatened but late in the game.
24 It was citing another 11th Circuit case which also found a
25 claim wasn't mooted by a school district's voluntary cessation

of the activity in part because a change was only made when there was imminent threat of a lawsuit. Well, you can't get much later in the game than here where most, if not all, of the policy changes that are relevant here and raised in defendants' motion were made after summary judgment was granted and some as recently as September, which was many months after summary judgment was granted. So, again, that goes to the question of whether these policy changes were truly -- really moot the claims at all, even if they addressed questions that the Court found in Griffin when it granted summary judgment.

THE COURT: Let me ask you a variation on the same question that I asked the Parole Office counsel. They said that they don't have the resources to hire lawyers and that the proper state entity that hires lawyers in this kind of -- is the Public Defender's Office. I mean, nobody's saying that there's not a due process right under *Gagnon* to have a lawyer under certain situations, but I hear the Parole Office saying -- Parole Office Commissioner saying that, listen, that's not us. I mean, ultimately, what I've heard is they don't have the money. We know we're going to hear out of the Public Defender's Office that they don't have the money. I mean, somebody's got to fund this, and I want to make sure we have all the proper parties if I've gotta say, somebody's not following *Gagnon* and you're the right party to provide those services and fund those services. Tell me about that from the

1  plaintiffs' perspective.

2          MS. BREIHAN:  Well, your Honor, the defendants

3  haven't cited to any law that says that the Public Defender is

4  the only entity that can provide representation to indigent

5  defendants or to indigent alleged parole violators who qualify

6  under *Gagnon*.  So certainly they have the authority to provide

7  representation in certain instances, but they don't -- they

8  haven't cited to any law that says that only the Public

9  Defender can.  In fact, there are indigent defendants who get

10  proper representation elsewhere or proceed pro se.

11          Also, this argument that DOC doesn't have the

12  resources seems to be presented here for the very first time.

13  I don't think that there's any evidence in the record that the

14  DOC does not have the resources.  In fact, the only evidence on

15  resources is to the contrary and compares the resources that

16  the DOC enjoys as compared to the Public Defender system, which

17  is notoriously overworked and underresourced and has been for

18  many years.

19          THE COURT:  Well, we don't have that evidence in

20  front of us either.  I mean, the reality is DOC has more

21  funding, but they have more responsibilities.  I mean, and they

22  do have this statute that says -- 600.042, that the Public

23  Defender is responsible for the representation of anybody where

24  there's a Federal Constitution or a State Constitution which

25  requires the appointment of counsel.  So they do have some

1  authority that they point to.

2      MS. BREIHAN:  Yes.  So two things, your Honor.

3  First is that the resources of the -- for the Public Defender

4  is important.  We included it in our response on Page 12.  But,

5  secondly, the statute that sets forth the responsibility

6  directed to the Missouri State Public Defender Commission, as

7  Mr. Pritchett noted in his argument, was changed significantly

8  and removed the language that gave the correct obligation to

9  provide attorneys to individuals facing revocation.  He

10  indicated that that was done in order to reduce the burden on

11  the Missouri Public Defender, and so as a matter of law, we

12  have an obligation to interpret that statute in order to give

13  intent to what the General Assembly intended when it eliminated

14  that language.

15      And the exhibits that are attached to the

16  defendants' motion that are in correspondence between the DOC

17  and the Public Defender's Office make clear that their position

18  is the same as ours, which is that when this statute was

19  amended, it eliminated the obligation to provide attorneys to

20  parolees facing revocation who are eligible under *Gagnon*.

21      Now, there are a couple of cases that the defendants

22  cite in support of this argument.  One is the *Patterson versus*

23  *Pennsylvania Board of Probation and Parole* case where a parolee

24  had their parole revoked, they brought a habeas action, and the

25  trial Court said you get a new hearing and, Parole Board, you

1  have to give an attorney to this person.  And there it was

2  reversed, and the Court said the Office of Public Defender, not

3  the Parole Board, should have provided counsel at the

4  revocation hearing.

5        But that case is distinguishable in two very

6  important -- really three very important ways.  First is that

7  at the time of that case, which was in 1969, *Gagnon* had not

8  been decided.  And there was a State statute in Pennsylvania

9  which gave -- said that the Public Defender shall be

10  responsible for furnishing legal counsel to any person who, for

11  lack of sufficient funds, is unable to obtain legal counsel at

12  probation or parole proceedings and revocation thereof.  So

13  that's almost the exact language that was deleted from the

14  Missouri statute at issue here regarding the obligations of the

15  State Public Defender Commission.  And, in fact, that State law

16  was broader than the right to counsel in *Gagnon*.

