**IN THE UNITED STATES DISTRICT COURT FOR THE**
**WESTERN DISTRICT OF MISSOURI**
**SOUTHERN DIVISION**

STEPHANIE GASCA, et al.,         )
                                         )
on behalf of themselves and all similarly  )
situated individuals,                )
                                         )
        Plaintiffs,             )
                                         )
v.                                  )     Case No. 17-cv-04149-SRB
                                         )
ANNE PRECYTHE, Director of the Missouri  )
Department of Corrections, et al.,       )
                                         )
        Defendants.        )

**<u>ORDER</u>**

**INDEX**

I.      BACKGROUND……………………………………………………………………3

II.     DISCUSSION……………………………………………………………………4

        A.      Revocation Proceedings……………………………………………5

                i.      Arrest and Preliminary Hearing (Stage 1)…………………………6

                        a.      Notice of Alleged Violations……………………………………7

                        b.      Notice of Rights…………………………………………....11

                                1.      Timeliness of Notice……………………………………14

                                2.      Content of Forms……………………………………16

                                3.      Explanation of Rights…………………………………...19

                        c.      Pressure to Waive Preliminary and Revocation Hearings………23

                ii.     Revocation Hearing (Stage 2)……………………………………26

                        a.      Disclosure of Evidence Against Parolee………………………..27

                        b.      Timeliness of Revocation Hearings……………………………28

                        c.      Written Statement of Revocation Decisions……………………30

                        d.      Hearings Conducted……………………………………………33

        B.      Screening for and Appointment of Counsel…………………………………34

                i.      Screening for Eligibility……………………………………………36

                        a.      Screening Instrument……………………………………………36

                        b.      Screening Process………………………………………………40

                ii.     Determination of Qualification for Counsel……………………………44

                iii.    Denial of Counsel………………………………………………………45

                iv.     Appointment of Counsel………………………………………………47

        C.      Appeal Process………………………………………………………………49

                i.      Availability of Appeal Form……………………………………………50

                ii.     Explanation of Appeal Decision………………………………………...51

III.    CONCLUSION…………………………………………………………………52

## I.     BACKGROUND

In *Morrissey v. Brewer*, 408 U.S. 471 (1972) and *Gagnon v. Scarpelli*, 411 U.S. 778 (1973), the United States Supreme Court outlined the minimum due process requirements for parole revocation proceedings and mandated appointment of state-funded counsel at parole revocation hearings in certain cases.  Nearly fifty years later, Defendants the Missouri Department of Corrections ("MDOC"), its Division of Probation and Parole, and the Missouri Board of Probation and Parole ("Parole Board"), in response to the instant lawsuit challenging the constitutionality of their parole revocation policies, procedures, and practices, conceded that "the policies that existed at the time Plaintiffs[1] filed their Amended Class Action complaint[2] did not satisfy the requirements of [*Morrissey* and *Gagnon*]" but contended that they had taken "substantial corrective measures to remedy these shortcomings."  (Doc. #140, p. 1).[3] Defendants consented to entry of summary judgment in Plaintiffs' favor as to liability on Plaintiffs' sole claim for due process violations under 42 U.S.C. § 1983.  In turn, the Court, finding "no genuine dispute as to any material fact" and that Plaintiffs were "entitled to judgment as a matter of law," entered summary judgment in Plaintiffs' favor.[4]  Fed. R. Civ. P. 56(a).

While the merits of the case have already been ruled, the question remains regarding whether Defendants' revised policies and procedures satisfy due process requirements.  On June 10–11, 2020, the Court conducted an evidentiary hearing to examine the current standing of Defendants' parole revocation process.  Having reviewed the evidence presented at the hearing

---

[1] The plaintiff class ("Plaintiffs") includes all adult parolees in the state of Missouri who currently face, or who in the future will face, parole revocation proceedings.

[2] Plaintiffs seek injunctive and declaratory relief and request that the Court retain jurisdiction of this case until Defendants bring their policies, procedures, and practices into constitutional compliance.

[3] All page numbers refer to the pagination automatically generated by CM/ECF.

[4] The motion for summary judgment and suggestions in support containing the undisputed facts, deemed admitted by Defendants pursuant to Local Rule 56.1(b)(1), are incorporated by reference herein.

3

and in the parties' briefing on the matter, the Court finds constitutional deficiencies in the current parole revocation process remain and issues this Order to remedy such due process violations.

## II.    DISCUSSION

*Morrissey* and *Gagnon* control the Court's analysis.  Although parole revocation "is not part of a criminal prosecution and thus the full panoply of rights due a defendant in such a proceeding does not apply to parole revocations," *Morrissey* held that certain minimum due process procedures are required for parole revocation proceedings.  408 U.S. at 480 (citation omitted).  This is because parole revocation deprives an individual of "conditional liberty," which "is valuable and must be seen as within the protection of the Fourteenth Amendment." *Id.* at 482.  Termination of conditional liberty, therefore, "calls for some orderly process, however informal."  *Id.*  The *Morrissey* Court identified "two important stages in the typical process of parole revocation."  *Id.* at 485.  "The first stage occurs when the parolee is arrested and detained[.]"  *Id.*  "The second occurs when parole is formally revoked."  *Id.*

In 1973, a year after *Morrissey*, the Supreme Court mandated the appointment of state-funded counsel at parole revocation hearings in certain cases.  Recognizing that "there are critical differences between criminal trials and probation or parole revocation hearings," the *Gagnon* Court found that "[t]he need for counsel at revocation hearings derives, not from the invariable attributes of those hearings, but rather from the peculiarities of particular cases."  411 U.S. at 788-89.  "[T]he decision as to the need for counsel must be made on a case-by-case basis in the exercise of a sound discretion by the state authority charged with responsibility for administering the probation and parole system."  *Id.* at 790.  "Although the presence and participation of counsel will probably be both undesirable and constitutionally unnecessary in

4

most revocation hearings, there will remain certain cases in which fundamental fairness—the touchstone of due process—will require that the State provide at its expense counsel for indigent probationers or parolees." *Id.*

The Supreme Court has noted it has not and could not "write a code of procedure" for parole revocation hearings. *Morrissey*, 408 U.S. at 488. Instead, "[m]ost States have done so by legislation, *others by judicial decision* usually on due process grounds." *Id.* (footnote omitted) (emphasis added). Thus, what follows is the Court's careful examination of each of the current policies, procedures, and practices at issue, considered individually and as components of the parole revocation process as a whole, and corresponding determinations as to whether due process is being met or violated. The Court will endeavor to identify mandated relief to remedy due process violations and suggested changes to avoid prolonged litigation.[5] The Court will conduct a status hearing with the parties following the issuance of this Order to discuss effectuating the remedies set forth herein.

The Court will first address Defendants' policies, procedures, and practices that correspond with each of the two stages of parole revocation proceedings before turning to the provision of state-funded counsel.[6] The Court will address only the aspects of the parole revocation process that are at issue at this juncture of the case.

### A. Revocation Proceedings

The Court recognizes that from the time Plaintiffs initiated this case in 2017 to present, Defendants have made significant changes to their parole revocation policies and procedures.

---

[5] In some instances, the Court finds that individual provisions of policies or components of forms may not violate due process in and of themselves, but present concerns and contribute to constitutional shortcomings in Defendants' parole revocation process as a whole. In those instances, the Court provides suggested revisions to bring Defendants closer to the administration of minimum due process to parolees and to avoid prolonged litigation.

[6] While this Order generally analyzes the components of revocation proceedings in chronological order, the Court will occasionally depart from this structure for purposes of clarity and succinctness.

5

The Court applauds the significant changes to the system, but notes these issues involve almost 50-year-old Supreme Court precedent. The Court deduces from the record as a whole that Defendants' revocation proceedings are designed to track the following basic structure. A parolee is arrested and detained. Within five to ten days of detention, the parolee is given an initial violation interview with a parole officer to discuss the alleged violations and the parolee's rights during the revocation process. At the initial interview, the parole officer gives the parolee the option to request or waive screening for eligibility for state-funded counsel and to request or waive a preliminary hearing. After the preliminary hearing is conducted or waived, if probable cause that the parolee committed the alleged violation(s) is determined to exist, a parole officer conducts another violation interview with the parolee in preparation for the revocation hearing. The parolee is reminded of his rights during the revocation process, given the option to request or waive a revocation hearing, and given the option to request or waive the right to be screened for state-funded counsel eligibility. A revocation hearing is waived or conducted, and determinations of whether the parolee violated conditions of his parole and whether revocation is warranted are made. Parole is then either revoked or the parolee is released on parole. The parolee receives notice of the decision and in some cases is given the option to appeal.

### i. Arrest and Preliminary Hearing (Stage 1)

Regarding the first stage of revocation proceedings, due process requires "that some minimal inquiry be conducted at or reasonably near the place of the alleged parole violation or arrest and as promptly as convenient after arrest while information is fresh and sources are available." *Morrissey*, 408 U.S. at 485. The purpose of this "preliminary hearing" is to "determine whether there is probable cause or reasonable ground to believe that the arrested parolee has committed acts that would constitute a violation of parole conditions." *Id.* "[T]he

6

determination that reasonable ground exists for revocation of parole should be made by someone not directly involved in the case." *Id.* "[T]he parolee should be given notice that the hearing will take place and that its purpose is to determine whether there is probable cause to believe he has committed a parole violation." *Id.* at 486-87. "The notice should state what parole violations have been alleged." *Id.* at 487.

"At the hearing the parolee may appear and speak in his own behalf; he may bring letters, documents, or individuals who can give relevant information to the hearing officer." *Id.* The parolee may question adverse witnesses at the discretion of the hearing officer. *Id.* "The hearing officer shall have the duty of making a summary, or digest, of what occurs at the hearing in terms of the responses of the parolee and the substance of the documents or evidence given in support of parole revocation and of the parolee's position." *Id.* "[T]he decision maker should state the reasons for his determination and indicate the evidence he relied on." *Id.* (citation and quotation marks omitted). With these United States Supreme Court mandates in mind, the Court turns to Defendants' policies, procedures, and practices that govern the preliminary hearing stage of the revocation proceedings.

### a. Notice of Alleged Violations

Defendants' Procedure P3-8.2 requires parole officers to interview parolees who have allegedly violated parole "within 10 business days of becoming aware of an alleged violation(s)" and in some cases within five business days.[7] (Doc. #194-2, pp. 2-3). Pursuant to the same procedure, at the violation interview, the parole officer is to advise the parolee of the specific violations and give the parolee an opportunity to respond to each violation. (Doc.

---

[7] For example, when the parolee is part of the Violator Unit, Procedure P3.8-7 provides that "[t]he Violator Unit shall be responsible for completing a violation interview and offering the preliminary hearing within five business days of the [parolee's] arrest." (Doc. #194-7, pp. 2, 5).

#194-2, p. 4).  Pursuant to Procedure P3-9.1, "within five business days of becoming aware of their incarceration on alleged violations," the parole officer is also required to offer the parolee a preliminary hearing.  (Doc. #287-1, p. 6).

According to Defendants, parolees also "are . . . to be provided with a copy of the violation report setting out their alleged violations at their violation interviews."  (Doc. #194, p. 8).  At least one of their procedures provides as much.  Procedure P3-9.1 requires that parolees be provided with a copy of the violation report—which details the particulars of the violation(s)—at their violation interviews.  (Doc. #287-1, p. 5).  Procedure P3-8.1 provides that an initial violation report should be provided to parolees "within 10 business days of substantiating the violation."  (Doc. #194-1, p. 8).  This same procedure also requires that any supplemental violation report be provided to parolees "within 10 business days of receiving additional information."  (Doc. #194-1, p. 9).

