# IN THE UNITED STATES DISTRICT COURT
## WESTERN DISTRICT OF MISSOURI
### SOUTHERN DIVISION

| | | |
|---|---|---|
| STEPHANIE GASCA, et al. | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | Case No. 17-cv-04149-SRB |
| | ) | |
| ANNE L. PRECYTHE, et al., | ) | |
| | ) | |
| Defendants. | ) | |

### PLAINTIFFS' STATUS REPORT

Plaintiffs filed this class action lawsuit over six years ago to advocate on behalf of themselves and other persons who have gone through or will go through the parole revocation process. In November 2020, this Court concluded that many due process violations persist and ordered certain remedies. Doc. 323 (the "Remedial Order"). Plaintiffs successfully defended the majority of the Court's Remedial Order before the Eighth Circuit. Doc. 357. On January 23, 2024, this Court entered an order retaining jurisdiction through December 31, 2024, in order to ensure Defendants' full compliance with the Remedial Order. Doc. 381. Defendants' filed a status report on May 1, 2024. Doc. 384. Plaintiffs now submit their report on the status of Defendants' compliance with the Court's Remedial Order.

Defendants have made strides in improving the revocation process so as to meet the reforms ordered by this Court, but they continue to fall short of ensuring minimum due process. Several issues continue to pervade the revocation process in Missouri, including: inadequate or improper screening for counsel, failure to notify individuals of their rights, and failure to disclose evidence. These deficiencies cannot be considered in isolation; these failures taint the entire process and due process will not be fulfilled in any part of the process until these deficiencies are remedied. For example, because a parolee is entitled to be screened for counsel at the outset, and

1

if they qualify, they are entitled to counsel for all that decisions that follow, from waiver of a preliminary hearing through representation at a revocation hearing. Thus, inadequate screening for counsel necessarily means the entire process thereafter is rendered unconstitutional.

Defendants' substantial deficiencies warrant further monitoring by this Court. Therefore, for the reasons discussed below, Plaintiffs respectfully ask the Court to enter an order that:

(i)    Retains jurisdiction for at least six months, or up until Defendants provide sufficient documentation demonstrating full compliance with the Remedial Order;

(ii)    Requires Defendants to submit to the Court and to Plaintiffs' counsel sufficient documentation demonstrating full compliance with the Remedial Order, on a monthly basis;

(iii)    Grants Plaintiffs' counsel leave to supplement or amend their motion for attorneys' fees and costs to recover expenses incurred in monitoring this Court's judgment; and

(iv)    Grants such other relief as is just and appropriate under the circumstances.

Such an order is necessary to ensure that Defendants fully remediate the constitutional violations established in this case.

**1.** **Numerous persistent issues revealed by Plaintiffs' counsel's review of a random sampling of class members' parole files and survey of dozens of class members.**

In preparation for this status report, Plaintiffs' counsel reviewed a random sampling of 96 class members' parole files. Defendants' counsel agreed to produce 24 parole files for each of the five months between May and September 2024—12 from files where the individual was deemed eligible for counsel, and 12 from files where the individual was deemed ineligible for counsel. Plaintiffs' counsel also conducted a survey of people who had their parole revoked in 2024. Surveys were sent to 528 incarcerated people, and Plaintiffs' counsel received 46 responses. *See* Affidavit of Cynthia West, attached hereto as **Exhibit 1** ("West Aff.") at ¶ 4. The results of that

2

survey and the parole files produced by Defendants revealed numerous deficiencies in Defendants' compliance.

A.  A note about how the parole files were selected and produced.

Over the course of several months, the parties cooperated to coordinate the production of certain training materials and parole files so as to assist Plaintiffs' counsel in preparation for this Report. Defendants produced their revocation-related training modules on July 26, 2024. On July 17, 2024, Plaintiffs' counsel asked Defendants to produce 144 parole files for people revoked between January-July 2024. Defendants produced certain files on September 27 and October 17. Upon reviewing these files, Plaintiffs' counsel noted several gaps in documentation. Missing from all files were several records Defendants represented they were maintaining to demonstrate compliance with the Remedial Order.