17        So the -- the statements or authority can be found

18  for vesting in the Parole Board the duties and responsibilities

19  of appointments of counsel for indigents.  The Court pre-dates

20  *Gagnon* placing that responsibility on the defendants here, the

21  agencies responsible for administering the parole process.

22        THE COURT:  All right.  I've got everything that I

23  need to ask.  Anything else from the plaintiff?

24        MS. BREIHAN:  One final note, your Honor.  To the

25  extent that the Court reaches the question of indispensability,

1    it seems like you're not going to, but I would just want to

2    make sure it's clear for the record that there's no prejudice

3    to entering a judgment in the PD's absence and that if there

4    were any prejudice, that could easily be avoided by shaping the

5    relief here that, as I said before when talking about whether

6    PD is a necessary party, that the Court can afford complete

7    relief to the party without bringing them in, but if the Court

8    does feel that they're necessary, then we would ask that they

9    be joined here for purposes of this hearing, that the case not

10   be dismissed.

11          THE COURT:  Okay.  Any brief rebuttal from -- I keep

12   wanting to call it the State, but that's -- how about we'll

13   call it the defendant?

14          MR. PRITCHETT:  Well, in this case it's not the

15   State because that is one of the arguments that was just made,

16   that it's the State's obligation to provide counsel.  Well,

17   under *Gagnon*, it's the State's responsibility, but it's not the

18   part of the State that's been sued.  It's the Public Defender

19   Commission's duty to do that.

20          And I couldn't disagree more with the interpretation

21   of the statute that the removal of the specific reference to

22   representation of parole violators was taken out of the statute

23   means they don't do it anymore, because it very directly says,

24   in those cases where the Federal Constitution requires

25   representation, the Public Defender shall do it, and that's

1 exactly what the claim is here.  In terms of, oh, the State --

2 excuse me -- in this case, the Department of Corrections could

3 just have a contract and the analogy is with the medical

4 provision, medical care, that's a false analogy.  There's no

5 alternate body set up by the State statutes to provide medical

6 care as there is with the State providing legal representation

7 to those who are due representation and can't afford it.

8          Another distinction, I think, is, it's been a

9 longstanding requirement of correctional prisons that they need

10 to provide medical care.  So, I mean, that's, like, a core

11 function.  I would say providing legal representation is not a

12 core function of the Department of Corrections.  And, again,

13 especially in this case where a separate body has been created

14 to deal with that.

15          You asked whether you had the authority to require

16 the Public Defender Commissioners to be joined --

17          THE COURT:  I don't think I do.  I mean, I think

18 either plaintiff has to ask to join a party or...

19          MR. PRITCHETT:  I'm not asking --

20          THE COURT:  You're saying because they are an

21 indispensable party, then they need to be dismissed.  You're

22 not asking to join them.  I get that.

23          MR. PRITCHETT:  I'm not asking that, and I think

24 that's the reason to dismiss this case because the Public

25 Defender Commissioners could be added; they just have chosen

1  not to.

2        THE COURT:  Sure.

3        MR. PRITCHETT:  But when it gets to it, Rule

4  19(a)(2), joinder by Court order, if a person has not been

5  joined as required, the Court must order that person be made a

6  party.  A person who refuses to join as a plaintiff may be made

7  either a defendant or, in a proper case, an involuntary

8  plaintiff.

9        THE COURT:  19...

10        MR. PRITCHETT:  19(a)(2).

11        MS. BREIHAN:  Your Honor, may I address that

12  briefly?  I don't want to interrupt Mr. Pritchett, but...

13        THE COURT:  Yeah, let's let him finish up, and I'll

14  join you back in there.

15        I'm always learning of all these magical Article III

16  powers, just forcing people to be parties to lawsuits.  I mean,

17  19(a)(2).

18        MR. PRITCHETT:  And, I don't know, Amy may be saying

19  there's some interpretation of that statute or that rule that's

20  not apparent to me, but it appears to me that it gives you the

21  authority to do that.

22        THE COURT:  What do you think there, Amy?

23        MS. BREIHAN:  Yeah, so the analysis under Rule 19 is

24  such that if the Court finds that the Public Defender

25  Commission is a necessary party, then they must be joined,

1   period.  And so the Court has the authority to do that if you

2   make the determination that they're necessary, in other words,

3   if you find that you can't give complete relief to the parties

4   without bringing them in.