Plaintiffs contend that Defendants' policy that "an alleged parole violator must receive a [] violation report [] outlining the alleged violations . . . within ten days of substantiating the violation . . . is not being consistently implemented in practice" and, therefore, violates due process.  (Doc. #316, p. 12).  Plaintiffs argue that, in practice, some parolees do not receive their violation reports until the revocation process is well under way, sometimes after they have already waived their constitutional rights.  Defendants respond that their procedures governing notice to parolees of their alleged violations satisfy due process, but they do not address in their briefing the concern that they fail to consistently comply with such policies.

The Court finds that the relevant policies, as written, satisfy *Morrissey*'s minimum due process requirements that parolees be given notice of their alleged violations and a preliminary hearing "as promptly as convenient after arrest while information is fresh and sources are

8

available." 408 U.S. at 485. However, Defendants' policies governing the timeliness of the initial interview and those governing the timeframe in which parolees must be provided with the violation report are inconsistent. For example, Procedure P3-8.1 states that parolees are to receive their violation reports within ten days of substantiating the violation. But Procedure P3-9.1 requires that parolees be provided with a copy of the violation report at the violation interviews, which, depending on circumstances, may be required to be held within five—and not ten—days.

*Suggested Change*

- Defendants should amend their policies to clarify that in all cases, parolees must receive their violation report at their initial violation interviews, regardless of whether the five or ten-day timeframe applies.[8]

The Court also finds that the relevant policies governing notice of alleged violations are not consistently implemented. Plaintiffs' expert, Mr. David Muhammad, "identified inadequate notice as one of the key constitutional deficiencies remaining in Defendants' parole revocation process." (Doc. #316, p. 12; Tr.[9] 91:15-18). All five class members who testified at the evidentiary hearing indicated they did not receive their violation report within the ten-day timeframe required by MDOC policy. (Tr. 148:22-25, 149:1-11, 186:1-18, 214:7-25, 215:1-16, 230:18-22, 247:18-25, 248:1-6). Four out of the five indicated they did not receive their violation report at their initial violation interview. (Tr. 148:22-25, 149:1-11, 186:1-18, 214:7-25, 215:1-16, 230:18-22). One class member testified she saw her violation report for the first time when she received her revocation decision. (Tr. 230:5-22). Another indicated he did not

---

[8] The Court observes similar inconsistences throughout Defendants' policies in other instances but is limited to critiquing only those inconsistencies at issue in this case. Defendants are encouraged to ensure all language is clear, consistent, and accurate across all policies and forms to ensure parolees' due process rights are being met.
[9] "Tr." denotes citation to the electronic transcript of the evidentiary hearing, located at Doc. #313 and Doc. #314.

receive notice of his violations until a month after his arrest and after he had been encouraged to

waive his revocation hearing.  (Tr. 148:22-25, 149:1-11).  A third class member asserted that he

did not receive his violation report until he had been in custody for over four months, even

though he met with a parole officer soon after his arrest.  (Tr. 214:7-25, 215:1-16).

Similarly, other parolees' declarations indicate they never received their violation

reports, or received untimely, incomplete, or inaccurate violation reports at their initial violation

interviews.  (Doc. #287-10, ¶ 5; Doc. #287-12, ¶ 13; Doc. #287-13, ¶¶ 7, 19; Doc. #287-20, ¶ 9;

Doc. #287-21, ¶ 19; Doc. #287-22, ¶ 9; Doc. #287-24, ¶¶ 7, 17).  In other instances, parolees

never received the relevant violation report at all.  (Doc. #316, p. 16; Doc. #287-18, ¶ 20).  This

evidence demonstrates parolees are making determinations as to whether they would like to

request or waive hearings and the right to be screened for state-funded counsel, as discussed

later in this Order, before being made aware of the alleged parole violations.

Thus, even though this Court finds Defendants' policies governing notice to parolees of

their alleged violations satisfy due process, Defendants' failure to adhere to such policies does

not.

*Mandated Remedy*

- Defendants are ordered to comply with the policies governing notice to parolees
  of their alleged violations and keep documentation of their compliance.

*Suggested Change*

- The Court encourages Defendants to ensure all forms, reports, and other relevant
  documents include space to state the date on which the document was provided
  or administered.

### b. Notice of Rights

Pursuant to Procedure P3-9.1, at the initial interview, parolees are to be provided a copy of the Notice of Rights During the Revocation Process form ("Notice of Rights form") (Doc. #194-8, p. 4).[10]

You have the right to a probable cause hearing in front of an officer who will not be your Probation and Parole Officer or your Probation and Parole Officer's immediate supervisor. This is an informal proceeding and is not your final revocation hearing. The hearing officer acts as a neutral fact-finder. The hearing officer merely determines if there is probable cause to believe you violated the terms of your supervision. If probable cause is found, the Court or Parole Board may schedule a revocation hearing.

During the preliminary hearing, you have the right to:

- Have counsel represent you, or be appointed counsel in some cases, as explained above
- Remain silent regarding any potential criminal charges. You do not have to admit to any wrongdoing and you have the right to refuse to answer any questions about your alleged violation(s)
- Tell your side of the story, if you think it will help your case
- Present witnesses, in person, or by phone through coordination with the Parole Officer.
- Ask questions of anyone who testifies at the hearing, unless the hearing officer specifically finds there is good cause for not allowing you to do so
- Present documents related to the alleged violation

If you are on probation, the judge will control when and how your revocation hearing takes place.

If you are on parole, you have the same rights at the revocation hearing that you have at the preliminary hearing. In addition, after the Parole Board makes a decision after the revocation hearing, you will receive written notice to include the evidence the Parole Board relied on in making its decision.

Procedure P3-8.7 requires the parole officer to explain the Notice of Rights form, which describes the revocation proceedings process, advises the parolee of the right to counsel, and discusses the right to preliminary and revocation hearings. (Doc. #194-7, p. 5).

Specifically, the Notice of Rights form explains that parolees have a right to a "probable cause hearing" and that the purpose of such a hearing is to "merely determine[] if there is probable cause to believe [the parolee] violated the terms of . . . supervision." (Doc. #194-3, p. 2). It states that the "preliminary hearing will occur within 10 business days of the initial

---

[10] The Notice of Rights Form is attached to this Order as Exhibit A.

interview." (Doc. #194-3, p. 3). It also explains that the hearing officer will be a neutral party and details the rights parolees have at the preliminary hearing. Further, the form provides that parolees have the same rights at the revocation hearing that they are entitled to at the preliminary hearing.

> You may have a right to counsel, if you desire counsel, you are free to obtain your own attorney to represent you. If you are on Missouri probation and cannot afford an attorney, you may tell the judge you would like counsel and the court will determine your eligibility. If you are on Missouri parole, conditional release or an Interstate probation or parole case and cannot afford counsel, you may tell your Probation and Parole Officer that you would like counsel and they will determine whether you are eligible. If you are on Missouri parole, conditional release or an Interstate probation or parole case and your request for counsel is denied, you will receive a written explanation for the denial.

The Notice of Rights form explains that if parolees cannot afford an attorney, they may tell their parole officer that they would like counsel and the parole officer will determine whether the parolee is eligible. The form also provides space for the parolee and a "witness" to sign. (Doc. #194-3, p. 3).

In addition to the Notice of Rights form, the Request for or Waiver of Preliminary Hearing form ("Preliminary Hearing form"),[11] which is to be completed at the initial violation interview pursuant to Procedure P3-9.1, provides a space for the parole officer to list the violation(s) charged against the parolee and boxes to fill out the date, time, and location of the preliminary hearing, as well as the hearing officer. (Doc. #287-1, p. 6).

---

[11] The Preliminary Hearing form is attached to this Order as Exhibit B.

NOTICE OF RIGHT TO COUNSEL AT A PRELIMINARY HEARING

You have a right to a preliminary hearing. You may be represented at your hearing by counsel of your choice, selected and paid for by you. You will receive written notice of the hearing and it is up to you to ensure your counsel has the information and is able to appear and represent you.

If you are on Probation for a Missouri case and cannot afford counsel, you may tell the judge you would like counsel and the court will determine your eligibility.

If you are on Missouri Parole, Conditional release or an Interstate Probation or Parole case, and cannot afford counsel, you may tell your Probation and Parole Officer that you would like counsel and they will screen you for eligibility. If your request for counsel is denied, you will receive a written explanation for the denial.

You may also decide to waive your right to counsel.

I will provide my own counsel_____client's initials,

Request I be screened for eligibility to have counsel represent me at the preliminary hearing_____client's initials, *OR*

Request to waive right to counsel_____client's initials

CLIENT'S REQUEST/WAIVER OF PRELIMINARY HEARING:

Having been fully informed and having full knowledge of these rights in the aforementioned section, I do hereby,

☐ REQUEST a preliminary hearing _____Client's Initials

☐ WAIVE a preliminary hearing_____Client's Initials

INTERSTATE CASES: Clients must sign a written admission in order to waive their hearing.

INTERSTATE CLIENT STATEMENT:

I,_____admit to violating all or some of the below listed conditions of my supervision by:

VIOLATION(S)
The charges brought against you consist of the following violation(s) of the conditions of your probation, parole or conditional release:

| CLIENT SIGNATURE | DATE | WITNESS SIGNATURE | DATE |
|---|---|---|---|
| | | | |

The Preliminary Hearing form also permits parolees to request or waive a preliminary hearing and request or waive the right to be screened for counsel or elect to provide their own counsel.

The Request for or Waiver of Revocation Hearing form ("Revocation Hearing form"),[12] which is also to be completed at a violation interview, similarly includes boxes to fill out the date, time, and location of the revocation hearing.

---

[12] The Revocation Hearing form is attached to this Order as Exhibit C.

13

**NOTICE OF RIGHT TO COUNSEL AT REVOCATION HEARING**

You have a right to a revocation hearing and your parole/conditional release may be revoked at your hearing. You may be represented at your hearing by counsel of your choice, selected and paid for by you. You will receive written notice of the hearing and it is up to you to ensure your counsel has the information and is able to appear and represent you. If you cannot afford counsel, you may tell your Parole Officer that you would like counsel and they will screen you for eligibility. If your request for counsel is denied, you will receive a written explanation for the denial. You may also decide to waive your right to counsel.

Request I be screened for eligibility to have counsel represent me at the revocation hearing _____ Initials     OR

Request to waive right to counsel _____ Initials

---

**CLIENT'S REQUEST/WAIVER OF REVOCATION HEARING:**

Having been fully informed and having full knowledge of these rights in the aforementioned section, I do hereby,

☐ WAIVE a revocation hearing _____ Initials

☐ REQUEST a revocation hearing _____ Initials

---

**By Signing this form, I agree that I have been provided the following:**

A copy of the Notice of Rights to Revocation Process form,

Any Violation Reports pertaining to the cited violations, and

Preliminary Hearing was:

☐ Waived

☐ Held (date:_____)

---

| CLIENT SIGNATURE | DATE | WITNESS SIGNATURE | DATE |

The Revocation Hearing form permits parolees to request or waive a revocation hearing and request or waive the right to be screened for counsel. The Revocation Hearing form does not, however, include the language allowing parolees to elect to provide their own counsel. Nor does it contain a space for the parole officer to list the violation(s) alleged against the parolee. Pursuant to Procedure P3-8.2, the Notice of Rights and hearing forms—like all signed forms—are required to be kept in the parolee's file. (Doc. #194-2, p. 4).

### 1. Timeliness of Notice

Plaintiffs argue that "Defendants have improved their process for notifying parolees of their rights, at least on paper. But implementation of this process is problematic because it is

'very inconsistent'" and does not satisfy due process concerns. (Doc. #316, p. 20; Tr. 45:12-15). Plaintiffs specifically complain that the Notice of Rights form is not always provided in a timely manner. Defendants do not address Plaintiffs' argument that Defendants fail to consistently provide timely notice of rights but argue instead that their policies are constitutional because they require timely notice.