The parties conferred regarding the production on October 23, 2024. At that time, the parties learned there had been a misunderstanding as to what Defendants were expected to produce. The parties agreed Defendants would produce the following for each of the months of May through September 2024: complete parole files for 24 people who went through the revocation process— 12 of whom were eligible for counsel, and 12 of whom who were ineligible for counsel. *See* Doc. 395-1. Plaintiffs' counsel also confirmed the records expected in each parole file and relevant to assessing Defendants' compliance:

1. Field Violation Reports (including any supplements thereto)
2. Preliminary Hearing or Preliminary Hearing Waiver Reports
3. Revocation Hearing or Revocation Hearing Waiver Reports
4. Preliminary Hearing Waiver or Request Form (see, eg, Doc. 384-15)
5. Parole Preliminary Hearing Officer Checklist (see, eg, Doc. 384-16)
6. Completed Counsel Screening Form (see, eg, Doc. 384-11)
7. Parole Preliminary/Revocation Hearing Counsel Notification (see, eg, Doc. 384-14)
8. Signed Notice of Rights Form (see, eg, Doc. 384-10)
9. Parole Preliminary Hearing Violation Interview Process form (see, eg, Doc. 384-13)
10. Parole Revocation Hearing Checklist (see, eg, Doc. 384-22)

3

11. Completed Request for Records (see, eg, Doc. 384-18) – although we recognize this form may not be in all parole files
12. Revocation Hearing Waiver or Request Form (see, eg, Doc. 384-17)
13. Revocation Decision (aka Notification of Board Action)
14. Revocation Order

*See id*. Defendants produced these records on November 20, 2024. It is Plaintiffs' counsel's understanding that the files produced on November 20 constitute the full parole files that exist for each individual.

A review of these parole files revealed that Defendants are either failing to maintain adequate documentation demonstrating their compliance with the Remedial Order, or they are not satisfying minimum due process standards. Either way, they are in violation of this Court's Order.

B. <u>Defendants are still not notifying all parolees of the alleged violations and have not maintained adequate documentation demonstrating their compliance with Remedies 1 or 3 of the Remedial Order.</u>

In their May 2024 Status Report, Defendants represented to this Court that they maintain "documentation of compliance with the policies requiring that parolees be notified of their alleged violations" in the form of completed copies of the Request for or Waiver of Preliminary Hearing form, Parole Preliminary Hearing Officer Checklist, and Parole Revocation Hearing Checklist (if applicable), and that these records are retained in parolees' parole files. Doc. 384 at 5-8. The sample parole files tell a different story.

Of the 96 parole files reviewed by Plaintiffs' counsel, four files were missing preliminary hearing request or waiver forms. Extrapolating this to the population of people who returned to MoDOC on a parole violation in fiscal year 2023 (5,706), Plaintiffs estimate that hundreds of people (228) had a similar experience of being revoked and reincarcerated without receiving notice of the alleged violations. In order for any of the due process rights created by *Morrissey* and *Gagnon* to be meaningful and effective, parolees must be aware of those rights. It is thus critical to fundamental fairness and due process that parolees be adequately informed of their rights during

4

the revocation process. *See Gagnon v. Scarpelli*, 411 U.S. 778 (1973); *Morrissey v. Brewer*, 408 U.S. 471, 481 (1972) ("due process is flexible and calls for such procedural protections as the particular situation demands") *and* 484 (discussing society's interest in treating parolee with basic fairness); *Schroeder v. City of New York*, 371 U.S. 208, 212 (1962) ("the requirement that parties be notified of proceedings affecting their legally protected interests is obviously a vital corolary [sic] to one of the most fundamental requisites of due process—the right to be heard."); *United States v. Taylor*, 747 F.3d 516, 519 (8th Cir. 2014) (waivers must be knowingly and voluntarily made); *Shafer v. Bowersox*, 329 F.3d 637, 650 (8th Cir. 2003) (quoting Edwards v. Arizona, 451 U.S. 477, 482 (1981)) (same).