5          I haven't heard any argument from the defendants as

6   to why, if the Public Defender is necessary, they cannot be

7   joined, and they would have to prove that in order to even

8   reach 19(b) analysis of whether they're an indispensable party,

9   in which case even in good conscious and justice of the case,

10  must -- in equity and good conscious, the case must be

11  dismissed.  So the first question is, are they necessary, in

12  which case they must be joined.  And then if they can't be

13  joined, then you get to 19(b).  But I haven't heard any

14  argument as to why the Public Defender can't be joined.

15         MR. PRITCHETT:  I don't have an argument as to why

16  the Public Defender Commissioners can't be joined.  I'm

17  surprised they haven't been.  I think they need to be and, in

18  their absence, complete relief cannot be provided to the

19  plaintiffs.

20         My reading of this thing -- and, I mean, I'm sure

21  there are distinctions, but it seems to be the main argument is

22  that they're not getting lawyers.  And even if this Court could

23  fashion a remedy that just said, if you don't get a lawyer,

24  well, then don't put them through the process, which since I

25  doubt the Court would say hold them indefinitely, I think the

1  result would be they get out if they don't get a lawyer.  If

2  that were the case, I think that that --

3          THE COURT:  It doesn't seem like the best public

4  policy.

5          MR. PRITCHETT:  It would seem like an improper

6  remedy to do that.  And it would be much more --

7          MS. BREIHAN:  Well --

8          MR. PRITCHETT:  -- friendly to have the Public

9  Defender's Office here.  And I see we have a disagreement over

10  whether the Public Defender's the exclusive party to provide

11  that, but again, I look at the statute, and the statute to me

12  says if it's required, Public Defender, you do it.

13          THE COURT:  Amy?

14          MS. BREIHAN:  Yes, your Honor.  Well, going off of

15  what Mr. Pritchett just said about as an alternative to

16  ordering the defendants to provide attorneys to eligible

17  parolees saying, well, if someone is eligible under *Gagnon* and

18  you don't give them an attorney, then you have to release them,

19  that is totally within the realm of reasonable and permissible

20  relief here.  In fact, under the *Brown versus Plata* case out of

21  California, the issue there was prison overcrowding, and

22  instead of saying that these prisons have to somehow make more

23  room for these folks, they said, if you don't have room for

24  them, you have to start releasing people.  So that's totally

25  within the realm of permissible relief.

1        But I want to just make sure that we are not

2  focusing exclusively on the right to counsel because, again,

3  that is one part, an important, however one part of this case.

4  There is so much more to this case, you know, so many more

5  Constitutional violations that have been established without

6  dispute back in February that continue to persist, and so this

7  right to counsel aspect is just one part of it.

8        We don't need to bring the Public Defender in

9  because, thankfully, the defendants have the authority to

10  contract for attorneys in this instance, and even if it would

11  require them to spend a little bit of money, as was pointed out

12  in *Randolph versus Rodgers*, you can order a State and its

13  officers to comply with Constitutional obligations even where

14  injunctive relief would have a substantial ancillary effect on

15  the State Treasury.  Defendants don't concede that point of

16  law.  I just want to reiterate that that's about more than

17  right to counsel and that you, your Honor, have authority and

18  ability to enter adequate relief here without bringing in

19  another party and making this a case within a case about the

20  Public Defender system within the State of Missouri and their

21  lack of resources and authority.

22        THE COURT:  Mike, one more bite?

23        MR. PRITCHETT:  I think it would just be rehashing

24  what we've discussed, Judge.

25        THE COURT:  All right.  Well, we're taking off

1  towards Springfield.  Thank you so much for these oral

2  arguments.  Everybody keep planning on -- is it February we're

3  seeing everybody?  Or is it January?

4          MS. BREIHAN:  Yes, your Honor.

5          MR. PRITCHETT:  February 7th, 6th.

6          THE COURT:  February 6th and 7th in Kansas City.

7  All right.  We'll see you there.

8          MS. BREIHAN:  Thank you again for accommodating us

9  to appear by phone.  We appreciate it.

10          MR. PRITCHETT:  Thank you, Judge.

11          (Proceedings concluded at 3:47 p.m.)

12

13                      CERTIFICATE

14      I certify that the foregoing is a correct transcript

15  from the record of proceedings in the above-entitled matter.

16

17  January 31, 2020

18

19                      /s/Judy K. Moore

20                      JUDY K. MOORE, CRR, RPR
                        United States Court Reporter

21

22

23

24

25