The Court agrees that Defendants' policy governing the timely provision of the Notice of Rights form to parolees satisfies due process requirements. But the evidence shows that the policy is not being applied in practice. Many parolees testified that they did not receive their Notice of Rights form during their initial interview as required by Defendants' policy and waited weeks to months to receive it, or, in some cases, never received it at all. (Tr. 145:17-22, 146:8-9, 156:20-22, 185:1-25, 186:1-3, 215:13-19, 230:10-24; Doc. #287-10, ¶ 6; Doc. #287-11, ¶ 5; Doc. #287-12, ¶ 9; Doc. #287-24, ¶ 8). Mr. Muhammad testified to the same. (Tr. 45:12-20, 46:2-8, 69:25, 70:1-4, 137:11-16).

Failure to provide the Notice of Rights form in a timely manner or at all pursuant to Defendants' policy and as required by *Morrissey* constitutes a violation of due process. 408 U.S. at 485-87 (Parolees must be given the required notice in advance of a preliminary hearing "as promptly as convenient after arrest while information is fresh and sources are available.").

*Mandated Remedy*

- Defendants are ordered to comply with their policy governing the timely provision of the Notice of Rights form to parolees and keep documentation of their compliance.

15

## 2. Content of Forms

Plaintiffs next complain that the Notice of Rights form, while an improvement from the previous mechanism used, provides insufficient information and "still includes language that is unnecessarily confusing." (Doc. #316, p. 20; Tr. 67:19-21). Plaintiffs note that "the form refers both to a preliminary hearing and to a probable cause hearing, but never connects the dots for a parolee by explaining that these are the same thing." (Doc. #316, p. 20; Tr. 68:7-10). Plaintiffs argue that not only is the right to be screened for a free attorney buried in dense language, but the criteria for qualifying for this right is absent from the form altogether. Plaintiffs also argue that the Notice of Rights form does not adequately describe the preliminary or revocation hearing processes themselves. Defendants respond by arguing that the Notice of Rights form sufficiently notifies parolees of their rights during revocation proceedings.

The Court notes initially that the Notice of Rights form must be analyzed together with the Preliminary Hearing form and the Revocation Hearing form because all three forms are administered at violation interviews and contribute to providing due process to parolees. In view of that, the Court finds that the forms for the most part satisfy due process. However, certain portions of the forms violate minimum due process requirements or are inconsistent with Defendants' policies, and the Court mandates amendments to the forms in those cases. The Court further finds that other provisions may not violate due process when considered as distinct components, but, when considered as a whole, they contribute to Defendants' failure to provide due process to parolees in the parole revocation process. In those instances, the Court suggests Defendants revise the identified forms to bring Defendants closer to the administration of minimum due process and avoid prolonged litigation. The Court addresses both types of

concerns with the identified forms, beginning with mandated revisions and then turning to suggested revisions.

*Mandated Remedies*

- Defendants are ordered to amend the Revocation Hearing form to add a space for the alleged violations to be listed, just as the Preliminary Hearing form provides such space. *Morrissey* requires "written notice of the claimed violations of parole" in connection with a revocation hearing. 408 U.S. at 489.

- Defendants are ordered to amend the Revocation Hearing form to include an option for parolees to provide their own counsel at revocation hearings, as required by Defendants' Procedure P6-8.1. (Doc. #287-5, p. 9)

In addition to these mandated revisions, Defendants are strongly encouraged to incorporate the following additional revisions to the identified forms to ensure parole revocation proceedings, as a whole, comply with due process requirements and to avoid protracted litigation.

*Suggested Changes*

- Parolees should be notified of the conditional right to "*state-funded*" counsel, or counsel that is free of cost to parolees, before they decide whether to provide their own counsel, request to be screened for counsel, or waive the right to counsel. *Gagnon*, 411 U.S. at 790. Currently, the Notice of Rights form fails to make clear that if eligible, parolees will be appointed counsel at no cost to parolees. This should be made clear on the Notice of Rights form.

- Defendants should consider defining the criteria that qualify a parolee for state-funded counsel on the Notice of Rights form. While the screening for and

17

appointment of state-funded counsel is addressed in detail later in this Order, this criteria for qualification should be contained on the Notice of Rights form in order for parolees to make an informed decision to either request to be screened for counsel or waive that right.

- As Plaintiffs note, the Notice of Rights form refers to the preliminary hearing as a probable cause hearing, without informing the parolee that they are the same. Defendants should either clarify that the preliminary hearing and probable cause hearing are synonymous or omit the term "probable cause hearing" from the Notice of Rights form.

- The Notice of Rights form also informs parolees that even if they waive their preliminary hearing, they "*will* still have a revocation hearing before the court or Parole Board." (Doc. #194-3, p. 3) (emphasis added). This is inaccurate since parolees have the option to waive the revocation hearing. Correcting this language to indicate parolees "*may*" have a revocation hearing if they so choose will help to ensure parolees have an accurate understanding of the revocation process.

- The Notice of Rights form incorrectly advises parolees that after the initial arrest, they will receive a copy of their alleged violations, "called the Notice of Rights," when, in fact, the alleged violations are contained in "violation reports." Defendants should fix this mistake and utilize the correct terminology.

- The Notice of Rights form provides that parolees should meet with a parole officer within five business days after the parolees' arrest; however, Defendants' policies in some instances call for a violation interview within ten business days.

18

Defendants should ensure this language conveys accurate expectations to

parolees and accurately reflects the timeframe within which the initial violation

interview with a parole officer will take place (five to ten business days after the

parolee's arrest, according to Defendants' policies).

Although the Court likely did not catch every inconsistency or inaccuracy within the

forms, the Court encourages Defendants to keep terminology consistent and ensure the forms

contain an accurate description of the revocation process to properly inform parolees of their

rights and guarantee the administration of due process.[13]

### 3. Explanation of Rights

Plaintiffs also argue that many parolees do not understand their rights due to higher rates

of illiteracy and mental illness among parolees. Plaintiffs argue that the Notice of Rights form

is only read to parolees if they request it, and, in at least one instance, a parolee asked for the

form to be read to him and was denied. Plaintiffs argue that parole officers should be required

to ask all parolees if they want the Notice of Rights form read to them. Defendants argue that

their policies governing provision of the Notice of Rights form to parolees satisfy due process

requirements.

Defendants' procedures provide that the parolee must be provided an explanation of the

Notice of Rights, Preliminary Hearing, and Revocation Hearing forms. Procedure P3-8.7 states

---

[13] Defendants should also consider the use of headings on the Notice of Rights form to differentiate between the preliminary hearing and the revocation hearing and ensure parolees understand they have a right to both. Defendants should also consider organizing the Notice of Rights form in a more accessible way. For example, Defendants could first describe the preliminary hearing and next describe the revocation hearing. Then, instead of couching the section describing the right to counsel in between the hearing descriptions, Defendants could move it to a section below the hearing descriptions. The Notice of Rights form also states, "If you want to have witness testimony at your preliminary hearing, you must include your witnesses' names and contact information on a separate piece of paper and give it to the PO." (Doc. #194-3, p. 3). Defendants should consider making these instructions more precise, to include the manner in which to submit such information to the parole officer. The Court reiterates that implementing these changes will ensure parolees have an accurate understanding of the parole revocation process and enable Defendants to carry out due process, while avoiding continued legal challenges.

that "The Violator Unit *shall explain* the Notice of Rights During the Revocation Process form .

. . [and] read the Notice of Right to Counsel section on the Request for or Waiver of Preliminary

Hearing form . . . to the [parolee]." (Doc. #194-7, p. 5) (emphasis added). Procedure P3-8.2

states that "the [parolee] shall be provided a copy of the . . . Notice of Rights During the

Revocation Process form . . . *for explanation* and signatures." (Doc. #194-2, p. 4) (emphasis

added). Procedure P3-9.1 further states that the parole officer "*shall explain* the purpose of the

violation interview[.]" (Doc. #287-1, p. 5) (emphasis added). Procedure P3-9.1 also states that

"The Notice of Right to Counsel section on the Request for or Waiver of Preliminary Hearing

form [] shall be read to the [parolee]." (Doc. #287-1, p. 6). Procedure P6-8.1 instructs parole

officers to read "The Notice of Counsel section on the Request for or Waiver of Revocation

Hearing form" to parolees. (Doc. #287-5, p. 9). Language at the top of the Notice of Rights

forms states:

> **YOU MAY REQUEST THAT THE DEPARTMENT OF CORRECTIONS REPRESENTATIVE
> READ THIS DOCUMENT TO YOU**

(Doc. #287-2, p. 3).[14]

Defendants explicitly acknowledge that their policies require parole officers to explain

the revocation process and the parolees' rights therein so that parolees can make an informed

decision to either request or waive their preliminary and revocation hearings. (Doc. #194, pp.

11-12) ("These policies establish that the parole revocation process is explained to alleged

parole violators and they are informed of their rights during this process, including the right to

counsel (and appointed counsel if eligible) before being asked to decide whether they wish to

waive either the preliminary hearing, the final hearing, or both."). Put simply, these policies

_____

[14] The Court notes that if an individual is illiterate, placing an item in all caps and bold does not change the
individual's ability to read or understand the language.

reflect the importance of explaining the revocation process and, where necessary, reading the forms to parolees to ensure they have notice of their rights and the purpose of the revocation proceedings. *Morrissey*, 408 U.S. at 486-87.

Evidence indicates that parole officers are not complying with these written procedures. In November of 2019, a survey was sent to all parolees who went through the revocation process after the grant of summary judgment in this case. Of the 470 class members who responded, only 12-15% of surveyed parolees reported being informed of their right to counsel. (Doc. #316, pp. 30, 35; Tr. 61:18-19). "Of the fifteen Class Members who submitted declarations to this Court, as well as the five witnesses who testified before this Court, none clearly understood that they may have been entitled to be represented by a free attorney" or what would qualify them for such representation. (Doc. #316, p. 22). Some indicated they were never told they might have the right to a state-funded attorney. (Doc. #287-10, ¶ 9; Doc. #287-11, ¶ 6; Doc. #287-12, ¶ 10; Doc. #287-13, ¶¶ 9, 14; Doc. #287-14, ¶¶ 11, 19; Doc. #287-15, ¶¶ 13, 23; Doc. #287-16, ¶ 18; Doc. #287-17, ¶ 8; Doc. #287-18, ¶ 13; Doc. #287-19, ¶ 10; Tr. 146:25, 147:1-2, 153:19-25, 154:1-5, 157:22-25, 264:22-25, 265:1-12, 228:2-4, 228:22-25, 229:1-2).

Parolees described their meetings with parole staff as "real quick" or "real fast" and described the parole officer's explanation of the preliminary hearing as "very vague." (Tr. 226:21, 252:11-13, 189:8-18). One parolee indicated he was told "nothing about the rights" he may have at a preliminary hearing. (Tr. 146:19-24). Another testified that "[n]othing about the process was explained to me, including what rights I may have." (Doc. #287-20, ¶¶ 8, 16). Another testified that "the parole officer did not explain any rights that I may have" and "I also do not recall waiving any hearings." (Doc. #287-11, ¶ 5). One parolee indicated that his parole

officer did not tell him what the purpose of the preliminary hearing was and that his violation interview left him with the impression that a revocation hearing did not pertain to him. (Tr. 250:23-25, 253:12-15). Another parolee asserted that she was told "nothing really" about the revocation hearing. (Tr. 229:18-19).