Even where a file contains a preliminary hearing request or waiver form, 34% of the time the form did not list the alleged violations or and a brief description of the circumstances of each one. Sometimes, for example, the preliminary hearing request or waiver form simple identified violations by number, or did not identify them at all:

 

To add further confusion to the process, some of the waiver forms referenced a *probation* revocation hearing—not a *parole* revocation hearing. For example:



Of the 96 parole files reviewed, 20 reflected a preliminary hearing had been conducted. But only four of those files contained a hearing officer checklist—the document that supposedly acts as a "check[] to ensure that parolees have been informed of their alleged violations" and have been timely provided with the notice of rights form. Doc. 384 at 5-6. Put another way, for 80% of the files where it was clear a preliminary revocation hearing was conducted, the file did *not* contain preliminary hearing officer checklist. Given the large number of people who also are not receiving notice of their alleged violations via waiver forms (as discussed above), Defendants' incomplete documentation fails to demonstrate they are meeting minimum due process standards in parole revocation proceedings.

C. Defendants are still not notifying all parolees of their rights in the process, in violation of due process and Court-ordered Remedies 2 and 5.

The Remedial Order directs Defendants to comply with its policy governing the timely provision of the Notice of Rights form to parolees and to keep documentation of compliance. Doc. 323 at 15, 52. Defendants represent that they maintain in parole files a signed Notice of Rights form, in addition to the waiver forms and checklists, as documentation that parole staff are

explaining to class members their rights in the revocation process. Doc. 384 at 5-6. But both the signed Notice of Rights form and checklists are missing from numerous files.

Six of the 96 files reviewed were missing signed notice of rights forms, suggesting over 6% of parolees were not notified of their rights—including their critical right to counsel.[1] Plaintiffs' counsel also conducted a survey of people who had their parole revoked in 2024. *See* West Aff. at ¶ 4. Of the 46 survey respondents, 21 (47%) reported they did not receive a written notice of their rights at or before the time they were offered a preliminary hearing. West Aff. at ¶ 5(a). This Court made clear that "[f]ailure to provide the Notice of Rights form in a timely manner or at all pursuant to Defendants' policy and as required by *Morrissey* constitutes a violation of due process." Doc. 323 at 15. The evidence demonstrates Defendants have not fully cured this constitutional violation.

    D.  <u>Defendants are not providing adequate decision notices to class members as mandated by Remedy 11.</u>

The Remedial Order directed Defendants to "[c]onstruct and implement a policy mandating that, when a decision to revoke parole is made—regardless of whether a hearing was conducted—the Notice of Board Action must provide to the parolee a written decision outlining the evidence relied on to determine whether the parolee violated a condition(s) of parole…and reasons for revoking." Doc. 323 at 33 (removing language struck by *Gasca v. Precythe*, 83 F.4th 705, 711 (8th Cir. 2023)). Defendants have not maintained documentation demonstrating they have implemented such a policy.

As an initial matter, very few of the sample parole files even contained written revocation Decision Notices at all. The majority of files (71%) did not contain written revocation decisions;

---

[1] To add insult to injury, in even more cases (eight) people were *not* screened for counsel despite Defendants' policy (effective May 1, 2024) of screening all class members. Defendants' adequacy in conducting the screenings themselves is discussed in Section 1(E), below.

even fewer (72%) did not contain revocation orders. Even when a file contains a written revocation Decision Notice, 70% of the time the notice is noncompliant with due process standards. The Board Decision Notices pictured below are representative of those noncompliant decision notices. These Notices say nothing about the evidence relied upon in determining the parolee violated one or more conditions of their parole, and they say nothing about the reasons the parolee's parole supervision was revoked.



In some instances, parole files with Decision Notices contained a second sheet along with the above Notice of Board Action sheets. This additional paperwork does nothing to remedy the due process deficiencies. These apparent supplemental decision notices do no more than list the reports relied upon by date, and the number and name of the condition of parole allegedly violated. Two examples are depicted below:

 

These forms, whether viewed individually or together, fail to satisfy *Morrissey*'s minimum due process standard requiring "a written statement by the factfinders as to the evidence relied on and reasons for revoking parole." 408 U.S. at 488.