Moreover, some parolees indicated their parole officers gave them the Notice of Rights form but they "did not really discuss it," much less ask if the parolees wanted the form read to them or if they had any questions. (Doc. #287-15, ¶ 25; Doc. #287-20, ¶ 8). Others indicated they did not recall receiving the Notice of Rights form but, if they did, they did not remember the parole officer explaining it to them. (Doc. #287-11, ¶ 5; Doc. #287-17, ¶ 32; Doc. #287-18, ¶12; Doc. #287-19, ¶ 8). Mr. Muhammad opined that the evidence demonstrates "a general lack of knowledge and understanding of the revocation process and the purpose of the hearings within that process." (Doc. #316, p. 26; Tr. 65:12-19). This Court agrees.

Accordingly, even though the Court finds that Defendants' policies requiring parole officers to explain the parole revocation process and parolees' rights therein conform to due process requirements, failure to abide by such policies render them meaningless.

*Mandated Remedies*

- Defendants are ordered to comply with their policies requiring parole officers to explain the content of the Notice of Rights, Preliminary Hearing, and Revocation Hearing forms and the parole revocation process to parolees at the violation interviews.

- Defendants are further ordered to orally offer to read the Notice of Rights form to parolees and to amend their policies to reflect this requirement.

### c. Pressure to Waive Preliminary and Revocation Hearings

Plaintiffs argue that parolees are often pressured to waive their rights to preliminary and revocation hearings. Defendants respond that all parolees who testified at the evidentiary hearing knowingly and voluntarily waived their rights to a hearing, which they argue is evidenced by the fact that they signed the forms indicating they waived.

As discussed, *Morrissey* requires that a parolee be given notice that the preliminary and revocation hearings will take place and the purpose of those hearings. 408 U.S. at 487-87. In other words, *Morrissey* makes clear that the default is to conduct preliminary and revocation hearings and that parolees are constitutionally entitled to such hearings. *See Gagnon*, 411 U.S. at 786 ("*Morrissey* mandated preliminary and final revocation hearings."); *Morrissey*, 408 U.S. at 485 ("[D]ue process would seem to require" a preliminary hearing to determine whether probable cause exists); *id.* at 487-88 ("There must also be an opportunity for a hearing, if it is desired by the parolee, prior to the final decision on revocation by the parole authority.").

Nevertheless, a parolee may waive his or her right to these hearings. "There is a presumption against the waiver of constitutional rights." *Brookhart v. Janis*, 384 U.S. 1, 4 (1966). All parties to this action agree that "'to be effective a waiver must be knowingly and voluntarily made.'" (Doc. #318, p. 6) (quoting *United States v. Taylor*, 747 F.3d 516, 519 (8th Cir. 2014)); (Doc. #316, p. 25); *see also Brookhart*, 384 U.S. at 4 (quoting *Johnson v. Zerbst*, 304 U.S. 458, 464 (1938) ("[F]or a waiver to be effective it must be clearly established that there was 'an intentional relinquishment or abandonment of a known right or privilege.'")). Defendants acknowledge that "in determining whether a waiver is knowing and voluntary . . . the totality of the circumstances is to be examined, with particular attention paid to the defendant's understanding of the right to be waived and how it might be waived." (Doc. #318,

23

p. 7) (citing *United States v. Jones*, 770 F.3d 710, 712 (8th Cir. 2014) (examining effective waiver in the context of federal parole revocation process)).

The evidence shows that parolees are pressured to waive their right to hearings. Eighty-three percent of parolee survey respondents "reported being encouraged to waive their preliminary hearing." (Doc. #316, p. 30; Tr. 62:4-19, 67:16-25, 68:1-25, 69:1-24). Only 45% of survey respondents were offered a revocation hearing, and 58% of those offered indicated they were encouraged to waive it. (Doc. #287-9, p. 4). Testimony at the evidentiary hearing reinforces the survey's results. Even after Defendants revised their policies, the rate of preliminary hearings conducted is 2.4% and the rate of revocation hearings conducted is 2.2%. (Doc. #316, p. 25; Tr. 60:1-15; Doc. #287-9, p. 4). According to Mr. Muhammad, this "damning data"—which goes unaddressed by Defendants—"shows that this [] basic right of having a hearing is happening very, very seldomly." (Tr. 60:3-15). The evidence indicates this low rate is due, at least in part, to pressure on parolees to waive their hearings.

Indeed, Mr. Muhammad opined that there is "significant pressure" placed on parolees to waive their hearings. (Tr. 65:8-11). His testimony and that of the parolees also indicate that the hearing rate is so low because parolees are often encouraged to waive their hearings. For example, one parolee testified that he waived his preliminary and revocation hearings because his parole officer told him he would likely be released and conducting hearings "would just slow the process." (Tr. 146:13-18). His parole was ultimately revoked. (Tr. 148: 14-22; Doc. #287-23, ¶ 21). Another parolee similarly testified he waived his preliminary hearing based on the understanding that he would likely be released and waived his revocation hearing because he "didn't think [the revocation hearing] pertained to him." (Tr. 253:15). This parolee's parole was also revoked. (Doc. #287-16, ¶ 29). A different parolee testified that he waived his

24

preliminary hearing because his parole officer gave him the impression that the hearing "would have been just basically a nuisance" and would only delay the revocation process, and that the parole board "typically [sticks] to what they've already made up their mind to do."  (Tr. 187:16-21, 189:22-25).  The parolee testified that he was informally notified that his parole was revoked but never received a written revocation decision.  (Tr. 197:21-25, 198:1-3).  Another parolee testified that she waived her hearings because the parole officer told her that she would be quickly released and that "it was [the parolee's] word against the police that arrested [her]." (Tr. 226:16-17, 227:11-13).  The parolee's parole was ultimately revoked.  (Doc. #287-19, ¶¶ 17-18).  Other parolees who submitted declarations and whose parole was ultimately revoked similarly testified that they were encouraged to waive their hearings, and did waive such hearings, often before being fully or accurately informed of their alleged violations or rights in the revocation process.  (Doc. #287-10, ¶¶ 9-10; Doc. #287-12, ¶¶ 8, 14; Doc. #287-13, ¶¶ 8, 12; Doc. #287-14, ¶¶ 17-18; Doc. #287-15, ¶ 22; Doc. #287-17, ¶¶ 7, 20, 27; Doc. #287-21, ¶ 15; Doc. #287-24, ¶¶ 9, 18; Doc. #287-25, ¶ 19).

The Court finds troubling the pressure placed on parolees to waive preliminary and revocation hearings, sometimes based on false and misleading information.  The issue is exacerbated by evidence that some parolees waive their right to hearings before receiving their violation reports and without an adequate explanation of their rights in the process.  Pressuring parolees to waive their hearings strips parolees of their right to challenge allegations that they contend are untrue or for which mitigating circumstances may render revocation unwarranted. (Doc. #287-13, pp. 2-4; Doc. #287-14, p. 3; Doc. #287-16, pp. 3-4; Doc. #287-23, p. 4).  A waiver that is the result of inaccurate or incomplete information or that is coerced or encouraged

is unknowing and involuntary, and denying parolees the hearings to which they are constitutionally entitled under *Morrissey* is a violation of due process.

*Mandated Remedy*

- Defendants are ordered to ensure parole officers stop encouraging and pressuring parolees to waive their hearings.

### ii. Revocation Hearing (Stage 2)

"There must also be an opportunity for a hearing, if it is desired by the parolee, prior to the final decision on revocation by the parole authority." *Morrissey*, 408 U.S. at 487-88. "This hearing . . . must lead to a final evaluation of any contested relevant facts and consideration of whether the facts as determined warrant revocation." *Id.* at 488. "The parolee must have an opportunity to be heard and to show, if he can, that he did not violate the conditions, or, if he did, that circumstances in mitigation suggest that the violation does not warrant revocation." *Id.* "The revocation hearing must be tendered within a reasonable time after the parolee is taken into custody." *Id.* "A lapse of two months . . . would not appear to be unreasonable." *Id.*

As outlined in *Morrissey*, the minimum due process requirements at "this second stage of parole revocation" include:

(a) written notice of the claimed violations of parole; (b) disclosure to the parolee of evidence against him; (c) opportunity to be heard in person and to present witnesses and documentary evidence; (d) the right to confront and cross-examine adverse witnesses (unless the hearing officer specifically finds good cause for not allowing confrontation); (e) a 'neutral and detached' hearing body such as a traditional parole board, members of which need not be judicial officers or lawyers; and (f) a written statement by the factfinders as to the evidence relied on and reasons for revoking parole.

*Id.* at 489.

### a. Disclosure of Evidence Against Parolee

Plaintiffs argue that Defendants have violated due process by failing to have a policy requiring Defendants to disclose evidence against parolees. Plaintiffs claim such evidence must be produced before the preliminary hearing. Defendants argue they are not required to disclose the evidence prior to the preliminary hearing, and, in any event, the evidence against parolees is disclosed. In support of their argument, Defendants point to their policies, which they claim "disclose to the parolee the adverse facts and witnesses against them" and "require officers to complete a Revocation Report, a letter given to the parolee so that they are notified of all the facts against them." (Doc. #318, p. 14) (citing Procedure P6-8.1).

Procedure P6-8.1 provides that "[i]f the [parolee] requests a revocation hearing before the Parole Board, then a Revocation Report shall be completed." (Doc. #287-5, p. 10). The report should be "provided to the [parolee] prior to the hearing" and contain the "condition(s) violated with a short explanation," "other violations," "mitigating or aggravating circumstances," and the parole officers' recommendation. (Doc. #287-5, pp. 10-11).

*Morrissey* requires disclosure to parolees of the evidence against them. 408 U.S. at 489; *see also Belk v. Purkett*, 15 F.3d 803, 806 (8th Cir. 1994) (finding evidence was not disclosed to Missouri parolee as required by *Morrissey* in that parolee "was not permitted to examine the written statement of the alleged victim," "did not receive the police reports," "was not given the results of the fingerprint test on the knife," and "was not told of [witnesses'] oral statements"). And contrary to Defendants' contention, their procedures do not require that evidence against the parolee be disclosed to parolees.

Mr. Muhammad testified that Defendants' failure to provide evidence to parolees and lack of policy requiring them to do so are key constitutional deficiencies of Missouri's parole

revocation process. (Tr. 91:15-18). He further stated that "no evidence [is] being provided to the alleged parole violator[s]." (Tr. 51:18-21). Accordingly, Plaintiffs urge the Court to require Defendants to adopt a policy requiring the disclosure of evidence to parolees. They request such evidence be produced no later than five days before the *preliminary* hearing.

While this Court agrees that such evidence must be provided to parolees, *Morrissey* only requires disclosure of evidence before the revocation hearing. 408 U.S. at 485-487; *Gagnon*, 411 U.S. at 786 (noting "[t]he final hearing is a less summary one because the decision under consideration is the ultimate decision to revoke rather than a mere determination of probable cause" and requires "disclosure to the [] parolee of evidence against him.").

*Mandated Remedy*

- The Court orders Defendants to disclose to parolees all evidence against them no later than five days before the revocation hearing. Defendants shall amend their policies to reflect this requirement.[15]

### b. Timeliness of Revocation Hearings

Plaintiffs next argue that revocation hearings are not consistently conducted in a timely manner. Defendants fail to address this argument in their briefing. *Morrissey* requires that "the revocation hearing must be tendered within a reasonable time after the parolee is taken into

---

[15] Plaintiffs also argue that "Defendants have a written policy that allows a hearing officer to address new evidence at a revocation hearing, even if that evidence was not included in a violation report or otherwise produced to a parolee." (Doc. #316, p. 17). Defendants do not respond to this argument. In support of their argument, Plaintiffs cite Procedure P3-9.4. But that procedure governs preliminary hearings, and Plaintiff did not cite, nor did the Court find, any authority requiring the disclosure of evidence to parolees in advance of the preliminary rather than the revocation hearing. Therefore, the provision at issue does not violate due process. However, the same provision is contained in Procedure P6-8.2, which governs revocation hearings. The provision reads: "Should the hearing panel be aware of relevant information contained in police reports or official documents regarding the alleged violation(s), but not summarized in the violation report, the information may be addressed with the [parolee]." (Doc. #287-8, p. 7). Still, contrary to Plaintiffs' argument, this provision does not state that hearing officers may address evidence not produced to a parolee. Instead, the provision addresses information contained in police reports or official documents, which, as the Court ordered, must be disclosed to parolees in advance of the revocation hearing. Therefore, the Court finds this provision does not violate due process.