E. Defendants are not yet fully compliant with *Gagnon* or Remedies 14, 16, and 18 of the Remedial Order.

Multiple issues remain with Defendants' practice of screening class members for counsel, warranting further oversight by this Court. According to Defendants, effective May 1, 2024, they

9

screen all class members for counsel. Yet Defendants conduct the screening improperly, in some instances outright deny counsel to eligible parolees, and unnecessarily confuse the process. For example, multiple people (11) were screened as eligible for counsel, but also received a form notifying them that they did *not* qualify for counsel. This raises questions about the accuracy of Defendants' recordkeeping overall, as well as whether they are providing counsel to all eligible parolees, as required by *Gagnon* and this Court's Remedial Order.

> i. *Defendants do not properly screen class members for counsel in violation of* Gagnon *and Remedies 14 and 16.*

Many screening instruments were completed improperly, incompletely, or inconsistently. For example, some screening forms reflect insufficient consideration of mitigating circumstances. In the case of one person screened for counsel on or about September 12, 2024, the interviewing officer noted that the individual was "diagnosed w/ ADD, ODD, PTSD," a learning disability and a behavioral disability, and "should be on medication but can't afford it." *See* Sample Screening Instrument, attached hereto as **Exhibit 3**, at 1. The interviewing officer also listed mitigating circumstances in the "Factor Four" section, including financial reasons and attempts to contact their parole officer. Exh. 3 at 2. The interviewing officer did not check whether substantial mitigating circumstances were found, and at the same time concluded the mitigating circumstances did not qualify this class member for counsel. Exh. 3 at 3. Yet the circumstances noted in the body of the form itself strongly suggest that this individual presumptively qualified for state-funded counsel under *Gagnon*, 411 U.S. at 790-91.

In other instances, parole staff failed to complete the screening instrument. *See* Sample Screening Instrument, attached hereto as **Exhibit 4**. The screening instrument marked as Exhibit 4 is missing the client name and DOC identification number, the parole staff name and contact

information, and neither sections "Factor One" nor "Factor Four" were completed. *Id*. Overall, the screening instruments were filled out inconsistently.

> ii. *In at least one case, Defendants have proceeded with revoking and reincarcerating a class member despite the fact that they qualified for counsel and counsel was not present at their preliminary hearing, in violation of Remedy 18.*

Perhaps most troubling is the instance where Defendants proceeded with a preliminary revocation hearing without counsel present, despite the class member qualifying for counsel. This person was screened on or about June 11, 2024. *See* Sample Screening Instrument, attached hereto as **Exhibit 5**. The screening instrument indicates that the person has problems understanding the English language because they have a "significant learning and comprehension disability." Exh. 5 at 1. The parole officer concludes that, based on these development and cognitive disabilities, the individual is not competent to proceed. *Id*. at 2. Nonetheless, the instrument does not indicate that an application for MSPD services or any other records were sent to the public defender's office. *Id*. at 3. This person remains incarcerated in MoDOC as of the filing of this status report.

A Field Violation Report in this person's parole file confirms that the class member was found eligible and determined to qualify for a public defender, that her assigned attorney was notified of the preliminary hearing date but did not attend, and that the hearing proceeded regardless of counsel's absence, and despite parole staff's stated "concerns with [their] cognition." This blatant denial of the right to counsel directly contravenes the Remedial Order, which requires Defendants to "[r]efrain from proceeding with revocation hearings and reincarcerating parolees who are not represented by state-funded counsel when minimum due process so requires." Doc. 323 at 53 (Remedy 18). And it rebuts Defendants' claim that they are in compliance with Remedy 18. *See* Doc. 384 at 15.