28

custody." 408 U.S. at 488. "A lapse of two months . . . would not appear to be unreasonable." *Id.* The Eighth Circuit has held that a three-month delay from the time a parolee under federal supervision was taken into federal custody until the revocation hearing was reasonable in light of "administrative difficulties." *Creech v. U.S. Bd. of Parole*, 538 F.2d 205, 208 (8th Cir. 1976).

In accordance with these rulings, the Court finds Defendants' Procedure P6-8.1, which requires revocation hearings be conducted within 30 days of a parolee's return to MDOC custody, is reasonable. (Doc. #287-5, p. 11). The evidence, however, indicates Defendants do not always comply with this policy. The average time from return to MDOC custody until the revocation hearing is 74 days. (Tr. 90:17-21; Doc. #291-31, p. 2). In a data set provided by Defendants, 40 of the 44 parolees who requested revocation hearings were in MDOC custody for more than 30 days before their revocation hearings. (Doc. #291-31, p. 2). Twenty-two out of the 44 were in MDOC custody for more than 60 days. (Doc. #291-31, p. 2). In some instances, parolees are in MDOC custody for hundreds of days before their revocation hearing. (Doc. #291-31, p. 2). Defendants offered testimony at the evidentiary hearing indicating more recent data shows shorter custodial stays overall and demonstrates that the major outliers are due to extenuating circumstances such as parolees not being in MDOC custody. (Tr. 366:1-25, 367:1-25, 368:1-25, 369:1-19). The Court recognizes that certain cases may arise in which Defendants, for reasons out of their control, will not be able to conform to their own 30-day policy. However, Defendants must demonstrate overall adherence to the policy in order to ensure due process is afforded to parolees, especially considering parolees may spend weeks in jail before being transferred to MDOC custody and Defendants do not account for such time.

29

*Mandated Remedy*

- The Court orders Defendants to demonstrate overall adherence to the policy requiring revocation hearings be conducted within 30 days of a parolee's return to MDOC custody, maintain documentation of their compliance with this policy, and keep detailed records to account for circumstances in which the 30-day deadline is not met.

The Court also notes that while Defendants' policy measures 30 days from the parolee's return to MDOC custody to the revocation hearing, the data set discussed above conflates the revocation hearing date with the date parolees receive revocation decisions. However, evidence indicates there is often a gap in time between the revocation hearing and the time the parole board makes a revocation decision. (Tr. 378:6-18). Defendants are directed to ensure the documentation they keep measures the time between parolees' return to MDOC custody and the revocation hearing.

### c. Written Statement of Revocation Decisions

Plaintiffs argue that Defendants fail to provide constitutionally adequate notice of revocation decisions, while Defendants argue the written statements provided to parolees satisfy constitutional demands. The revocation hearing "must lead to a final evaluation of any contested relevant facts and consideration of whether the facts as determined warrant revocation." *Morrissey*, 408 U.S. at 488. "The decision to revoke probation or parole typically involves two separate tiers: (1) a retrospective factual question whether the probationer has violated a condition of probation; and (2) a discretionary determination by the sentencing authority whether violation of a condition warrants revocation of probation." *Belk*, 15 F.3d at 814 (quoting *Black*, 471 U.S. at 609 (quotation marks omitted)). "Thus, a revocation decision

30

must include both a finding that the parolee violated a condition of his parole and that the parolee should be committed to prison." *Id.* The parolee must be given "a written statement by the factfinders as to the evidence relied on and reasons for revoking parole." *Morrissey*, 408 U.S. at 489. This requirement ensures the written statements "provide an adequate basis for review to determine if the decision rests on permissible grounds supported by the evidence." *Belk*, 15 F.3d at 814 (citing *Black*, 471 U.S. at 613-14).

Procedure P6-8.2 requires the hearing panel to make "a determination as to preponderance of the evidence on each violation cited." (Doc. #287-8, p. 8). If the hearing panel finds there to be a violation(s), then "[t]he hearing panel shall review all violations, aggravating and mitigating circumstances and shall make a determination as to whether the [parolee's] parole or conditional release should be revoked." (Doc. #287-8, p. 8). Subsequently, a Notification of Board Action "shall be processed and delivered to the [parolee], in person, within 10 business days from the date on the notice." (Doc. #211-1, p. 3). While a lead analyst for the Parole Board testified that parolees who have been revoked following a revocation hearing will "receive the decision, the aggravating circumstances in detail, and mitigating circumstances in detail," Defendants proffer no policy that requires parolees to be given "evidence relied on and reasons for revoking parole" after a revocation hearing. (Tr. 378:21-25). The lead analyst testified that "[a] parolee that has waived their hearing will simply receive the order of revocation with the violations and a notice of the decision," but again, Defendants point to no policy setting forth this requirement. (Tr. 379:10-13).

Plaintiffs argue, and Defendants do not dispute, that at least two testifying parolees did not receive their Notification of Board Action at all or received it weeks after the revocation decision was made. (Tr. 160:21-25, 161:1-7; 198:2-3).

*Mandated Remedy*

- Defendants are ordered to comply with the policy requiring parolees be given the Notification of Board Action within 10 business days of the date on the Notification. The Court orders Defendants to maintain careful documentation of the delivery of the Notifications of Board Action to parolees.

Next, Defendants' policies require the hearing panel to (1) determine whether the parolee has violated a condition(s) of parole and (2) consider whether revocation is warranted based on the violation(s) and aggravating circumstances. Defendants, however, have no policy that requires parolees be given "a written statement by the factfinders as to the evidence relied on and reasons for revoking parole." *Morrissey*, 408 U.S. at 489. While Defendants testify that "if it's a revocation hearing notice and [the parolee has] been revoked, [he or she will] receive the decision, the aggravating circumstances in detail, and mitigating circumstances in detail of what was considered for the revocation," Defendants do not indicate they have a policy requiring such information be provided to revoked parolees in writing. (Tr. 378:21-25).

The parties do not dispute that under current practices, parolees who waive the revocation hearing will only receive written notice that their parole has been revoked, with no discussion of the evidence relied upon or reasons for revocation. Waiver of the revocation hearing does not equate to waiver of the right to "a written statement by the factfinders as to the evidence relied on and reasons for revoking parole." *Morrissey*, 408 U.S. at 489. The evidence demonstrates that some revocation decisions are appealable even if a revocation hearing is not conducted. (Doc. #131-20). And for purposes of appeal, written statements must "provide an adequate basis for review to determine if the decision rests on permissible grounds supported by the evidence." *Belk*, 15 F.3d at 814 (citing *Black*, 471 U.S. at 613-14).

32

*Mandated Remedy*

- Defendants are ordered to construct and implement a policy mandating that, when a decision to revoke parole is made—regardless of whether a hearing was conducted—the Notice of Board Action must provide to the parolee a written decision outlining the evidence relied on to determine whether the parolee violated a condition(s) of parole, the mitigating circumstances considered, and reasons for revoking. *Morrissey*, 408 U.S. at 489.

Defendants' Procedure P6-6.1 requires that the "Notification of Board Action . . . shall be processed and delivered to the [parolee], in person, within 10 business days from the date on the notice," that a parolee "is presumed to have received their decision within 10 business days of the date the notice was final formed," and that parolees must file appeals "within 30 days after the decision has been received." (Doc. #211-1, pp. 3, 6). Defendants have no policy dictating how long after a revocation hearing or waiver of revocation hearing that a revocation decision must be made and the associated Notification of Board Action completed. Such a policy is necessary in order to give meaning to the policies governing parolees' receipt of revocation decisions and deadlines for filing appeals.

*Mandated Remedy*

- The Court orders Defendants to construct and implement a policy requiring revocation decisions be made and Notifications of Board Action completed within a reasonable amount of time after a revocation hearing or waiver thereof.

### d. Hearings Conducted

The parties dispute to a limited extent whether Defendants' policies, procedures, and practices governing the administration of the preliminary and revocation hearings themselves

33

and Defendants' compliance therewith satisfy due process requirements. The evidence in the record is insufficient for the Court to make that determination. The Court acknowledges that evidence is likely lacking because so few hearings are conducted and anticipates that as Defendants implement the relief required in this Order, they will begin to conduct hearings at a higher rate. Therefore, should constitutional issues arise regarding the administration of hearings and the governing policies in the future, the Court will address them at such time. The Court will further discuss this matter at a status hearing to be arranged by the Court following the issuance of this Order.

## B. Screening for and Appointment of Counsel

One of the most glaring shortcomings of Defendants' parole revocation policies and procedures is the failure to properly screen for state-funded counsel eligibility and appoint counsel when due process so requires. "[T]here are critical differences between criminal trials and probation or parole revocation hearings[.]" *Gagnon*, 411 U.S. at 788-89. "The need for counsel at revocation hearings derives, not from the invariable attributes of those hearings, but rather from the peculiarities of particular cases." *Id.* at 789. "[T]he decision as to the need for counsel must be made on a case-by-case basis in the exercise of a sound discretion by the state authority charged with responsibility for administering the probation and parole system." *Id.* at 790. "Although the presence and participation of counsel will probably be both undesirable and constitutionally unnecessary in most revocation hearings, there will remain certain cases in which fundamental fairness—the touchstone of due process—will require that the State provide at its expense counsel for indigent probationers or parolees." *Id.*

Under *Gagnon*:

Presumptively, it may be said that counsel should be provided in cases where, after being informed of his right to request counsel, the probationer or parolee makes

such a request, based on a timely and colorable claim (i) that he has not committed the alleged violation of the conditions upon which he is at liberty; or (ii) that, even if the violation is a matter of public record or is uncontested, there are substantial reasons which justified or mitigated the violation and make revocation inappropriate, and that the reasons are complex or otherwise difficult to develop or present. In passing on a request for the appointment of counsel, the responsible agency also should consider, especially in doubtful cases, whether the probationer appears to be capable of speaking effectively for himself.

411 U.S. at 790-91.

Thus, *Gagnon* indicates indigent parolees are presumptively entitled to counsel in essentially three circumstances: (1) when the parolee's request for counsel is based on a timely and colorable claim that he or she has not committed the alleged parole violation (claim of innocence); (2) when the parolee's request is based on a timely and colorable claim that mitigating circumstances make revocation inappropriate even if he or she did commit the violation, and the circumstances are complex or otherwise difficult to develop or present (complex mitigating circumstances); and (3) when the parolee appears to be incapable of speaking effectively for himself. *Id.* "In every case in which a request for counsel at a preliminary or final hearing is refused, the grounds for refusal should be stated succinctly in the record." *Id.* at 791.

Plaintiffs argue the Counsel Eligibility Screening Instrument ("Screening Instrument")[16] is facially deficient, the screening process is deficient as implemented in practice, and that Defendants fail to provide counsel to eligible parolees. Defendants argue their policies ensure parolees can waive legal counsel, hire their own legal counsel, or be screened and apply for a public defender, satisfying due process requirements. The Court addresses each of these arguments in turn.

---

[16] The Screening Instrument is attached to this Order as Exhibit D.