## 2. MSPD's Parole Revocation Defense Team has identified additional evidence disclosure issues.

Defendants are not consistently disclosing evidence relied upon in the revocation process, in contravention of *Morrissey*, *Belk*, and the Remedial Order. *See Morrissey*, at 408 U.S. at 489; *Belk v. Purkett*, 15 F.3d 803, 806 (8th Cir. 1994). Earlier this year, Defendants reported to this Court: "The evidence to be used against parolees is provided to counsel (if the parolee is represented) or to the parolee at least five days (but generally seven days) before the revocation hearing occurs." Doc. 384 at 8. This is inconsistent with what MSPD and class members report.

Of the 96 files reviewed, only five contained records request forms, despite the fact that Defendants' training materials instruct parole officers to offer this to every class member. This suggests that in 95% of cases, Defendants are not disclosing evidence relied upon in reaching a revocation decision. This is corroborated by public defenders involved in the process (for at least some class members).[2]

According to MSPD, Defendants routinely fail to disclose video evidence, police reports, and lab results (unless the tests were run by probation & parole), which impact a parolee's due process rights throughout the parole revocation process and is a clear violation of this Court's Remedial Order. *See* Affidavit of Amy Davis, attached hereto as **Exhibit 2** ("Davis Aff.") at ¶ 4. For example, MSPD only receives unreliable field tests as opposed to full lab results when an individual is involved in a potential revocation for possession, distribution, and/or use, even though a lab test is necessary to ensure the parole revocation process meets minimum due process requirements. *See* Davis Aff. at ¶7. Most troubling, MSPD reports that video evidence is rarely produced, even when Field Violation Reports, which the Parole Board relies upon for their

---

[2] This also is further corroborated by the survey, which confirmed that in instances where people have revocation hearings, over half did not receive evidence of the alleged violations at least 5 days before their revocation hearing. West Aff. at ¶ 5(d).

decision, summarize the videos. *See* Davis Aff. at ¶¶ 5-6. MSPD further reports that the Parole Board never calls lay witnesses, choosing to rely on the testimony of the police office alone, even though a parolee's due process rights at the revocation stage are reliant on being able to confront and cross-examine adverse witnesses. Davis Aff. at ¶ 8; *see Morrissey*, 408 U.S. at 489 ("minimum requirements of due process…include… the right to confront and cross-examine adverse witnesses (unless the hearing officer specifically finds good cause for not allowing confrontation)").

MSPD explains that these evidentiary issues in the parole process are so pervasive and serious that MSPD has filed writs of habeas corpus, citing to this Court's findings in this case, on behalf of their clients because they are not receiving minimum due process protections as outlined by this Court. Davis Aff. at ¶ 10.

Overall, it is clear that Defendants are not complying with minimum due process standards with respect to the disclosure of evidence. This issue warrants further Court supervision to ensure Defendants are disclosing evidence of alleged violations in every case—including video evidence and toxicology or lab results.

### 3. **There remain issues with timeliness and pressure to waive hearings.**

This Court previously found Defendants had a practice of pressuring class members to waive their preliminary or revocation hearings. Unfortunately, despite training on this issue, this practice persists. The majority of survey respondents who signed a form waiving their preliminary hearing (78%) or revocation hearing (67%) reported being pressured to do so, either by being told the process would move faster if they waived or that the result was likely already determined, so a hearing wouldn't make a difference. West Aff. at ¶ 5(b).

Evidence of the very low rate of hearings suggests this practice persists more broadly. Of the 2,396 class members screened for counsel between January 1, 2024 and July 26, 2024, 91% reportedly waived their preliminary hearings. At the June 2020 evidentiary hearing in this case,

Plaintiffs' expert David Muhammad testified, among other things, regarding the "shocking[ly]" low number of hearings being conducted each year. *See* Transcript of Evidentiary Hearing at 91:22-23 (Muhammad summarizing the key constitutional deficiencies with Missouri's parole revocation system and concluding that the "biggest issue is the extremely small number of cases being heard," "that there's so few hearings."); 60:1-15 (Muhammad testifying that the 2.4% and 2.2% rates of preliminary hearings and revocation hearings, respectively, is "damning data show[ing] that this [ ] basic right of having a hearing is happening very, very seldomly…Quite honestly, I was shocked."). Very little has changed.