35

### i. Screening for Eligibility

### a. Screening Instrument

Defendants' Screening Instrument is divided into two sections: (1) "Screening Questions to ask the Client [parolee]" and (2) "Processing Questions for the PO – (Not to be Asked of the Client [parolee])." (Doc. #287-3, p. 2).

| Screening Questions to ask the Client |
|---|
| 1) Are you contesting any of the alleged violations?  ☐ Yes  ☐ No |
| 2) Do you have any problems understanding the English Language?  ☐ Yes  ☐ No<br>    a) If client answers yes, explain: |
| 3) What is your highest level of education completed:<br>    ☐ Elementary    ☐ Junior High/Middle School    ☐ High School/HSE    ☐ College |
| 4) Do you have any history of mental illness or are you now suffering from any mental illness?<br>    ☐ Yes  ☐ No<br>    If yes, explain: |
| 5) Have you consumed any alcohol, drugs, or any medication within the last 48 hours?  ☐ Yes  ☐ No<br>    a) If yes, list all substances client consumed: |

The first section, "Screening Questions to ask the Client," contains one question that corresponds with the first ground under which parolees presumptively qualify for state-funded counsel—a parolee's claim of innocence (question one). The Screening Instrument asks whether the parolee is contesting any of the alleged violations and contains a checkbox for the parole officer to select "yes" or "no." The Screening Instrument, however, contains no space for an explanation if the parolee denies violating a condition(s) of parole.

*Mandated Remedy*

- Defendants are ordered to amend the "Screening Questions to ask the Client" section of the Screening Instrument to provide space in case a parolee wishes to explain the claim of innocence, which serves to aid the parole officer in

36

Case 2:17-cv-04149-SRB   Document 323   Filed 11/12/20   Page 36 of 55

determining whether the parolee qualifies for counsel based on a timely and colorable claim of innocence. *Gagnon*, 411 U.S. at 790.

The Screening Instrument lacks any "Screening Questions to ask the Client" that correspond with the second ground—complex mitigating circumstances. *Id*. While there are questions related to mitigation on the Screening Instrument, they are located under the section marked "Not to be Asked of the Client." [17]

*Mandated Remedy*

- Because parolees must be given the opportunity to share mitigating circumstances surrounding the alleged violation, Defendants are ordered to amend the "Screening Questions to ask the Client" section of the Screening Instrument to add a screening question(s) to be asked of parolees related to potential complex mitigating circumstances, with space for parole officers to detail the alleged mitigating circumstances.

The Screening Instrument is sufficient as to the third ground—whether a parolee appears capable of advocating on his or her own behalf. It asks questions about the parolee's education, understanding of the English language, history of mental illness, and use of alcohol, drugs, or medication (questions two through four).

---

[17] The Court is unable to understand how a parole officer determines whether "the alleged violations [could] have been avoided" or "what circumstances caused the alleged violations" without asking those questions of the parolee, but that is what is currently required by the Screening Instrument.

The third ground is also sufficiently addressed in the second section of the Screening Instrument, "Processing Questions for the PO – (Not to be Asked of the Client)."

| Processing Questions for the PO – (Not to be Asked of the Client) |
|---|
| 1) Does client appear to be oriented to time, place, and nature of interview? ☐ Yes ☐ No<br>List any observations: |
| 2) Are the issues to be adjudicated during the revocation complex and are there substantial mitigating circumstances?<br><br>a) Could the alleged violations have been avoided?<br><br>b) What circumstances caused the alleged violation?<br><br>c) Is there a reason the violation will not happen again?<br><br>d) Summarize mitigating factors for each violation, what evidence makes the violations less believable or less severe?<br><br>e) If the issues to be adjudicated at the revocation hearing are complex and there are substantial mitigating circumstances, have the client complete a public defender application. |
| 3) Based on the client's understanding of the English Language, education, presence or absence of mental illness, and consumption or lack thereof of alcohol, drugs, or medication, and your physical observations, is the client incompetent to proceed? ☐ Yes ☐ No<br><br>a) If your answer is "Yes", have the client complete a public defender application.<br><br>b) If your answer is "No", list the reasons: |
| If the Public Defender application was faxed to the Public Defender's Office, what date: |

The Screening Instrument contains two processing questions for the parole officer pertaining to the third ground of ability to effectively speak for oneself (questions one and three).[18] The Screening Instrument also currently contains processing questions to aid parole officers on the

_____

[18] The Court notes the two processing questions that correspond with the third ground that presumptively qualifies a parolee for counsel—inability to effectively speak for oneself—are currently numbered as questions one and three. To help with clarity and support accurate processing, Defendants should list these two processing questions sequentially.

38

second ground—complex mitigating circumstances (question two with sub-questions). However, the Court acknowledges that while there are five processing questions that correspond with the second ground, the first four (questions 2(a) – 2(d)) call for subjective responses and appear to be questions that should be asked of the parolee rather than the parole officer.

*Suggested Changes*

- Defendants should move these four processing questions that correspond with the second ground—complex mitigating circumstances—questions 2(a) – 2(d) up to the "Screening Questions to ask the Client" section of the Screening Instrument pertaining to the second ground.

- Defendants should add an option to the processing questions(s) that correspond with the second ground for the parole officer to check "yes" or "no," in response to whether complex mitigating circumstances exist and direct the parole officer to secure state-funded counsel when required, which is the current format of the processing questions pertaining to the third ground for counsel qualification.

Unlike the second and third grounds, the Screening Instrument contains no processing questions for the parole officer pertaining to the first ground—claim of innocence. *Id.*

*Mandated Remedy*

- Defendants are ordered to amend the "Processing Questions for the PO – (Not to be Asked of the Client)" section of the Screening Instrument to add a processing question(s) to aid parole officers in determining whether appointment of counsel is warranted based on the parolee's timely and colorable claim that he has not committed the alleged violation.[19]

---

[19] The processing question(s) should, at minimum, allow the parole officer to check "yes" or "no" in response to whether the parolee contests a violation(s) and direct the parole officer to secure state-funded counsel when

In sum, Defendants must make the amendments to the Screening Instrument ordered by the Court above to comply with minimum due process demands as required by *Gagnon*. Defendants are encouraged to make the additional amendments suggested by the Court to ensure proper screening of parolees for state-funded counsel and to avoid continued litigation.

### b. Screening Process[20]

As previously discussed, parolees are presumptively entitled to state-funded counsel in three circumstances—claim of innocence, complex mitigating factors, and parolees' inability to effectively speak on his own behalf. Pursuant to Procedures P3-8.7, P3-9.1, and P6-8.1, "[i]f the [parolee] is eligible for a public defender based on the Counsel Eligibility Screening Instrument . . . then the [parole officer] shall assist the [parolee] in completing [an application for a public defender]." (Doc. #194-7, p. 5; Doc. #287-1, p. 6; Doc. #287-5, p. 9). Procedures P3-9.2 and P6-8.2 provide that "[i]f it has been determined the [parolee] lacks the mental ability to understand the proceedings, an attorney shall be requested through the Public Defender's Office to protect the [parolee's] interest, regardless of the [parolee's] wishes." (Doc. #194-13, p. 5; Doc. #287-8, p. 6). Once Defendants make the revisions to the Screening Instrument ordered by this Court, these policies will satisfy constitutional requirements. In practice, however, Defendants' current counsel eligibility screening process fails to capture all parolees who qualify for state-funded counsel.

A parole supervisor and parole officer testified to their belief that parolees only qualify for state-funded counsel if the parolee is indigent, has trouble understanding English, or has a

---

required, which is the current format of the processing questions pertaining to the third ground for counsel qualification.

[20] Plaintiffs argue that screening for state-funded counsel should be conducted by a neutral, detached individual who is not involved in the parolee's case. *Morrissey* requires a "'neutral and detached' hearing body" conduct revocation hearings, not counsel screening. 408 U.S. at 489. Therefore, the Court declines to impose such a requirement on Defendants.

mental disability.  For example, the parole supervisor testified, "My understanding would just be if there's no assets or no [] financial means to secure counsel, then they would [] qualify for public defender service."  (Doc. #316-1, 58:17-25, 59:1-5).  The parole officer testified, "My understanding of who qualifies is any offender that needs assistance that does not understand the process of the revocation hearing."  (Doc. #316-2, 30:22-25, 31:1-10).  Indeed, parolees testified that they were told by parole officers that they would only qualify for state-funded counsel if they did not speak English, were illiterate, or had a mental illness, and revocation hearing transcripts substantiate this testimony.  (Tr. 15:6-8, 82:21-25, 83:1-15, 190:8-18, 194:1-11, 15-21; Doc. #291-27, 8:5-25, 9:1-2).  Still, some parolees testified they were never asked about their mental health or learning disabilities to determine qualification for state-funded counsel.  (Tr. 217:6-8, 218:6-8, 231:10-12, 243:16-25, 250:16-19, Doc. #287-10, ¶¶ 13-14; Doc. #287-15, ¶ 26; Doc. #287-16, ¶¶ 19-21; Doc. #287-17, ¶¶ 9-10; Doc. #287-21, ¶ 24; Doc. #287-25, ¶ 23).

Moreover, Defendants fail to consistently screen for timely and colorable claims of innocence and complex mitigating circumstances, which *independently* presumptively qualify indigent parolees for state-funded counsel. *Gagnon*, 411 U.S. at 790-91.  A parole supervisor testified that a claim of innocence is one factor in counsel eligibility consideration but alone is not enough to warrant appointment of counsel.  (Tr. 457:2-25, 458:16-20) (At the evidentiary hearing, the Court asked the parole supervisor if parolees "have made a timely and colorable claim that they did not commit the alleged violation of the conditions and that's all you know, is that enough to go with counsel, or [are] there still other things you need to look at?"  The parole supervisor answered, "There will still be other factors.").  The parole supervisor also testified that this approach is how parole officers are trained to conduct screenings and determine

counsel eligibility. (Tr. 458:16-20). Further, many parolees testified that they were not asked whether they contested the alleged parole violation(s) or whether there were any mitigating circumstances related to their alleged violations, and that they did not understand the meaning of "mitigating circumstances" and received no explanation thereof. (Tr. 191:2-5, 6-9, 194:19-21, 196:17-23, 209:19-25, 210:1-7, 217:3-5, 228:8-13; Doc. #287-10, ¶ 13; Doc. #287-11, ¶ 7; Doc. #287-16, ¶ 18; Doc. #287-17, ¶¶ 30-31; Doc. #287-23, ¶ 9).

This evidence is particularly concerning where, as here, many class members asserted they had credible claims of innocence, mitigating circumstances, mental health issues, and learning disabilities that would have qualified them for counsel had they been properly screened. (Tr. 190:19-25, 191:1, 216:12-25, 217:1-2; Doc. #287-10, ¶¶ 13-14; Doc. #287-11, ¶ 7; Doc. #287-13, ¶ 13; Doc. #287-14, ¶ 20; Doc. #287-16, ¶¶ 19-21; Doc. #287-17, ¶¶ 9, 29; Doc. #287-21, ¶ 24; Doc. #287-25, ¶ 23). Parole officers must administer counsel eligibility screening in a manner consistent with the understanding that in addition to the inability to speak effectively for oneself, both a timely and colorable claim of innocence and a timely and colorable claim of mitigating circumstances that are complex or otherwise difficult to develop or present also independently warrant appointment of state-funded counsel.

*Mandated Remedy*

- The Court orders Defendants to train parole officers and other Division of Probation and Parole employees involved in and responsible for the counsel eligibility screening process to conduct the screening process in accordance with the three separate grounds set forth in *Gagnon*.