Even when preliminary hearings are conducted, they often are not conducted close in time or place to the violation, in contravention of *Morrissey*, at 485 (due process requires a preliminary hearing "be conducted at or reasonably near the place of the alleged parole violation or arrest and as promptly as convenient after arrest while information is fresh and sources are available"). Davis Aff. at ¶ 11. The Remedial Order suggested that, to avoid prolonged litigation, Defendants ensure they comply with their policy of interviewing parolees within 5-10 business days of their arrest. *See* Doc. 323 at 18-19. Defendants are not consistently meeting these deadlines. According to the sample parole file review, nearly one-third of individuals are not being interviewed within 10 days of their arrest; 63% of survey respondents reported not meeting with a parole officer within 5 days of their arrest. Defendants' conduct should continue to be monitored to ensure they are not pressuring parolees to waive hearings, and that they are offering and conducting preliminary hearings close in time to the arrest.

### 4. <u>Conclusion</u>

A federal court has broad equitable remedial powers. *Swann v. Charlotte–Mecklenburg Bd. of Educ.*, 402 U.S. 1, 15 (1971). While federal courts are cautioned not to overreach into the administration of state prisons, federalism does not automatically trump the power of this Court to

enforce the Constitution and its orders. *See Stone v. City & Cnty. of San Francisco*, 968 F.2d 850, 861 (9th Cir. 1992), *as amended on denial of reh'g* (Aug. 25, 1992) (citing *Spallone v. U.S.*, 493 U.S. 265, 280 (1990)); *see also Hutto v. Finney*, 437 U.S. 678, 688 n9 (1978) (when state and local authorities fail to rectify a wrong, federal court may invoke its broad equity powers to remedy the situation).

This Court entered a Remedial Order in November 2020, addressing long-standing, systemic due process deficiencies within Defendants' parole revocation system. That Order was largely upheld by the Eighth Circuit Court of Appeals. Defendants have had years to bring their revocation policies and practices into compliance with the Remedial Order. Since that time, thousands of people have been reincarcerated, had their lives turned upside down, and have been subjected to a constitutional inadequate process run by the Defendants. Although they have made progress in complying with this Court's Remedial Order, Defendants are not yet in substantial compliance. They continually fail to provide the most basic due process rights to class members— even in the few instances where counsel is involved. For these reasons, it is just and appropriate for this Court to further retain jurisdiction until such time as Defendants have demonstrated compliance with the Remedial Order, and to grant Plaintiffs' counsel leave to seek attorneys' fees and expenses incurred in monitoring Defendants' compliance with the Remedial Order.

WHEREFORE, for the foregoing reasons, Plaintiffs respectfully request this Court enter an Order:

(i)     Retaining jurisdiction for at least six months, or up until Defendants provide sufficient documentation demonstrating full compliance with the Remedial Order;

(ii)    Ordering Defendants to submit to the Court and to Plaintiffs' counsel sufficient documentation demonstrating full compliance with the Remedial Order, on a monthly basis;

(iii)   Granting Plaintiffs' counsel leave to supplement or amend their motion for attorneys' fees and costs to recover expenses incurred in monitoring this Court's judgment; and

(iv)    Granting such other relief as is just and appropriate under the circumstances.

Dated: December 20, 2024                    Respectfully submitted,

                                            By: /s/ Amy E. Breihan
                                            Amy E. Breihan, #65499
                                            Megan G. Crane, #71624
                                            Susannah Porter Lake, #68758
                                            Roderick & Solange MacArthur Justice Center
                                            3115 South Grand Boulevard, Suite 300
                                            St. Louis, MO 63118
                                            Phone: (314) 254-8540
                                            Fax: (314) 254-8547
                                            amy.breihan@macarthurjustice.org
                                            megan.crane@macarthurjustice.org
                                            susie.lake@macarthurjustice.org

                                            *Counsel for Plaintiffs*