Furthermore, the evidence shows that under Defendants' current practice, parole officers often do not even reach the counsel screening stage because they wrongly require parolees to

42

make a decision to waive or request hearings before offering to screen for counsel or are otherwise not informed that they might have the right to representation by a state-funded attorney. (Tr. 483:10-13, 355:6-9; Doc. #316-2, 106:23-25, 107:1-25, 108:5; Doc. #316-3, 84:13-25, 85:1-11; Doc. #287-10, p. 3; Doc. #287-11, p. 3; Doc. #287-12, pp. 3-4; Doc. #287-13, pp. 3-4; Doc. #287-14, pp. 3-4; Doc. #287-15, p. 3; Doc. #287-16, p. 5; Doc. #287-17, pp. 3, 5-6; Doc. #287-18, p. 3; Doc. #287-19, p. 3; Doc. #287-20, p. 3; Doc. #287-23, p. 3; Doc. #287-24, p. 4; Doc. #287-25, pp. 3-4). It is imperative that after being informed of the right to be screened for state-funded counsel and the qualifications for state-funded counsel, parolees be allowed to make a determination as to whether or not they request to be screened for counsel (and subsequently screened for counsel if applicable) *before* requesting or waiving a preliminary or revocation hearing. Parolees must be informed of the right to be screened for state-funded counsel and subsequently screened upon request in order to make an informed and voluntary decision whether to request or waive the hearings to which they are entitled under *Morrissey*. This is because, as parolee testimony indicates, the possibility of appointment of counsel is a consideration relevant to the decision to request or waive such hearings. (Doc. #287-14, ¶ 12; Doc. #287-15, ¶ 13; Doc. #287-16, ¶ 18; Doc. #287-18, ¶ 17; Doc. #287-20, ¶ 18; Doc. #287-24, ¶ 21) (parolees testifying that had they known they could be screened for state-funded counsel, they would not have waived their right to a preliminary or revocation hearing); *see Brady v. United States*, 397 U.S. 742, 748 (1970) ("Waivers of constitutional rights not only must be voluntary but must be knowing, intelligent acts done with sufficient awareness of the relevant circumstances and likely consequences").

*Mandated Remedy*

- Defendants are ordered to ensure parolees are informed of the right to be screened for state-funded counsel and are subsequently screened upon request before parolees decide whether to request or waive preliminary or revocation hearings. Defendants are further ordered to amend their policies to reflect this requirement.

### ii. Determination of Qualification for Counsel

"[T]he decision as to the need for counsel must be made on a case-by-case basis in the exercise of a sound discretion by the state authority charged with responsibility for administering the probation and parole system." *Gagnon*, 411 U.S. at 790. Procedures P3-8.7, P3-9.1, and P6-8.1 reflect Defendants' understanding that the Division of Probation and Parole is charged with the responsibility of determining eligibility for state-funded counsel. The procedures state that "*[i]f the [parolee] is eligible for a public defender based on the Counsel Eligibility Screening Instrument* . . . then the [parole officer] shall assist the [parolee] in completing [an application for a public defender]." (Doc. #194-7, p. 5; Doc. #287-1, p. 6; Doc. #287-5, p. 9) (emphasis added). Both *Gagnon* and Defendants' own procedures require parole officers and other employees of the Division of Probation and Parole involved in and responsible for the counsel eligibility screening process to administer the Screening Instrument and determine counsel eligibility. The evidence shows this policy is not consistently understood or implemented.

One parole supervisor testified that parole officers do not determine whether parolees are eligible for state-funded counsel—the Missouri State Public Defender System ("MSPD") does. (Doc. #316-1, 47:6-12) (When asked whether "it is the parole officer who makes the

44

determination whether [parolees] are eligible or not for counsel," the parole supervisor responded, "No. We [] are told to fax everything to the Public Defender's Office."). The Assistant Division Director testified similarly. (Tr. 339:17-23) (When asked "who makes the decision as to which parolees qualify for counsel under *Gagnon*," the Assistant Division Director responded that "[I]t's the public defender who has the final determination."). Another parole supervisor testified that the parole officers she supervises send every Screening Instrument completed to the MSPD along with an application for a public defender. (Tr. 486:20-25, 487:4-25, 488:1-24) (The parole supervisor was asked, "So your parole officers don't make the decision themselves if someone's eligible and then only send eligible applications?" The parole supervisor responded, "Correct."). Another parole supervisor testified that the parole officers who conduct the screening make the counsel qualification determination. (Tr. 455:7-9).

*Mandated Remedy*

- The Court orders Defendants to adhere to their policies and, as mandated by *Gagnon*, require parole officers and other employees of the Division of Probation and Parole responsible for the counsel eligibility screening process to administer the Screening Instrument and make counsel eligibility determinations.

### iii.  Denial of Counsel

"In every case in which a request for counsel at a preliminary or final hearing is refused, the grounds for refusal should be stated succinctly in the record." *Gagnon*, 411 U.S. at 791. Defendants identify no procedure that governs recording or giving parolees notice of a denial of counsel. Indeed, a parole supervisor and the Assistant Division Director testified that there are no written policies that state the requirements for the written notice. (Tr. 336:2-5, 455:15-21)

45

(For example, the parole supervisor was asked, "And there aren't any written policies that dictate what has to be in that notice, are there?" The parole supervisor responded, "Correct."). Nevertheless, a parole supervisor testified that parole officers provide parolees who have been deemed ineligible for counsel with a written decision that includes reasons why they have been denied immediately after the determination is made. (Tr. 455:10-14, 20-21). The Assistant Division Director testified that parole officers send a memo to parolee explaining the ineligibility determination. However, a unit supervisor's testimony and other evidence indicates parolees do not always receive a written decision and that if they do, the written decisions do not address all bases for counsel eligibility and are given to parolees after the passage of a significant amount of time. For example, the unit supervisor was asked, "[I]f [parolees are] screened and then found not eligible, do they receive a written decision, an explanation of why they're not eligible for counsel?" The unit supervisor responded, "No, not from our office." (Tr. 486:20-23). Additionally, one parolee's written decision, which was dated for nearly two weeks *after* the date of his revocation hearing, stated he didn't qualify for state-funded counsel only because, "You appear to have an understanding of the English language, test average on the IQ and memory testing, your mental health does not appear to affect your ability to understand, and you did not appear to be under the influence of drugs or alcohol." (Doc. #287-26, p. 2).

*Mandated Remedy*

- The Courts orders Defendants to construct and implement a policy requiring that a finding that a parolee is ineligible for counsel must be recorded in the appropriate and relevant records and be given to parolees in writing within a

46

reasonable amount of time. The decision must expressly state all grounds for refusal. *Gagnon*, 411 U.S. at 791.

### iv. Appointment of Counsel

When parolees are determined to be eligible for appointment of state-funded counsel, Defendants wholly fail to provide such counsel. (Doc. #318, p. 21; Tr. 342:17-19). Plaintiffs argue that Defendants are knowingly evading their obligation to provide counsel to eligible parolees. Defendants argue they lack authority to provide counsel and that under Missouri law, only the MSPD possesses such authority. Defendants are mistaken. The authority, and, in fact, the requirement to provide state-funded counsel when warranted was bestowed on Defendants by the Supreme Court in *Gagnon* nearly fifty years ago:

> [T]he decision as to the need for counsel must be made on a case-by-case basis in the exercise of a sound discretion by the state authority charged with responsibility for administering the probation and parole system. Although the presence and participation of counsel will probably be both undesirable and constitutionally unnecessary in most revocation hearings, there will remain certain cases in which fundamental fairness—the touchstone of due process—will require that the State provide at its expense counsel for indigent probationers or parolees.

411 U.S. at 790.

*Gagnon* tasks "the state authority charged with responsibility for administering the probation and parole system" with making the counsel eligibility determination. *Id.* Defendants recognize they are that agency. (Tr. 341:6-17) (When asked if "the Division of Probation and Parole is the division of the Department of Corrections that is responsible for administering the probation and parole system in Missouri," the Assistant Division Director responded, "Correct."). *Gagnon* goes on to require that when the state authority—here, Defendants—finds parolees eligible for counsel, the State must provide such counsel at its expense. *Id. Gagnon* does not address state public defender systems nor instruct that public

47

defenders must provide state-funded counsel.  Instead, *Gagnon* commands state probation and parole systems to conduct revocation proceedings that comply with due process, which includes providing counsel to indigent parolees at cost to the State when parolees meet outlined criteria. *Id.*  The Court also underscores that Defendants consented to entry of summary judgment in Plaintiffs' favor and therefore admitted as true Plaintiffs' allegation that Defendants fail to provide State-funded counsel in violation of *Gagnon*.  (Doc. #130, ¶¶ 32-40).  Still, Defendants continue to contradict their prior concession by arguing they are not liable for the unconstitutional policy violations for which they previously admitted liability.

Defendants' Procedures P3-8.7, P3-9.1, and P6-8.1 mandate that for parolees who have been screened and deemed eligible for appointment of counsel, parole officers must "assist the [parolees] in completing the Application/Affidavit for Public Defender Services and Promise to Pay form" and fax the completed form and Screening Instrument to the Public Defender Office. (Doc. #194-7, p. 5; Doc. #287-1, p. 6; Doc. #287-5, p. 9).  Defendants claim that after doing so, whether counsel is appointed is no longer their concern; it is the MSPD's.  But the MSPD declines to provide representation for parole revocation proceedings.  (Doc. #194-15; Tr. 314:3-6).  In turn, Defendants fail to provide counsel to parolees for whom state-funded counsel is constitutionally required pursuant to *Gagnon*.  (Tr. 342:6-19).

*Mandated Remedies*

- Because such practice violates *Gagnon*, Defendants are ordered to refrain from proceeding with revocation hearings and reincarcerating parolees who are not represented by state-funded counsel when minimum due process so requires.[21]

---

[21] Defendants argue the Court lacks authority to enter this injunction because "a prisoner in state custody cannot use a § 1983 action to challenge 'the fact or duration of his confinement.'"  *Wilkinson v. Dotson*, 544 U.S. 74, 78 (2005) (citation omitted).  This argument fails on multiple grounds.  Most obviously, Plaintiffs in this action are a class of adult parolees in the state of Missouri who currently face, or who in the future will face, parole revocation

48

- Defendants are also ordered to adopt and implement a new policy for appointing state-funded counsel to eligible parolees.  All forms should be updated to reflect this new policy.

## C.  Appeal Process

Plaintiffs argue that Defendants' process for appealing revocation decisions does not comport with the demands of due process.  There appears to be little to no case law that addresses due process requirements for the appellate process in the context of parole revocation proceedings.  Indeed, Plaintiffs failed to cite to any and Defendants altogether failed to address the argument.  In general, "a State has great discretion in setting policies governing parole decisions, but it must nonetheless make those decisions in accord with the Due Process Clause." *Evitts v. Lucey*, 469 U.S. 387, 401 (1985) (citing *Morrissey*, 408 U.S. at 481-84).  The Supreme Court also contemplated an appellate process for parole revocation decisions in *Black*, as did the Eighth Circuit in *Belk*.  *See Belk*, 15 F.3d at 814 (citing *Black*, 471 U.S. at 611) ("While the sentencing authority is not required to elaborate upon the reasons for a course not taken, it must specifically state the reason for its decision and the evidence relied upon to provide an adequate basis for review to determine if the decision rests on permissible grounds supported by the evidence.").

---

proceedings.  Plaintiffs are not all imprisoned and challenge *revocation* procedures, which affect parolees (not prisoners); the plaintiff class does not challenge the "fact or duration of [their] confinement."  *Wilkinson* held that state prisoners *may* bring a § 1983 action for injunctive relief challenging the constitutionality of state parole procedures.  *Id.* at 1245-1249.  The exception to this rule, which Defendants cite, applies to prisoners seeking "an injunction ordering [their] immediate or speedier release into the community," which lies "within the core of habeas corpus."  *Id.* at 74, 82 (citing *Preiser v. Rodriguez*, 411 U.S. 475, 487, 500 (1973)).  The plaintiff class in this case seeks only injunctive relief directed at Defendants' policies, practices, and procedures.  Class members do not seek immediate or speedy release in their own individual cases.  Therefore, the claims of the plaintiff class do not lie at "the core of habeas corpus," *id.* at 82 (quoting *Preiser*, 411 U.S. at 489), but "seek relief that will render invalid" state parole revocation procedures.  *Id.* (citing *Wolff v. McDonnell*, 418 U.S. 539, 554-55 (1974)).

Recognizing an appellate process is necessary, Defendants' Procedure P6-6.1, which governs the appeal of parole revocation decisions, provides that hearing panel decisions are appealable but majority parole board decisions are not.  (Doc. #211-1, p. 5).  The policy states that the Notice of Board Action shall indicate whether the decision is subject to appeal, although parolees may consult with an institutional parole officer regardless of whether the decision is appealable.  (Doc. #211-1, p. 6).  The policy also states that if a parolee wishes to appeal an appealable decision, then the institutional parole officer must give the parolee an Appeal to Board Decision form ("Appeal form").  (Doc. #211-1, p. 6).  Such an appeal must be filed within 30 days after the parolee receives the Notice of Board Action.  (Doc. #211-1, p. 6).  Parolees are "presumed to have received their decision within 10 business days of the date the notice was final formed."  (Doc. #211-1, p. 6).  "The appeal shall be considered by the Parole Board within 30 days of receipt of the appeal, or as soon thereafter as possible, and the [parolee] shall be advised of the Parole Board's decision as soon as the notice can be prepared and delivered."  (Doc. #211-1, p. 6).  "If no appeal is filed within 30 days after the [parolee] receives the original decision, then the decision shall stand as final."  (Doc. #211-1, p. 6).

### i.  Availability of Appeal Form

Plaintiffs argue, and the evidence shows, that the appeal process is hindered for some parolees because the appeal form is not made available to parolees upon request in a timely manner or, in some cases, at all.  Some parolees encounter significant delay in obtaining an appeal form while others do not receive the form at all, even after sending multiple communications to parole officers.  (Tr. 152:21-25, 153:1-5; 255:21-25; Doc. 287-13, ¶ 16; Doc. 287-18, ¶¶ 23-24).  Although parolees are required to appeal an appealable decision within 30 days, parolees are not automatically given an appeal form when they receive a Notice of

Board Action revoking parole. If the thirty-day clock begins ticking on the day parolees receive their Notice of Board Action, then parolees must receive the appeal form on the day they receive their decision.

*Mandated Remedy*

- Defendants are ordered to make the appeal form available to parolees whose decisions are appealable on the same day they receive their decision. Defendants are further ordered to amend their policies to reflect this requirement.

Further, when revocation decisions are not subject to appeal, parolees are not made aware of the reasoning for lack of appealability.

*Suggested Change*

- The Court encourages Defendants to include on the Notice of Board Action for decisions that are not subject to appeal the reason for which the decision is not appealable. *See Morrissey*, 408 U.S. at 489 (requiring an explanation for revocation decisions).

### ii. Explanation of Appeal Decision

Plaintiffs argue, and Defendants do not dispute, that parolees whose appeals are denied receive a decision that "does not provide any explanation as to why" the appeal was denied. (Doc. #316, p. 58). Testimony offered by Defendants at the evidentiary hearing and parolee testimony corroborates this argument. (Tr. 406:24-25, 407:11-21; Doc. #287-23, ¶ 25). In at least one instance, a parolee received no response to his appeal. (Doc. #287-21, ¶ 25).

*Mandated Remedy*

- Defendants are ordered to include in their decisions denying appeals the reasoning for the denial. Without this requirement, Defendants could arbitrarily

and routinely deny appeals of revocation decisions. *Morrissey*, 408 U.S. at 489

(requiring an explanation for revocation decisions). Defendants are further

ordered to amend their policies to reflect this requirement.

## III.    CONCLUSION

In sum, the Court orders the following relief:

Mandated Relief to Remedy Minimum Due Process Violations

1.  Comply with policies governing notice to parolees of their alleged violations and keep documentation of compliance (p. 10).
2.  Comply with policy governing the timely provision of the Notice of Rights form to parolees and keep documentation of compliance (p. 15).
3.  Amend the Revocation Hearing form to add space for the alleged violations to be listed (p. 17).
4.  Amend the Revocation Hearing form to include an option for parolees to provide their own counsel at revocation hearings (p. 17).
5.  Comply with policies requiring parole officers to explain the content of the Notice of Rights, Preliminary Hearing, and Revocation Hearing forms and the parole revocation process to parolees at violation interviews (p. 22).
6.  Orally offer to read the Notice of Rights form to parolees and amend policies to reflect this requirement (p. 22).
7.  Ensure parole officers stop encouraging and pressuring parolees to waive their hearings (p. 26).
8.  Disclose to parolees all evidence against them no later than five days before the revocation hearing and amend policies to reflect this requirement (p. 28).
9.  Demonstrate overall adherence to the policy requiring revocation hearings be conducted within 30 days of a parolee's return to MDOC custody, maintain documentation of compliance with this policy, and keep detailed records to account for circumstances in which the 30-day deadline is not met (p. 30).
    a.  Ensure the documentation kept measures the time between parolees' return to MDOC custody and the revocation hearing (p. 30).
10. Comply with policy requiring parolees be given the Notification of Board Action within 10 business days of the date on the Notification and maintain careful documentation of the delivery of the Notifications of Board Action to parolees (p. 32).
11. Construct and implement a policy mandating that, when a decision to revoke parole is made—regardless of whether a hearing was conducted—the Notice of Board Action must provide to the parolee a written decision outlining the evidence relied on to determine whether the parolee violated a condition(s) of parole, the mitigating circumstances considered, and reasons for revoking (p. 33).
12. Construct and implement policy requiring revocation decisions be made and Notifications of Board Action completed within a reasonable amount of time after a revocation hearing or waiver thereof (p. 33).

52

13. Screening Instrument:
   a. Amend the "Screening Questions to ask the Client" section of the Screening Instrument to provide space in case a parolee wishes to explain the claim of innocence (pp. 36-37).
   b. Amend the "Screening Questions to ask the Client" section of the Screening Instrument to add a screening question(s) to be asked of parolees related to potential complex mitigating circumstances, with space for parole officers to detail the alleged mitigating circumstances (p. 37).
   c. Amend the "Processing Questions for the PO – (Not to be Asked of the Client)" section of the Screening Instrument to add a processing question(s) to aid parole officers in determining whether appointment of counsel is warranted based on a timely and colorable claim that he has not committed the alleged violation (p. 39).
14. Train parole officers and other Division of Probation and Parole employees involved in and responsible for the counsel eligibility screening process to conduct the screening process in accordance with the three separate grounds set forth in *Gagnon* (p. 42).
15. Ensure parolees are informed of the right to be screened for state-funded counsel and are subsequently screened upon request before parolees decide whether to request or waive preliminary or revocation hearings and amend policies to reflect this requirement (p. 44).
16. Adhere to policies requiring parole officers and other employees of the Division of Probation and Parole responsible for the counsel eligibility screening process to administer the Screening Instrument and make counsel eligibility determinations (p. 45).
17. Construct and implement a policy requiring that a finding that a parolee is ineligible for counsel must be recorded in the appropriate and relevant records and be given to parolees in writing within a reasonable amount of time. The decision must expressly state all grounds for refusal (pp. 46-47).
18. Refrain from proceeding with revocation hearings and reincarcerating parolees who are not represented by state-funded counsel when minimum due process so requires (p. 48).
19. Adopt and implement a new policy for appointing state-funded counsel to eligible parolees and update all forms to reflect the new policy (p. 49).
20. Make the appeal form available to parolees whose decisions are appealable on the same day they receive their decision and amend policies to reflect this requirement (p. 51).
21. Include in decisions denying appeals the reasoning for the denial and amend policies to reflect this requirement (pp. 51-52).

Suggested Changes to Avoid Prolonged Litigation

1. Amend policies to clarify that in all cases, parolees must receive their violation report at their initial violation interviews, regardless of whether the five or ten-day timeframe applies (p. 9).
2. Ensure all forms, reports, and other relevant documents include space to state the date on which the document was provided or administered (p. 10).
3. Notice of Rights Form:
   a. Make clear on the Notice of Rights form that if eligible, parolees will be appointed counsel at no cost to parolees (p. 17).

53

b. Define the criteria that qualify a parolee for state-funded counsel on the Notice of Rights form (pp. 17-18).

c. Clarify on the Notice of Rights form that "preliminary hearing" and "probable cause hearing" are synonymous or omit the term "probable cause hearing" from the Notice of Rights form (p. 18).

d. Correct the language on the Notice of Rights form that states even if parolees waive their preliminary hearing, they "*will* still have a revocation hearing before the court or Parole Board," to accurately state parolees "*may*" have a revocation hearing if they so choose (p. 18).

e. Change the language on the Notice of Rights form that incorrectly advises parolees that the copy of the alleged violations they will receive is called the "Notice of Rights," to the correct terminology, which is "violation report" (p. 18).

f. Ensure language on the Notice of Rights form conveys accurate expectations to parolees and accurately reflects the timeframe within which the initial violation interview with a parole officer will take place (five to ten business days after the parolee's arrest, according to Defendants' policies) (pp. 18-19).

g. Use headings on the Notice of Rights form to differentiate between the preliminary hearing and the revocation hearing and ensure parolees understand they have a right to both (p. 19).

h. Organize the Notice of Rights form in a more accessible way, such as by first describing the preliminary hearing and next describing the revocation hearing and by moving the section describing the right to counsel to a section below the hearing descriptions (p. 19).

i. Make the instructions for parolees to submit witness names and contact information to the parole officer more precise, to include the manner in which to submit such information to the parole officer (p. 19).

**4.** Screening Instrument:

a. List sequentially the processing questions that correspond with the third ground that presumptively qualifies a parolee for counsel—inability to effectively speak for oneself—which are currently numbered as questions one and three (p. 38).

b. Move the four processing questions that correspond with the second ground—complex mitigating circumstances—questions 2(a) – 2(d) up to the "Screening Questions to ask the Client" section of the Screening Instrument pertaining to the second ground (p. 39).

c. Add an option to the processing questions(s) that correspond with the second ground for the parole officer to check "yes" or "no" in response to whether complex mitigating circumstances exist and direct the parole officer to secure state-funded counsel when required (p. 39).

d. Add an option to the processing question(s) that correspond with the first ground for the parole officer to check "yes" or "no" in response to whether the parolee contests a violation(s) and direct the parole officer to secure state-funded counsel when required (pp. 39-40).

**5.** Include on the Notice of Board Action for decisions that are not subject to appeal the reason for which the decision is unappealable (p. 51).

Accordingly, Defendants are hereby **ORDERED** to comply with and implement the relief set forth above.

Defendants are further **ORDERED** to keep documentation of their compliance with their policies and this Order.

Defendants are further **ORDERED** to train all Division of Probation and Parole employees involved in parole revocation proceedings to carry out the revocation process in compliance with this Order and the policies and procedures discussed herein.

As discussed briefly in this Order, the Court anticipates that as Defendants implement the relief required in this Order, they will begin to conduct hearings at a higher rate. Should constitutional issues arise regarding the administration of hearings and the governing policies in the future, or other constitutional issues come to light, the Court will address them at such time. The Court will retain jurisdiction over the case until Defendants' parole revocation policies, procedures, and practices afford parolees the due process rights mandated by *Morrissey* and *Gagnon*. The Court is confident that given the great strides taken by Defendants, jurisdiction over this matter will be extremely limited.

The Court will contact the parties to schedule an initial status hearing to discuss implementing the remedies set forth in this Order.

**IT IS SO ORDERED.**

/s/ Stephen R. Bough
STEPHEN R. BOUGH, JUDGE
UNITED STATES DISTRICT COURT

DATED: November 12, 2020